IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

ERIC LYLE WILLIAMS,                        §
                                           §
              Petitioner,                  §
                                           §
v.                                         §
                                           §     No. 3:20-CV-3030-N
BOBBY LUMPKIN, Director, Texas             §
Department of Criminal Justice,            §
Correctional Institutions Division,        §
                                           §
              Respondent.                  §

MEMORANDUM OPINION AND ORDER DENYING WITHOUT PREJUDICE MOTION
FOR INVESTIGATIVE FUNDING

The matters before the Court are (1) Williams' motion for travel authorization to allow his Arizona co-counsel to travel to Texas to meet face to face with Williams and various others, filed May 6, 2021 (ECF no. 41), and (2) Williams' motion filed May 6, 2021 (ECF no. 28) requesting $25,000 in investigative funding plus an additional $2,500 in travel expenses for two investigators (mitigation specialists) to conduct an investigation of two hundred hours duration into the existence of new or additional potentially mitigating evidence.   For the reasons discussed below, Williams' motion for investigative funding again will be denied without prejudice.   His request for travel authorization for his Arizona co-counsel will also be denied without prejudice.

Background

In December 2014, a Kaufman County jury convicted Williams of capital murder in connection with the fatal shootings of the Kaufman County District Attorney and his wife.   The Texas Court of Criminal Appeals' opinion affirming Williams' conviction recites that he began working as part of the legal community in Kaufman County, Texas in the early 1990's when he was hired as a trial court coordinator.   Williams also worked and volunteered in law enforcement and served in the Texas State Guard.   He obtained a law degree and began practicing law in

Kaufman County.   He was elected to the position of Justice of the Peace and took office in January 2011.   In June 2011 Williams was charged with a felony offense.   Kaufman County District Attorney Michael McLelland and Assistant District Attorney Mark Hasse represented the State in Williams' prosecution.   A jury convicted Williams of the offenses of burglary and theft. He subsequently lost his law practice, his elected office, and his Texas State Guard post.   On a morning in January 2013, Assistant District Attorney Hasse was fatally shot while walking on a public sidewalk to his office.   On March 30, 2013, District Attorney McLelland and his wife were both fatally shot multiple times inside their residence.

At the punishment phase of Williams' trial, the jury heard evidence establishing that, in addition to the murders of the McLellands, Williams fatally shot Assistant District Attorney Hasse after researching Hasse online and purchasing a vehicle Williams used to drive to and from the crime scene, the same modus operandi Williams later employed in the McLelland murders.   In addition, Williams' wife Kim testified that after his burglary and theft convictions, Williams grew angrier and angrier and made detailed plans to murder both of the prosecutors who had handled his felony prosecution.   Williams also told Kim that he planned to murder McLelland's wife because she would be a witness.   After killing Hasse, Williams was described as "happy" and "joyous" and ready to kill his remaining victims.   Following the murders. Williams enjoyed media attention, mocked the murder investigations, talked about killing the investigators, and submitted false Crime Stoppers tips.   The jury also heard testimony that Williams displayed no remorse for his crimes and planned to kill two state judicial officers.   After the jury answered the Texas capital sentencing special issues in a manner favorable to the prosecution, the trial court imposed a sentence of death.

The Texas Court of Criminal Appeals affirmed Williams' conviction and sentence, expressly finding the largely circumstantial evidence of Williams' guilt introduced at the guilt-innocence phase of trial legally sufficient to support the jury's verdict and that the evidence fully supported the jury's affirmative answer to the Texas capital sentencing scheme's future dangerousness special issue. *Williams v. State*, AP-77,053, 2017 WL 4946865, *1-*7 (Tex. Crim. App. Nov. 1, 2017), *cert. denied*, 138 S. Ct. 1989 (May 14, 2018).

The Texas Court of Criminal Appeals subsequently denied Williams' application for state habeas corpus relief, which included a claim that Williams' trial counsel rendered ineffective assistance in connection with the punishment phase of trial by failing to adequately investigate Williams' background and present available mitigating evidence. *Ex parte Eric Lyle Williams*, WR-85,942-01, 2020 WL 5540714, *2 (Tex. Crim. App. Sept. 16, 2020).

<u>Requests for Investigative Funding Generally</u>

Title 18 U.S.C. § 3599(f), in conjunction with § 3599(g)(2), authorizes this Court, with very specified statutory limitations, to authorize counsel appointed in a capital habeas corpus proceeding to retain the services of investigators if such services are "reasonably necessary." The determination of what is reasonably necessary requires a court to consider (1) the potential merit of the claims to be investigated; (2) the likelihood that the services sought will generate useful and admissible evidence; and (3) the prospect the petitioner will be able to overcome any procedural hurdles standing in the way of a merits determination. *Ayestas v. Davis*, 933 F.3d 384, 388-89 (5th Cir. 2019). Requests for funding must relate to a potentially viable federal habeas claim. *Nelson v. Davis*, 953 F.3d 651, 666-76 (4th Cir. 2020).

As explained previously, a federal habeas corpus proceeding is not a forum for retrying every aspect of a state criminal proceeding. The criminal trial is the main event where a

defendant's rights are to be determined and not simply a tryout on the road to appellate (or habeas) review.   *Davila v. Davis*, 137 S. Ct. 2058, 2066 (2017).   A federal habeas corpus proceeding is likewise not a "do over" (using new evidence and new counsel) for claims fully litigated in the state courts, particularly for claims resolved on the merits after full evidentiary development in the petitioner's prior state habeas corpus proceeding.

Under AEDPA, the proper place for development of the facts supporting a federal habeas claim is the state court.   *See Harrington v. Richter*, 562 U. S. 86, 103 (2011) ("Section 2254(d) thus complements the exhaustion requirement and the doctrine of procedural bar to ensure that state proceedings are the central process, not just a preliminary step for a later federal habeas proceeding."); *see also Hernandez v. Johnson*, 108 F.3d 554, 558 n.4 (5th Cir. 1997) (holding AEDPA clearly places the burden on a federal habeas petitioner to raise and litigate as fully as possible his federal claims in state court).   Furthermore, where a petitioner's claims have been rejected on the merits in state court, further factual development in federal court is effectively precluded by virtue of the Supreme Court's holding in *Cullen v. Pinholster*, 563 U. S. 170, 181-82 (2011):

> We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.   Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law.   This backward-looking language requires an examination of the state-court decision at the time it was made.   It follows that the record under review is limited to the record in existence at that same time *i.e.,* the record before the state court.

Thus, a petitioner is not entitled to a federal evidentiary hearing on any of his claims which were rejected on the merits by the state courts, either on direct appeal or during his state habeas corpus proceeding.   *See Halprin v. Davis*, 911 F.3d 247, 255 (5th Cir. 2018) ("If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation

4

of § 2254(d)(1) on the record that was before that state court." (quoting *Cullen*, 563 U.S. at 185)),
*cert. denied*, 140 S. Ct. 167 (2019).

Williams' Fifth Motion for Investigative Funding

This court has previously denied one prior motion for investigative funding and twice
denied Williams' leave to proceed ex parte with sealed motions for investigative funding.   The
denial of Williams' initial investigative funding motion was based upon his failures to specify the
amount of funding he was requesting and to identify with any reasonable degree of specificity the
new or additional mitigating evidence he wished to seek.   See ECF no. 26.   This court's denials
of Williams' requests for leave to proceed *ex parte* on two of his sealed motions seeking
investigative funding were based on the failure of Williams to include any information in either of
those two proposed motions that was protected by the attorney client privilege, the work product
doctrine, or any other source of confidentiality recognized by state or federal law.   *See* ECF nos.
30 & 37.   This court did, however, grant Williams substantial funding (well in excess of the
statutory cap contained in 18 U.S.C. § 3599(g)(2)) to obtain expert assistance to examine
voluminous electronically stored data furnished to his trial counsel, a matter that was the subject
of extensive telephonic negotiations and consultations with all parties.   *See* ECF no. 40.

In his latest motion he again requests investigative funding to hire a pair of mitigation
specialists whom Williams identifies as having backgrounds in social work, trauma counseling,
and work as a paralegal.   Williams offers only vague and non-specific descriptions of the
purportedly unexhausted federal habeas claim which he believes these two mitigation specialists
will be able to help his federal habeas counsel develop, arguing that it will be (1) a "fundamentally
altered" claim from the *Wiggins* claim his state habeas counsel asserted; (2) based on new material
evidence that does more than supplement the existing record; (3) supported by crucial new factual

5

allegations; and (4) place his former *Wiggins* claim in a significantly different legal posture.   ECF no. 42, at 11-12.   Put more succinctly by Williams: "If the new evidence this investigation yields is sufficiently different from what the state habeas counsel presented so as to fundamentally alter the claim, as Mr. Williams believes it will be based on a detailed review of the file, the IATC-mitigation claim now contemplated is a new, distinct claim that has not [been] adjudicated on the merits in state court, and is not subject to § 2254(d), and thus [is] also not subject to *Pinholster*."   ECF no. 42, at 12.

As explained above, Williams fully litigated a claim in his state habeas corpus proceeding in which he argued that his trial counsel failed to adequately investigate Williams' background and present available mitigating evidence.   The Texas Court of Criminal Appeals rejected Williams' *Wiggins* claim on the merits, concluding that it failed to satisfy either prong of the standard set forth in *Strickland v. Washington*.   *Ex parte Williams*, 2020 WL 5540714, *2.

The constitutional standard for determining whether a criminal defendant's Sixth Amendment right to the effective assistance of counsel is set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668, 687 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.   First, the defendant must show that counsel's performance was deficient.   This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.   Second, the defendant must show that the deficient performance prejudiced the defense.   This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

To satisfy the first prong of *Strickland*, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Williams v. Taylor*, 529 U.S. 362, 390-91 (2000).   In so doing, a convicted defendant has the burden of proof and must overcome a strong presumption that the conduct of his

trial counsel "falls within [a] wide range of reasonable professional assistance."   *Strickland*, 466 U.S. at 689.   "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant."   *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009) (quoting *Strickland*, 466 U.S. at 688-89).   Under the well-settled *Strickland* standard, the Supreme Court recognizes a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.   *See Wiggins*, 539 U.S. at 523; *Bell v. Cone*, 535 U.S. 685, 698 (2002); *Strickland*, 466 U.S. at 690.

To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different.   *Wiggins*, 539 U.S. at 534; *Strickland*, 466 U.S. at 694.   A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding.   *Strickland*, 466 U.S. at 694.

Complaints about a trial counsel's failure to investigate the defendant's background and to present available mitigating evidence are not new.   In the context of penalty phase mitigation in capital cases, the Supreme Court has held that it is unreasonable not to investigate further when counsel has information available to him that suggests additional mitigating evidence - such as mental illness or a history of childhood abuse - may be available.   *See, e.g., Porter v. McCollum*, 558 U.S. 30, 39-40 (2009) (trial counsel failed to interview any witnesses or to request any of the defendant's school, medical, or military records and ignored information in a report on the defendant's competency evaluation suggesting possible mitigating evidence - including evidence of mental illness - could be gleaned from investigation into the defendant's family background and military service); *Wiggins v. Smith*, 539, U.S. 510, 524-26 (2003) (counsel failed to investigate the

7

defendant's background beyond review of summary records from competency evaluation, presentence report, and records from the state foster care system, failed to compile a social history of the defendant, and presented no mitigating evidence concerning the defendant's background); *Williams v. Taylor*, 529 U.S. 362, 395-96 (2000) (counsel failed to conduct even a cursory investigation into the defendant's background which would have shown the defendant's parents had been imprisoned for the criminal neglect of the defendant and his siblings, the defendant had been severely beaten by his father, and had been returned to his parents' custody after they were released from prison).   Such claims are commonly referred to as *Wiggins* claims.

With regard to the prejudice prong of *Strickland*, the Supreme Court held the petitioners in *Wiggins*, *Porter*, and *Williams* were prejudiced by the failure of their trial counsel to fully investigate, develop and present available mitigating evidence.   More specifically, the Supreme Court found in *Wiggins* that his trial counsel failed to discover, develop, and present available mitigating evidence showing:

> Wiggins experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother.   He suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care.   The time Wiggins spent homeless, along with his diminished mental capacities, further augment his mitigation case.   Petitioner thus has the kind of troubled history we have declared relevant to assessing a defendant's moral culpability.

*Wiggins,* 539 U.S. at 253.

In *Porter*, the new mitigating evidence undiscovered and undeveloped by trial counsel included lay and expert testimony showing (1) Porter routinely witnessed his father beat his mother, one time so severely that she had to go to the hospital and lost a child, (2) Porter's father was violent every weekend and Porter was his father's favorite target, particularly when Porter tried to protect his mother, (3) on one occasion, Porter's father shot at him for coming home late

but missed and beat Porter instead, (4) Porter attended classes for slow learners until he left school at age 12 or 13, (5) to escape his horrible family life, Porter enlisted in the Army at age 17 and fought in the Korean War, (6) Porter suffered a gunshot wound to the leg yet fought heroically through two battles, (7) after the war, Porter suffered dreadful nightmares and would attempt to climb his bedroom walls at night with knives, (8) Porter developed a serious drinking problem and began drinking so heavily that he would get into fights and not remember them at all, (9) Porter suffered from brain damage that could manifest in impulsive, violent behavior, (10) at the time of the capital offense, Porter was substantially impaired in his ability to conform his conduct to the law and suffered from an extreme mental or emotional disturbance, and (11) Porter had substantial difficulties with reading, writing, and memory.  *Porter*, 558 U.S. at 449-51.

Prejudice was established in *Williams* through testimony showing trial counsel failed to discover and develop available mitigating evidence showing (1) Williams experienced a nightmarish childhood, (2) Williams' parents had been imprisoned for criminal neglect of Williams and his siblings, (3) Williams had been severely beaten by his father, committed to the custody of the social services bureau for two years during his parents' incarceration, and then returned to his parents after they were released from prison, (4) Williams was borderline mentally retarded and did not advance beyond the sixth grade in school, (5) Williams received commendations for helping to crack a prison drug ring and for returning a guard's missing wallet, (6) Williams was among the inmates least likely to act in a violent, dangerous or provocative way, (7) Williams seemed to thrive in a more regimented and structured environment, and (8) Williams earned a carpentry degree while in prison.  *Williams,* 529 U.S. at 395-96.

Establishing deficient performance under *Strickland* requires more, however, than a mere showing that a criminal defendant's trial counsel could have done more investigation or presented additional mitigating evidence.   *See Thomas v. Lumpkin*, ___ F.3d ___, ___, 2021 WL 1593162, *15 (5th Cir. Apr. 23, 2021) ("Our concern is not whether counsel at trial could have done more. This is often, almost always, the case.").   Rather the evaluation of trial counsel's performance turns on the objective reasonableness of the scope of said counsel's investigation, which in turn depends to a great extent upon the information furnished to trial counsel by the defendant himself, information furnished by those family members and other individuals who knew the defendant and whom the defendant's defense team interviewed, and the information contained in the defendant's school, medical, employment, and institutional records obtained by the defense team prior to trial. *See Burger v. Kemp*, 483 U.S. 776, 795 (1987) ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.   Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant.   In particular, what investigation decisions are reasonable depends critically on such information." (quoting *Strickland*, 466 U.S. at 691)).

Williams' motions for funding of mitigation specialists have not alleged any specific facts showing that he ever communicated any information to his defense team prior to his capital murder trial suggesting that further investigation into either (1) his background or family history, (2) his educational history, employment history, or professional history, or (3) his medical/mental health would disclose mitigating evidence showing he was the victim of an abusive or neglected childhood, that he was the victim of physical, emotional, or sexual abuse as a child, or that he suffered any identifiable medical or mental health condition that impacted his mental status or behavior at the time of his capital offense.   Nor does Williams allege any specific facts showing

10

that the medical, educational, employment, or other institutional records reasonably available at the time of his trial contained similar evidence.   The court also notes that Williams was convicted of a pair of murders that involved considerable planning and premeditation.

There is no allegation currently before this court establishing that Williams was suffering from any significant medical or mental health condition at the time of his capital offense.   Instead, Williams' federal habeas counsel simply list a number of factors or medical conditions (i.e., diabetes, the effects of unidentified prescriptions medications and unspecified other substances, chronic headaches, sleep apnea, and depression), without explaining when Williams experienced those conditions or how they might have impacted his mental state or behavior at the time of his capital offense.   ECF no. 42, at 16.   More significantly, Williams fails to allege any specific facts showing that his defense team was unaware that Williams suffered from any of these conditions at the time of his offense or how his defense team failed to investigate his medical/mental health history.   On the contrary, Williams admits that his defense team consulted with not less than three mental health experts, one of whom evaluated Williams prior to trial.   While Williams alleges that his trial counsel failed to furnish these experts with sufficient information about Williams' background prior to trial, he does not allege with any reasonable degree of specificity precisely what additional information then in the possession of his trial counsel should have been disclosed by the defense team to these experts.

A second fundamental problem with Williams' requests for investigative funding to develop new or additional mitigating evidence is that Williams has consistently failed to allege any specific facts showing either (1) what information about Williams' background was in the possession of his trial counsel (as a result of information furnished by Williams, his family members, or other sources then available); (2) what, if any, additional avenues of information

11

about Williams' background went unexplored by Williams' defense team (including the names or at least reasonably specific identifying information of individuals possessing personal knowledge of Williams' background); (3) what information was contained in the medical, educational, employment, and other institutional records – in Williams' case his school, college, law school, employment, Texas State Guard, State Bar of Texas, and Kaufman County records – available at the time of Williams' trial that might have clued his trial counsel into the need for further investigation into identifiable areas that might furnish potentially mitigating evidence; (4) any other information was reasonably available to Williams' trial defense team that suggested particular leads that could have led to the discovery of potentially mitigating evidence.

This court appointed counsel for Williams initially in October 2020 (ECF nos. 6 & 7).. The court appointed new lead counsel and a third attorney to represent Williams in December 2020 (ECF nos. 15 & 17).   By this juncture in this proceeding, Williams' federal habeas counsel have had ample opportunity to (1) consult with their client and his family (even despite the restrictions imposed by the current COVID pandemic); (2) interview and review the files of Williams' state trial counsel, mitigation specialists, and expert witnesses; (3) interview and review the files of Williams' state appellate counsel; (4) interview and review the files of Williams' state habeas counsel; and (5) review the record from Williams' trial, direct appeal, and state habeas corpus proceedings, including any testimony given during the latter proceeding by Williams' trial counsel addressing the scope of Williams' defense team's investigation for potentially mitigating evidence. Williams' federal habeas counsel have also had ample time to obtain and review (1) any relevant medical or mental health records in the custody of any physician, psychologist, or other health care provider relating to Williams; (2) Williams' Texas Department of Criminal Justice administrative and medical records, including his routine mental health evaluations; and (3) any of Williams'

12

educational records, Williams' employment records, or records relating to Williams maintained by the State Bar of Texas, the Texas State Guard, or Kaufman County.  Williams' motions for investigative funding are virtually bereft of any specific facts showing what any of the foregoing records contain in terms of identifying specific targets for investigation of mitigating evidence that allegedly went unexplored by his defense team prior to trial.

By this point in time, Williams' federal habeas counsel should, therefore, be able without much difficulty to inform this court of (1) the names of any and all individuals identified by Williams or his family in their pretrial communications with Williams' trial counsel and defense team as possessing potentially mitigating information; (2) the names of any and all medical or mental health professionals who ever examined, treated, or diagnosed Williams; (3) the names of any and all medical or mental health facilities where Williams was ever examined, treated, or diagnosed for any condition; (4) the contents of any educational, employment, medical, or other institutional records available at the time of Williams' trial which suggested that further investigation into particular areas in the search for mitigating evidence may have proven advantageous; and (5) the names of any of the foregoing individuals, health care providers, or health care facilities whom Williams now alleges his trial counsel and defense team failed to contact or from whom his defense team failed to obtain available records relating to Williams. Instead of furnishing this court with these types of specific information (some of which would likely have qualified for inclusion in an ex parte motion because of its potentially confidential nature), Williams continues to argue that if this court writes him a check for $27,500, his mitigation specialists will fan out across the State, look into unspecified areas, seek unidentified documents, interview unidentified witnesses, and ultimately, possibly, find new or additional mitigating evidence that was not presented at his trial.

Another problem with Williams' request for investigative funding is that it ignores the possibility that this trial counsel may have been fully aware of the omitted mitigating evidence and made a strategic decision not to present that evidence at trial because it could have proven problematic in terms of helping them obtain favorable answers to the Texas capital sentencing special issues. Thus far, Williams has failed to furnish this court with any specific facts showing whom his trial counsel actually interviewed, what information those individuals furnished regarding Williams' background, and whether Williams' defense team learned any identifiable information during their investigation for mitigating evidence that suggested avenues for finding mitigating evidence that went unexplored. Nor has Williams addressed the substance of the testimony, if any, offered by his trial counsel and defense team during Williams' state habeas corpus proceeding regarding the reasoning of his defense team for the scope of the mitigation investigation actually undertaken by said counsel. Instead, Williams' motions for investigative funding make broad ranging attacks upon the manner in which his trial defense team conducted its investigation for mitigating evidence without explaining either what information his defense team did, in fact, obtain, or whether there was any specific information revealed during that investigation that pointed to areas of additional investigation that could reasonably have been expected to produce new or additional mitigating evidence.

For example, in his proposed, sealed, ex parte, motions for investigative funding Williams argued, as he does in his latest motion for investigative funding, that his defense team should have presented evidence addressing Williams' life history after he graduated from high school. The problems with this argument include the fact that Williams does not allege with any reasonable degree of specificity exactly what information, if any, his trial defense team actually obtained about Williams' post-high school life history. Instead, Williams again focuses on the actual

14

mitigation case presented by his trial counsel and not on the scope of his defense team's *investigation* for mitigating evidence.   Williams does not allege that he or his family identified for his defense team any individuals or groups of individuals who had personal knowledge of any information about Williams' post-high school life history that might have helped Williams' defense counsel obtain favorable answers to the Texas capital sentencing special issues.   For all this court knows at this juncture, Williams' defense team may have interviewed dozens of people who knew Williams during his college, law school, or early employment years, during Williams' years practicing law, or during his rise to elected Kaufman County judicial office.   It is possible that few, if any, of those witnesses had any testimony to offer that Williams' defense counsel reasonably believed would prove beneficial at the punishment phase of a capital murder trial.

Complaints of uncalled witnesses are not favored in federal habeas corpus review because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative.   *Charles v. Stephens*, 736 F.3d 380, 390-91(5th Cir. 2013); *Woodfox v. Cain*, 609 F.3d 744, 808 (5th Cir. 2010); *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009).   To prevail on such claims, a petitioner must name the witness, demonstrate the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense. *Day*, 736 F.3d at 538 (citing *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985)).

In his *ex parte* proposed motions for investigative funding, Williams identifies one incident that apparently took place after he obtained his law license and argues his trial counsel failed to adequately investigate that incident.   But the descriptions of that incident contained in Williams' proposed motions make clear that (1) Williams himself possessed personal knowledge of all

relevant facts concerning that incident (he does not explain why he failed to make that incident known to his defense team or even whether he did so) and (2) the incident as described in Williams' proposed motions would have been double-edged, at best, in that it would have increased the likelihood of an affirmative answer to the future dangerousness special issue.   Failure to present evidence that is double-edged in nature generally lies within the discretion of trial counsel.   *See Ayestes v. Davis*, 933 F.3d 384, 392 (5th Cir. 2019) ("this Court has repeatedly denied claims of ineffective assistance of counsel for failure to present 'double edged' evidence where counsel has made an informed decision not to present it." (quoting *Hopkins v. Cockrell* 325 F.3d 579, 586 (5th Cir. 2003)), *cert. denied*, 140 S. Ct. 1107 (2020); *Smith v. Davis*, 927 F.3d 313, 337 (5th Cir. 2019) (defense counsel acted reasonably in choosing not to present mental health evidence because doing so could have opened the door to evidence showing the defendant displayed antisocial personality disorder and had confessed to feigning mental illness while incarcerated), *cert. denied*, 140 S. Ct. 1299 (2020).

As explained above, by this juncture, Williams' federal habeas counsel should be aware of what information their client passed on to his trial counsel and defense team, as well as the exact parameters of the investigation for mitigating evidence actually conducted by Williams' defense team.   If his defense team's interviews with Williams and his family or his defense team's review of Williams' educational, employment, medical, or other records reasonably pointed Williams' defense team in the direction of possible sources of mitigating evidence (such as by identifying potential witnesses possessing personal knowledge of mitigating evidence or potential records possibly containing mitigating evidence) and Williams' defense team failed to pursue those leads, that information would go a long way toward justifying the expenditure of scarce federal tax dollars to subsidize a new mitigation investigation at this juncture.   Thus far, however, Williams

has failed to offer this court any such fact-specific allegations.  Williams does not allege any specific facts showing that his trial counsel or any member of his defense team have failed to cooperate with Williams' federal habeas counsel or withheld any documents or other information from Williams' federal habeas counsel.

Likewise, Williams offers this court no specific facts showing the exact scope of the investigation for new or additional mitigating evidence undertaken by his state habeas counsel in support of Williams' *Wiggins* claim.  Once again, Williams focuses on the case in mitigation presented by his state habeas counsel at Williams' evidentiary hearing rather than on the reasonableness of the investigation his state habeas counsel conducted and the results of that investigation.  Williams does not allege that his state habeas counsel has failed to cooperate with his federal habeas counsel or failed to furnish any information when requested to do so.

Typically when a capital habeas litigant requests investigative funding from this court under § 3599, the petitioner will offer at least some rational explanation as to (1) exactly what types of information the petitioner believes might be discovered through the investigation for which he is requesting funding and (2) where or how the petitioner intends to look for it, i.e., why he reasonably believes beneficial information is currently available and can be reasonably obtained through interviews of living witnesses or examination of currently available records.  With the exception of his request for funding to obtain access to electronically stored data, Williams' motions for investigative funding in this case have not furnished this court with that courtesy. Instead, Williams continues to request funding so that his mitigation specialists can look who knows where for who knows what.

As best this court currently understands it, Williams proposes to have his mitigation specialists examine unspecified medical records.  But he does not explain where his mitigation

17

specialists will be able to obtain any medical records that were available at the time of is trial but not obtained by his defense team.   Nor does he explain why he believes his social worker and paralegal will be able to discern any potentially helpful information from those records.   Williams alleges that his defense team failed to investigate adequately his medical and mental history (because his defense team interviewed "only one family physician").   But in virtually the next breath, Williams also admits that his trial counsel consulted with three mental health experts about Williams' case, including one who evaluated Williams.   This is an obvious factual disconnect that requires explanation.   Williams has not alleged any specific facts showing that any medical practitioners, health care professionals, mental health professionals, or other care givers who possessed personal knowledge of Williams' medical or mental health history went un-interviewed by his defense team.   Likewise, he has failed to identify any health care facility possessing documents or records at the time of Williams' trial relating to Williams' physical or mental health from whom his defense team failed to obtain Williams' records.   Finally, Williams complains that his trial counsel failed to obtain a brain scan for Williams until after trial but then fails to explain what information, if anything, that brain scan revealed.

Williams argues that his defense team failed to present evidence addressing Williams' life history after high school.   But he does not identify any un-interviewed individuals (or groups of individuals with any reasonable degree of specificity) whom he believes might have had personal knowledge of mitigating evidence at the time of his capital murder trial that related to Williams' post-high school life history.   Furthermore, Williams graduated from high school, college, and law school.   He passed the Texas State Bar exam.   He practiced law for a number of years, apparently successfully.   He was elected to public office in Kaufman County.   He has thus far failed to allege any specific facts showing why his trial defense team should have believed that

further investigation into Williams' apparently successful educational years and subsequent professional career was necessary.

Williams does not allege any specific facts showing that any event or incident took place during his adult years that lessened his moral culpability for the murders of the McLellands and Mark Hasse.  Insofar as he complains that his prior convictions for burglary and theft were politically motivated, he fails to allege any facts showing that his 2012 state criminal convictions have ever been reversed, set aside, or vacated by any state appellate court or any federal habeas court.  Furthermore, Williams' trial counsel pursued this very line of defense at the punishment phase of Williams' trial, presenting both evidence and argument suggesting there was a political motive to Williams' previous criminal prosecution.  More significantly, Williams fails to allege with any reasonable degree of specificity exactly what investigation, if any, his trial defense team actually undertook into Williams' adult life history.  If Williams or his family told his defense team information that should have alerted Williams defense team to a need for additional investigation into Williams' adult life, he has thus far failed to disclose that information to this court.

Williams' arguments in support of his requests for investigative funding to explore the possible existence of additional mitigating evidence focus, erroneously in this court's view, on the actual case in mitigation *presented* by his trial counsel.  As explained above, the focus of an ineffective assistance claim of this type proposed by Williams is properly on the objective reasonableness of the *investigation* actually undertaken by Williams' trial counsel.  *Charles v. Stephens*, 736 F.3d 380, 389 (5th Cir. 2013) ("strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." (quoting *Strickland*, 466 U.S. at 690-91)).  In investigating

19

mitigation evidence, trial counsel must either (1) undertake a reasonable investigation or (2) make an informed strategic decision that investigation is unnecessary. *Charles*, 736 F.3d at 389.

To justify a wide-ranging, time-consuming, and expensive investigation into Williams' entire adult life history, this court requires more than conclusory assertions that a new, bigger, bolder, broader (and unexhausted) *Wiggins* claim might be available if his mitigation specialists are allowed to conduct what appears to be a wholesale canvassing of virtually everyone whom Williams met after he graduated from high school. For the reasons discussed above, and in this court's previous Orders denying investigative funding, absent allegations of specific facts identifying deficiencies in the mitigation *investigation* undertaken by Williams' defense team (e.g., mitigation witness not interviewed, documents or records available at the time of trial that were never obtained or reviewed by the defense team, or some other specific omission on the part of the defense team's investigators), such a census is not reasonably necessary in this cause. Williams fully litigated a *Wiggins* claim during his state habeas corpus proceeding as well as numerous other assertions of ineffective assistance by his state trial counsel and state appellate counsel. He must do more to justify expensive investigations for new mitigating evidence than assert in conclusory fashion that his state habeas counsel could have done more.

In conclusion Williams' latest motion seeking $27,500 in professional fees and travel expenses, as has been true for all of Williams' prior requests for investigative funding unrelated to electronic data storage issues, fails to furnish this court with any reasonable degree of specificity with regard to exactly (1) what information he hopes to find, (2) the identities (or even generic descriptions) of the individuals or groups of individuals whom he alleges his trial counsel failed to adequately interview (and who are still available to be interviewed), (3) what documents or records existed at the time of trial that his defense team failed to obtain or review, or (4) the reasons why

his trial counsel should have conducted a more searching investigation than they did into Williams' medical and mental health history, adult life history, and any other aspects of Williams' background with the potential to furnish mitigating evidence, i.e., evidence that could have helped his defense team obtain answers to the Texas capital sentencing special issues favorable to the defense.

As this court has previously explained, Williams' reliance upon the Supreme Court's opinions in *Martinez v. Ryan*, and *Trevino v. Thaler* is unpersuasive. Those opinions recognize a narrow exception to the procedural default doctrine for claims of ineffective assistance by a state trial counsel. As this court explained in *Broadnax v. Davis*, 2019 WL 330 2840, *19 n.27 (N.D. Tex. July 23, 2018), *aff'd Broadnax v. Lumpkin*, 987 F.3d 400 (5th Cir. 2021), *Martinez v. Ryan,* 556 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013), do not allow a petitioner to re-litigate with new evidence a claim that was previously litigated on the merits at the state court level. The Supreme Court's holding in *Martinez v. Ryan* furnishes a narrow avenue for circumventing a procedural default. It requires a showing that the performance of a federal habeas petitioner's state habeas counsel was so deficient as to preclude state court merits review of a meritorious claim of ineffective assistance by trial counsel, thus permitting a federal habeas court to undertake a merits review of the otherwise procedurally defaulted complaint of ineffective assistance by state trial counsel. *See In re Edwards*, 865 F.3d 197, 207-08 (5th Cir.), *cert. denied*, 137 S. Ct. 909 (2017) (To show cause for procedural default under *Martinez* and *Trevino*, "the petitioner must show (1) that his claim of ineffective assistance of counsel at trial is 'substantial' (i.e., 'has some merit'); and (2) that his habeas counsel was ineffective for failing to present those claims in his first state habeas application." (quoting *Beatty v. Stephens*, 759 F.3d 455, 465-66 (5th Cir. 2014)); *Prystash v. Davis*, 854 F.3d 830, 836 (5th Cir. 2017), *cert. denied*, 138 S. Ct. 649

(2018) (holding the Supreme Court's rulings in *Martinez* and *Trevino* created a narrow exception to the general rules of procedural default that applies only to a claim of ineffective assistance by state trial counsel).   Here, Williams has failed to allege with any reasonable degree of specificity the exact parameters of the investigation for new mitigating evidence conducted by his state habeas counsel.   Nor has Williams alleged any specific facts showing the scope of the investigation conducted by his state habeas counsel was objectively unreasonable given the information readily available to his state habeas counsel.

Moreover, the Supreme Court has expressly declined to extend the holdings in *Martinez* and *Trevino* beyond the context of procedurally defaulted complaints of ineffective assistance by state trial counsel.   *See Davila v. Davis*, 137 S. Ct. 2058, 2065-66 (2017) (declining to extend the holdings in *Martinez*  and *Trevino*  to a complaint of ineffective assistance by state appellate counsel and declaring that doing so would constitute an improper overruling of its prior opinion in *Coleman v. Thompson*); *Busby v. Davis*, 892 F.3d 735, 755-56 (5th Cir. 2018) (citing *Davila* and declining to extend the holdings in *Martinez/Thaler* beyond the context of procedurally defaulted claims of ineffective assistance by state trial counsel).   The holdings in *Martinez* and *Trevino* do not furnish a vehicle for obtaining de novo federal habeas review of substantive constitutional claims which a federal habeas corpus petitioner litigated unsuccessfully in a state habeas corpus proceeding but now wishes to re-litigate using new evidence and different counsel.

As explained previously, should Williams submit future investigative funding requests, he may do so under seal only if he can make a showing of the need for confidentiality as required by Section 3599(f).   He was convicted of capital murder in state court in 2014.   His conviction was affirmed on direct appeal in 2017.   The United States Supreme Court denied certiorari review in 2018.   In his state habeas corpus proceeding, Williams asserted a broad-ranging claim of

22

ineffective assistance by his trial counsel, alleging a host of aspects of his trial counsel's performance that allegedly rendered his trial counsels' representation ineffective.   Williams also asserted in his state habeas corpus application an equally multi-faceted claim of ineffective assistance against his state appellate counsel.   Thus, in all reasonable probability, Williams has waived the attorney-client privilege available under both state and federal law with regard to most topics of communication between himself and his state trial counsel and most of his communications between himself and his state appellate counsel.   *See In re Harris*, 491 S.W.3d 332, 335 (Tex. Crim. App. 2016) ("a defendant waives the attorney-client privilege when he argues that his sentence should be overturned because his counsel was constitutionally ineffective." (quoting *In re Medina*, 475 S.W.3d 291, 302 (Tex. Crim. App. 2015)); *Laughner v. United States*, 372 F.2d 326, 327 (5th Cir. 1967) ("where, as here, the client alleges a breach of duty to him by the attorney, we have not the slightest scruple about deciding that he thereby waives the privilege as to all communications relevant to the issue.").

A similar outcome is most likely true for Williams' broad assertions of the attorney work product doctrine vis-a-vis the work product of his trial counsel and defense investigators and experts.   The work product doctrine first recognized by the Supreme Court in *Hickman v. Taylor*, 329 U.S. 495, 511 (1947), creates a *qualified* privilege against the compelled disclosure of written statements, private memoranda, and personal recollections prepared by or formed by an adverse party's counsel in the course of his legal duties.   *Upjohn Co. v. United States*, 449 U.S. 383, 397-98 (1981).   The work-product doctrine was subsequently incorporated into Rule 26(b)(3), FED. R. CIV. P.   *Dept. of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001).   Rule 26(b)(3) emphasizes the need for a federal court to protect against the disclosure of the mental impressions, conclusions, opinions, and legal theories of a party's attorneys or other

23

representatives when ordering the discovery of documents and other tangible materials prepared in anticipation of litigation or for trial.  *Id.*   The primary policy underlying the work-product privilege is the protection of the privacy of an attorney's mental processes.  *Goldberg v. United States*, 425 U.S. 94, 106 (1976); *United States v. Nobles*, 422 U.S. 225, 236-38 (1975) ("At its core, the work-product shelters the mental processes of the attorney providing a privileged area within which he can analyze and prepare his client's case.").   Like the attorney-client privilege, moreover, the work product doctrine can be waived.  *See Nobles*, 422 U.S. at 239 (holding criminal defendant effectively waived work-product protection with regard to reports prepared by his defense investigator about the investigator's interviews with prosecution witnesses when defense called the investigator to testify at trial regarding his interviews with those same prosecution witnesses); *United States v. Mann*, 61 F.3d 326, 331 (5th Cir. 1995) (recognizing that general rules of waiver are applicable to the attorney work-product doctrine).

Any work-product doctrine claims Williams might wish to raise with regard to reports, memoranda, or other documents prepared by Williams' trial team or his state habeas counsel in anticipation of litigation that were subsequently disclosed to opposing counsel, attached to pleadings filed with a state court, or admitted into evidence during Williams' trial or state habeas corpus proceedings are in all reasonable likelihood waived.  *See Shields v. Sturm, Ruger & Co.*, 864 F.2d 379, 382 (5th Cir. 1989) (holding the attorney work product doctrine is waived when the attorney requests the witness to disclose the information or when the attorney discloses the information to the court voluntarily or makes no objection when it is offered).

Thus, it is far too late in the day for Williams to argue that his communications with his trial counsel and members of his defense team (or his communications with his state appellate counsel) are still protected by the attorney-client privilege or the attorney work-product doctrine.

In light of his repeated invocations in his motions for investigative funding of the Supreme Court's *Martinez v. Ryan* and *Trevino v. Thaler* decisions, the same is likely true for his otherwise privileged communications with his state appellate and state habeas counsel.  Thus, insofar as Williams wishes to proceed *ex parte* with regard to any future motions requesting investigative or expert funding (i.e., to be entitled to protection as confidential), his future funding motions should include information protected by the attorney-client privilege covering his communications with his *federal* habeas counsel or information protected by the attorney work product doctrine as it applies to his *federal* habeas counsel.

Contrary to the tenor and tone of Williams' latest funding motion, there is nothing unduly burdensome with the requirements that Williams furnish this court with (1) some rational description of the new or additional mitigating evidence for which he wishes his mitigations specialists to search and (2) an explanation as to how and where his mitigation specialists might possibly find that evidence.  Nor is it unreasonable for this court to request some fact-specific explanation as to how the new *Wiggins* claim Williams proposes to present in this court will differ from the *Wiggins* claim the Texas Court of Criminal Appeals rejected on the merits during Williams' recent state habeas corpus proceeding.   At a minimum, this court had a duty to ensure that Williams is not proposing to send his mitigation specialists out in search of previously undiscovered mitigating information, witnesses with personal knowledge of same, or documents containing potentially mitigating information which no longer exist.

If you do not know what you are looking for, you will never know when you find it.  Williams has been consistently vague in his motions seeking investigative funding with regard to exactly what new mitigating evidence he hopes to discover and where or how he believes his mitigation specialists are likely to find it.   This court requires at least a modicum of specificity

25

from Williams before it will authorize the expenditure of federal tax dollars for the investigation of a *Wiggins* claim that, quite possibly, was fully litigated and resolved on the merits in state court. Collectively, AEDPA and the Supreme Court's holding in *Pinholster* mandate at least as much. Vague, speculative, or conclusory assertions of what new mitigating evidence might be discovered by his mitigation specialists (i.e., pronouncements as to how much bigger, bolder, and broader Williams' proposed new *Wiggins* claim will be than the similar claim he litigated in his state habeas proceeding) accomplish none of these legitimate purposes.   They also fail to establish the reasonable necessity for the investigative funding requested by Williams.   Section 3599 does not require this court to fund the pursuit of undomesticated Canadian waterfowl.

<u>Motion for Travel Authorization</u>

Williams requests permission for his Arizona-based co-counsel to travel to Texas to meet with Williams and various other individuals.   This court appointed not one but two Texas-based attorneys to represent Williams in December 2020 for the purpose of avoiding unnecessary expenses such as these.   The budget request made by Williams' counsel did not include any express provision for travel time by out-of-state counsel (ECF no. 27).   Likewise, the budget approved by the Fifth Circuit in this case (ECF no. 29) did not include express provision for travel time for Williams' Arizona-based counsel.   Travel time is separate and independent from travel expenses.   Generally, the *expenses* associated with travel are the province of this court.   Payment for travel time by an attorney is a matter over which the Fifth Circuit exercises budgetary control.

Williams must submit and obtain approval for an amended budget if he wishes his Arizona-based counsel to be able to charge the federal judiciary for her time traveling to Texas.   If Williams' Arizona-based co-counsel wishes to travel to Texas without charging for her time, i.e., and only charge for her actual out-of-pocket travel expenses, this court will reconsider her request

for travel authorization.   Likewise, if there is some legitimate reason why Williams' two Texas-based counsel are unable to undertake the tasks proposed by Williams' out-of-state counsel, this court will reconsider its denial of Williams' Arizona-based counsel to travel to Texas.   At present there is no allegation before this court suggesting that only his Arizona-based counsel is capable of performing the tasks outlined in his motion for travel authorization.   Accordingly, Williams' request for travel time by his out-of-state counsel will be denied without prejudice.

It is hereby ORDERED that (1) Williams' motion for investigative funding, filed May 6, 2021 (ECF no. 42), is DENIED without prejudice and (2) Williams' motion for travel authorization, filed May 6, 2021 (ECF no. 41), is DENIED without prejudice.

SIGNED May 21, 2021.


**DAVID C. GODBEY**
**UNITED STATES DISTRICT JUDGE**

27