IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ERIC LYLE WILLIAMS, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | |
| | § | No. 3:20-CV-3030-N |
| ERIC GUERRERO, Director, Texas Department of Criminal Justice, Correctional Institutions Division, | § | |
| | § | |
| | § | |
| | § | |
| Respondent. | § | |

**MEMORANDUM OPINION AND ORDER**

Petitioner Eric Lyle Williams filed this federal habeas corpus action pursuant to Title 28 U.S.C. Section 2254 challenging his December 2014 Rockwall County conviction for capital murder and sentence of death. For the reasons set forth below, he is entitled to neither federal habeas relief nor a Certificate of Appealability from this Court. Likewise, he is not entitled to a stay and abeyance of these proceedings to return to state court and present unexhausted claims. Accordingly, his latest motion for stay and abeyance (ECF no. 205) will be denied.

## I. BACKGROUND

### A. The Offense

There is no genuine dispute as to the facts of Williams's capital offense. On March 30, 2013, Williams, dressed like a masked law enforcement officer, entered the residence of Kaufman County District Attorney Michael McLelland and his wife Cynthia and fatally

shot both of the McLelland's with an assault rifle.[1] This capital offense followed a prior murder in which Williams fatally shot Assistant Kaufman County District Attorney Mark Hasse with a handgun in a courthouse parking lot on the morning of January 31, 2013. The McLelland and Hasse murders were in retaliation for the successful prosecution by D.A. McLelland and Assistant D.A. Hasse of Williams, a former Kaufman County Justice of the Peace, on charges of burglary of a building and theft by a public servant.[2]

---

[1] There is some confusion in the pleadings over whether Williams made entry into the McLelland home through the front or back door on the morning he fatally shot the McLelland's. That confusion likely arises because the Service Manager for the ADT Security System company which installed and monitored the McLelland home's security system testified at trial that his company's records indicated the rear or back door to the McLelland home was the only door opened on the morning of the murders. Volume 45 of the verbatim transcription or "Reporter's Record" from trial (henceforth "R.R.") [found at ECF no. 118-9], at pages 16-25. The company employee who actually installed the McLelland home's security system testified without contradiction, however, that he mislabeled (erroneously switched) the labels for the back and front doors on the McLelland home's security system when he installed same. 45 R.R. [ECF no. 118-9] 7-15.

As is explained in detail hereinafter, there was no physical evidence presented at trial showing that entry into the McLelland residence on the morning of the murders was made other than through the front door. The bodies of both victims were found in close proximity to the front door (Cynthia in a hallway just inside the front doorway and Michael in a hallway just outside a nearby restroom). Likewise, all of the many shell casings found at the crime scene by law enforcement officers were discovered near the two bodies. Some were underneath the bodies. There was no sign of forced entry into the McLelland home. There was likewise no sign that anything had been taken from the McLelland home.

[2] The state district judge who presided over Williams' trial testified without contradiction during the guilt-innocence phase of Williams' capital murder trial that the jury convicted of an unspecified felony. 44 R.R. [ECF no. 118-8] 68-76. Certified copies of the Judgments of conviction in both of Williams' cases were admitted into evidence at trial as State Exhibit 324. 49 R.R. [ECF no. 118-13] 185-87. A copy of the Judgment in the burglary case, dated April 9, 2012, appears at ECF no. 131-1, at pp. 38-39. The Judgment in Williams' theft case, with the same date, appears at ECF no. 131-1, at pp. 40-42. The Judgments were affirmed on August 1, 2013. ECF no. 131-1, at 43.

The reason these facts are not in serious dispute is that Williams's co-defendant, confessed accomplice, and spouse, Kim Williams testified without refutation in rebuttal during the punishment phase of Williams's capital trial, detailing the extensive planning and preparation which preceded Williams's fatal shootings of the McLelland's.[3] She gave

[3] The punishment phase trial testimony of Kim Williams appears at 54 R.R. [ECF no. 118-18] 8-109.

Kim Williams's punishment phase rebuttal testimony regarding the McLelland murders was chilling. She testified in pertinent part that (1) she and her husband originally planned to murder Michael McLelland in another parking lot ambush (like the earlier Hasse murder) but later changed their plans and decided to shoot McLelland at home on a holiday weekend (Easter weekend in particular) because McLelland would not have law enforcement officers furnishing personal security, 54 R.R. [ECF no. 118-18] 53-54; (2) the transmission on the Mercury Sable they had used as a getaway car during the Hasse murder blew so they had to find a new getaway vehicle, *Id.*, at 54; (3) Williams chose a Crown Victoria because it looked like an undercover police car and no one would questions its presence at the McLelland home, *Id.*, at 54-55; (4) Kim went with Williams to pick up the Crown Victoria, *Id.*, at 55; (5) Williams was initially unsure of which weapon to use for the McLelland murders so he tested weapons by firing at concrete pillars at an underpass between Seagoville and Kaufman near their home, *Id.*; (6) law enforcement set up a task force command post to investigate the Hasse murder at an armory located near their home, which caused Williams to make jokes but later to grow paranoid and tell Kim their house was likely bugged, *Id.*, at 57; (7) thereafter Williams used a deck of cards whenever he discussed the plans for the McLelland murders, *Id.*, 58; (8) in preparation for the murders, Kim drove them to the McLelland residence and Williams took photographs as Kim drove slowly, *Id.*; (9) Williams' plan was to dress like a law enforcement officer, ring the McLelland's' door bell, and, when Cynthia McLelland presumably answered the door, to introduce himself as law enforcement and say that a gunman had been spotted in the area so that she would let him inside the home – while Kim's role was to drive them to and from the McLelland residence and honk the horn if anyone came while Williams was inside, *Id.*, at 59; (10) Williams told Kim that Cynthia had to die, describing her as "collateral damage," because she would otherwise be a witness to the shooting of her husband, *Id.*, at 60; (11) Williams was in a good mood and excited the night before the McLelland murders as he tried on various clothes to wear the next day, *Id.*; (12) Williams wore a bullet proof vest with "Sheriff" stenciled across the front, some sort of helmet, ski goggles over his glasses, and a piece of cloth pulled up from his neck to cover his mouth and nose, *Id.*, 61; (13) the morning of the McLelland murders, they left home in their Sport Trac and went to their storage unit in Seagoville, arriving right at six a.m., *Id.*, at 62; (14) Williams pulled out the Crown Victoria and parked the Sport Trac inside their storage unit, *Id.*; (15) Kim

an equally detailed account of the planning and preparation in which she and Williams engaged before they carried out the Hasse murder in January 2013.[4] Finally, Kim also

---

drove them to the McLelland residence in Forney and parked in the driveway, *Id.*, at 63; (16) Williams exited the Crown Victoria, leaving the door open, and went to the *front door*, *Id.*; (17) there were no lights on inside the home when they arrived but, once Williams rang the front doorbell, a light went on at the corner of the porch and Williams went inside, *Id.*, at 64; (18) thereafter Kim heard gunshots, *Id.*; (19) Williams then exited the house and got into the Crown Victoria, *Id.*, at 64-65; (20) Williams had a long rifle attached to a sling so that he could carry the weapon and still keep both of his hands free, *Id.*, at 65-66; (21) Williams removed the weapon and sling when he returned to the Crown Victoria, *Id.*, at 66; (22) they drove back to the storage unit in Seagoville using a different route than before, during which drive Williams appeared happy and satisfied, as was Kim, *Id.*, at 67; (23) Williams told Kim that he shot Cynthia McLelland an extra time because she was still moaning and that was the final shot he fired before leaving the McLelland home, *Id.*; (24) at the storage unit, Williams pulled out the Sports Trac, put the Crown Victoria inside and took fifteen-to-twenty minutes spraying and wiping down the Crown Victoria before he exited the storage unit wearing different clothing than the clothes had had worn to the McLelland residence that morning, *Id.*, at 68; (25) they then went to Kim's parents' home down the street from their own home, *Id.*; (26) Williams appeared happy and joyous as he barbecued steaks, *Id.*, at 69; (27) that evening Kim drove them, as Williams directed, to Lake Tawakoni, where Williams instructed her to slow down and then stop at a bridge, *Id.*, at 70; (28) Williams exited their vehicle and threw a bag over, *Id.*; (29) as they drove back toward their home, Williams received a cellphone call and they went to meet law enforcement at a Denny's where Williams was tested for gunshot residue on his hands and they both handed over their cellphones, *Id.*, at 71; (30) Kim left her cellphone at home when they left the house the morning of the McLelland murders and Williams had many cellphones, *Id.*; (31) State Exhibits 309 & 310 (which law enforcement recovered along with multiple weapons from Lake Tawakoni) appeared to be a Silver Razor cell phone similar to one Williams owned, *Id.*, at 72; (32) in the months before the Hasse and McLelland murders, Williams appeared mesmerized by a manifesto written by a former California police officer who killed several former law enforcement colleagues out of revenge, *Id.*, at 72-74; (33) Williams sent emailed tips to law enforcement after the McLelland murders because he thought it was funny and he wanted to " mess with them, to screw with them," *Id.*, at 74-75; and (34) Williams gave a media interview after the McLelland murders then later watched himself and acted arrogantly, like nothing had happened, *Id.*, at 7.

[4] With regard to the Hasse murder, Kim Williams testified without contradiction in pertinent part that (1) when he was arrested for burglary, Williams obtained a cell phone, called Kim, and instructed her to place a large computer monitor that was inside their home

into its box and to take the monitor to her parents' home just down the street from the Williams' residence, 54 R.R. [ECF no. 118-18] 21; (2) that monitor had been used by them for surfing the web and not for work-related business, *Id.*; (3) Williams was subsequently convicted and received a probated sentence but lost his position as a Justice of the Peace and was suspended from practicing law, *Id.*, at 23, 28; (4) Williams became angry with Michael McLelland and Mark Hasse, the prosecutors who had helped to convict him and he began talking seriously about killing them, *Id.*, at 23-31; (5) Williams also became angry with his former employer and mentor Judge Ashworth after Judge Ashworth went to prosecutors while Williams was awaiting trial and revealed an incident which took place in Huntsville in which Williams was alleged to have threatened a young woman, *Id.*, at 27-29; (6) Williams had a drinking problem and also took prescription pills at night, *Id.*, at 30-31; (7) Williams began making plans to murder Judge Ashworth by shooting him with a crossbow, boring out the Judge's stomach, and inserting napalm, *Id.*, at 31-32; (8) Williams also made alternative plans to kidnap Judge Ashworth and place him in a freezer or bury the Judge's body in a flower bed behind the Williams' home, *Id.*, at 32; (9) Williams also began making plans to murder Hasse and Michael McLelland, possibly by ambushing Hasse at his home, *Id.*; (10) Kim and Williams drove to the Hasse residence to inspect the location but Williams thereafter changed plans and decided to ambush Hasse in the parking lot outside the Kaufman County Courthouse in a manner similar to the broad daylight shootings in the film *Tombstone*. *Id.*, at 33-34; (11) shooting Hasse on a public street in broad daylight was intended to freeze any witnesses or bystanders by its brazenness and give them time to drive away from the scene, *Id.*, at 34-35; (12) in furtherance of their plan to ambush Hasse, they visited the parking lot outside the courthouse a couple times prior to the murder, *Id.*, at 35-36; (13) Williams knew what kind of truck Hasse drove, *Id.*, at 36; (14) Williams still had possession of guns stored at his storage unit in Seagoville despite being on probation, *Id.*, at 36-37; (15) they began looking for, and obtained, a Mercury Sable to use as a getaway car for the Hasse murder because it was an "every person car" that would blend in easily, *Id.*, at 38-39; (16) after keeping the Mercury Sable at their home only one night, they parked the Mercury behind an auto parts store in Seagoville for easy access, *Id.*; (17) as the day of the Hasse murder approached, Williams grew excited, happy, and nervous, *Id.*, at 40; (18) Williams planned to wear a see-through ghost-face Halloween mask, dark pants, a black nylon jacket, a bulletproof vest, black ankle boots like those worn by police, and his glasses to the Hasse ambush, *Id.*, at 40, 45; (19) Kim originally planned to wear a mask as well but later chose not to do so because she was driving them to and from the Hasse murder location, *Id.*, at 41; (20) Williams took a pair of pistols to shoot Hasse, *Id.*, at 41; (21) Kim drove them in their Sport Trac to Seagoville to pick up the Mercury, *Id.*, at 43; (22) Kim drove the Mercury while Williams drove the Sport Trac to an undeveloped street with few houses near a hospital where he parked the Sport Trac, *Id.*, at 43-44; (23) Williams directed Kim as she drove them to the courthouse parking lot, found a parking spot, but kept their engine idling, *Id.*, at 44-45; (24) it was cold and quiet while they waited, *Id.*, at 42, 45; (25) Hasse arrived and parked in his usual parking space, *Id*, at 45-46; (26) Williams waited for Hasse to exit his truck and walk past the Mercury

testified without refutation about the extensive preparations in which they had engaged for their next planned assassination, *i.e.*, the murder of a Kaufman County judicial officer.[5]

### B. Indictment

On June 27, 2013, a Kaufman County grand jury indicted Williams on two Counts of capital murder, to wit, (1) intentionally causing the death of Cynthia McLelland by shooting her with a firearm while in the course of committing or attempting to commit the

---

before Williams exited their vehicle and ran to catch up to Hasse *Id.*, at 46; (27) Kim did not watch the murder but heard several gunshots, after which Williams ran back to the Mercury and told her to drive, *Id.*; (28) Williams directed Kim as she drove them back to their Sport Trac, *Id.*, at 46-47; (29) while they did not converse as they drove away from the Hasse murder, Williams and Kim both seemed to be happy, *Id.*, at 47; (30) Kim drove the Mercury back to their storage unit in Seagoville, missing an exit and arriving after Williams, *Id.*, 47-48; (31) Kim heard Williams spray down the Mercury and attempt to wipe away any fingerprints, *Id.*, at 48; (32) when Williams exited the storage unit, he had on different clothes than those he had worn to the Hasse murder and was carrying a bag in his hands, *Id.*, at 48-49; (33) Kim drove them home, *Id.*, at 49; (34) Williams told her that Hasse had begged "no, no, please, please, no" before Williams shot Hasse, *Id.*, at 50; (35) Williams appeared satisfied with himself, *Id.*; (36) once home, Kim took a Valium and went to bed while Williams put his arm in a sling to fool the police and watched news reports of Hasse's murder, *Id.*, at 50-51; (37) when police arrived at the Williams' residence, Williams told Kim to be quiet and not say anything, *Id.*, at 52; (38) Williams smiled and appeared cocky while watching a television broadcast of the McLelland press conference on the Hasse murder, *Id.* at 53; and (39) when the police arrived at the Williams' residence, Kim stayed in the bedroom, *Id.*, at 51.

[5] Kim Williams also testified that (1) Williams said he kept a hit list in his head which Kim knew included Judge Ashworth and Judge Wiley and that Judge Ashworth (whom Williams had talked about killing since 2009-10) was next on the list, 54 R.R. [ECF no. 118-18] 76-78; and (2) Williams had planned and prepared to murder Judge Ashworth by (a) visiting a field located behind the Ashworth residence, (b) making napalm and putting it into jars, (c) obtaining a set of bolt cutters for breaching the chain link fence behind the Ashworth residence, (d) obtaining and practicing with a crossbow, and (e) digging and measuring a hole in the flower bed behind the Williams' residence (as a place to dispose of the Judge's body). *Id.*, at 9, 27-29, 31-32, 77-82.

burglary of her habitation; and (2) murdering more than one person during the same criminal transaction, more specifically by intentionally and knowingly shooting both Michael and Cynthia McLelland with a firearm.[6]

**C. Guilt-Innocence Phase of Trial**

The guilt-innocence phase of Williams' trial commenced on December 1, 2014.

The prosecution presented only circumstantial evidence in support of the charges against Williams. That circumstantial evidence was nonetheless substantial and compelling.[7] The prosecution's evidence included testimony establishing that (1) on the evening of the day in which the McLelland murders took place, Williams's hands tested positive for gunshot residue[8]; (2) just months before the McLelland murders, Williams

---

[6] Williams's capital murder indictment appears among the voluminous state court record in this case at ECF no. 98, at p. 35 of 493.

[7] The Texas Court of Criminal Appeals' opinion affirming Williams's conviction and sentence on direct appeal contains an accurate and thorough summary of the evidence presented during the guilt-innocence phase of Williams's capital murder trial. *See Williams v. State*, AP-77,053, 2017 WL 4946865, *1-4 (Tex. Crim. App. November 1, 2017).

[8] A law enforcement officer testified without contradiction that, around ten p.m. on the date of the McLelland murders, (1) he contacted Williams and arranged to meet Williams and to have Williams' hands tested for gunshot residue; (2) when they met, Williams informed him that he had not fired a firearm in many months, since his prior felony conviction; (3) another officer collected the samples from Williams's hands using a test kit. 45 R.R. [ECF no. 118-9] 154-64.

A different law enforcement officer testified that he collected the GSR sample from Williams using a test kit. 45 R.R. [ECF no. 118-9] 165-70.

A forensic chemist and trace evidence analyst with the Texas Department of Public Safety's crime lab testified that he examined the test kit obtained from Williams on March 30, 2013 and determined that (1) Williams's test kit had nine positive results and three indicative results; (2) the only ways to test positive in such a manner were to either fire a firearm, be close to a firearm that is fired, or to handle a firearm after it has been fired; (3) Williams' test results were consistent with someone who had handled a firearm within four

contacted a former fellow Texas State Guard member who had served with Williams and asked him to help Williams secure a storage unit (Unit 18 at Gibson's Self Storage in Seagoville, Texas)[9]; (3) the former owner of a white Ford Crown Victoria vehicle found parked in Unit 18 just days after the McLelland murders sold that vehicle to Williams after Williams contacted him through Craigslist in February 2013, paid cash, and gave his name to the seller as Richard Greene[10]; (4) video recordings from nearby business establishments

---

hours of being tested. 46 R.R. [ECF no. 118-10] 7-24.

[9] Williams's former fellow Texas State Guard member (Barton Rodger Williams, Jr. – no relation to Eric Lyle Williams) testified without contradiction that (1) Williams contacted him in November 2012 and asked for help securing the storage unit because Williams needed room for his in-laws' items; (2) he helped Williams secure the storage unit in Seagoville by signing the lease along with Williams but Williams paid the rental fee (one year in advance); and (3) after the day he and Williams leased the unit, he never went back to the storage unit until after the McLelland murders, when he went to the unit to show law enforcement officers where it was located. 44 R.R. [ECF no. m118-8] 230-55.

The manager of the storage facility in Seagoville testified without contradiction that (1) gate codes were necessary to access the storage facility and recorded entries on to the facility; (2) he leased Unit 18 to Williams and another man named Rodger Williams on December 28, 2012; (3) Unit 18 was 10 X 20 feet in size and large enough to house a car; (4) the unique gate code for Unit 18 was activated at 6:06 a.m. and 6:18 a.m. on March 30, 2013 (the morning of the McLelland murders) and again later the same morning at 7:07 a.m. and 7:24 a.m.; and (5) after the date he leased Unit 18, he never again saw Rodger Williams. 44 R.R. [ECF no. 118-8] 256-94.

[10] 44 R.R. [ECF no. 118-8] 211-29. The man who sold the Crown Victoria to Williams also testified that (1) after he gave Williams the key to the vehicle, and Williams took the vehicle from the seller's residence, the seller realized that he had left a garage door opener inside the Crown Victoria; (2) he thereafter called the telephone number of the person to whom he had sold the vehicle and asked for the return of the garage door opener; (3) he later received the garage door opener in question in a package mailed to him; and (4) the license plate found in the back of the Crown Victoria when it was found inside Unit 18 was the license plate which had been on the Crown Victoria when he owned it. *Id.*, at 217-18.

A postal inspector testified that (1) the package sent by the buyer of the Crown

showed a whitish vehicle depart Gibson's Self Storage on the morning of the McLelland murders and return less than an hour later – while no other vehicle entered or exited the facility during that same time frame except for a black SUV which resembled Williams' Ford Sport Trac[11]; (5) the title and repair manual for the Crown Victoria found inside Unit 18 were discovered in a drawer in a file cabinet inside Williams's garage at his residence[12]; (6) a pair of fingerprints found on the Crown Victoria in Unit 18 matched those of Williams[13]; (7) at least thirty guns were found inside Unit 18, along with a crossbow, a

---

Victoria to the seller of that vehicle which contained the garage door opener in question bore a postage stamp generated by a home computer which corresponded with a meter licensed to Williams; and (2) the stamp on the package did not appear to have been tampered with. 45 R.R. [ECF no. 118-9] 171-74

[11] A forensic video analyst with the Tarrant County Criminal District Attorney's Office testified without contradiction that (1) a vehicle pulled into the Gibson's Self Storage facility a little after its gates opened at six a.m. on March 30, 2013 and a different vehicle left that facility shortly thereafter; (2) that "different" vehicle appeared to be either a Ford Crown Victoria or a Mercury Grand Marquis; (3) that vehicle returned to Gibson's Self Storage later that same morning; (4) no other vehicle entered or left Gibson's Self storage during that time frame; (5) after that vehicle returned, a Ford Utility Vehicle – a Sport Trac exited Gibson's Self Storage; (6) only one set of headlights entered the McLelland neighborhood the morning of their murders and only one set of vehicle headlights exited that neighborhood during the time frame in which the murders took place. 46 R.R. [ECF no. 118-10] 121-43.

[12] 45 R.R. [ECF no. 118-9] 67-70; and 46 R.R. [ECF no. 118-10] 27-28.

[13] An FBI Special Agent testified that sixteen latent fingerprints were lifted from the Crown Victoria found inside Unit 18, along with a yellow sticky note, and were transmitted to the Kaufman County Sheriff's Department for comparison. 46 R.R. [ECF no. 118-10] 25-34.

A latent fingerprint examiner with the Texas DPS crime lab testified without contradiction that two of the fingerprints lifted from the Crown Victoria in Unit 18 matched those of Williams. 46 R.R. [ECF no. 118-10] 35-46.

A different latent fingerprint examiner with the Texas DPS crime lab testified without contradiction that two latent fingerprints found on one of the lower receivers (a Rock River lower receiver with a bungee sling attached) found inside Unit 18 matched

bullet proof vest, several foot lockers filled with tactical gear, and a blue bag which contained a single unfired round of high velocity rifle ammunition[14]; (8) the twenty shell casings found at the McLelland residence the day of their murders and in the days thereafter were all fired from the same high velocity rifle which also (a) fired multiple high velocity shell casings recovered from a location near a highway overpass close to the Williams' residence and (b) cycled the unfired round found inside a blue bag in Unit 18[15];

Williams' fingerprints. 46 R.R. [ECF no. 118-10] 47-56.

[14] An FBI Special Agent testified without contradiction that the weapons found inside Unit 18 included two lower receivers for assault rifles, one of which was a Rock River lower receiver to which a bungee sling was attached (and a Velcro Sheriff's Department patch was attached to the sling). 45 R.R. [ECF no. 118-9] 55-90. She also testified without contradiction that (1) a bumper guard was found in the trunk and a license plate was found inside the Crown Victoria, which had once served as a police cruiser, *Id.*, 83-85; (2) in addition to the two AR lower receivers, a 5.7 caliber upper receiver was also found inside Unit 18, *Id.*, at 85-88; (3) "Williams" was stenciled on the foot lockers found inside Unit 18, *Id.*, 81; and (4) everything inside Unit 18 appeared to belong to Williams, *Id.*, 71-72.

[15] Multiple witnesses testified to the recovery of the multiple shell casings found at (1) the McLelland residence and (2) the rural location near the highway overpass close to the Williams residence.

The McLelland family friend who discovered the victims' bodies at the McLelland residence testified there was no sign of forced entry and there were multiple spent cartridges in the hallway just inside the front door. 44 R.R. [ECF no. 118-8] 77-101.

The Texas Ranger who served as team leader at the McLelland residence testified about (1) the general condition of the crime scene, including the recovery of sixteen shell casings at the McLelland residence, the lack of evidence suggesting forced entry, the absence of evidence showing any sign of a robbery or theft had taken place, the presence of handguns belonging to the McLelland's found inside a zippered canvas bag on the dining room table near the front doorway, and the recovery of multiple bullets and bullet fragments from walls, the floor, and furniture; (2) the multiple shell casings recovered from an overpass located near U.S. Highway 175 north of Kaufman and south of Seagoville; and (3) physical damage (which appeared to be from high velocity projectiles) on several nearby cement pillars supporting the overpass. 44 R.R. [ECF no. 118-8] 102-60.

An ATF Special Agent testified without contradiction that (1) an assault rifle

(9) a unique number generated by a Crime Stoppers tipline was found inside the Williams home, along with a tax receipt from TipSubmit.com[16]; (10) both Michael and Cynthia

---

consists of two parts or receivers – an upper receiver which fires the round and a lower receiver which, unlike the upper receiver, bears a serial number; (2) only the upper receiver of the assault rifle touches the round as it is cycled and leaves toolmarks on the shell casing; (3) the same lower receiver can support multiple different upper receivers, which can be changed out to permit the same rifle to fire different caliber ammunition; (4) thus changing out the upper receiver of an assault rifle allows the same rifle to fire either .223, 5.56, or 5.7 caliber ammunition; (5) two of the lower receivers found in Unit 18 were capable of firing the shell casings found at both the McLelland residence and the location near the highway overpass; (6) to fully unload an assault rifle, it is necessary to remove the magazine and then to eject the unfired round located in the chamber; (7) the unfired, ejected, round will bear the same toolmarks as the shell casings fired by the weapon; (8) all of the shell casings recovered from the McLelland residence bore the same manufacturer's initials, *i.e.,*, "L.C." for "Lake City," near the primer mark; and (8) to conceal which assault rifle was used to commit an offense, one need only remove and dispose of the upper receiver of the assault rifle. 45 R.S. [ECF no. 118-9] 91-119.

A forensic scientist in the firearms and toolmark section of the Texas Department of Public Safety's crime lab testified without contradiction that all of the shell casings fired and found at the McLelland residence were fired from the same weapon, which was either a .223, a 5.45, or a 5.56 caliber weapon; (2) all bullets and bullets fragments recovered from the McLelland's during their autopsies or from the McLelland residence were fired by the same weapon; (3) he could not identify the specific weapon used to fire those shots because the lower receivers recovered from Unit 18 did not include an upper receiver which could have fired the shell casings in question; (4) the unfired cartridge recovered from Unit 18 was cycled through the same weapon (upper receiver) which fired the cartridges found at the McLelland residence; and (5) the lone upper receiver found in Unit 18 was a 5.7 caliber upper receiver. 45 R.R. [ECF no. 118-9] 121-53.

[16] An FBI Special Agent testified without contradiction to the discovery of the tax receipt from TipSubmit.com inside the Williams' residence. 45 R.R. [ECF no. 118-9] 64.

The Deputy Chief of the Kaufman County Sheriff's Department testified without contradiction that (1) receipts are issued anonymously via TipSubmit.com when people contact the Kaufman County Crime Stoppers tipline; (2) after a tip is received, a unique password is generated which allows law enforcement to have follow-up communications with the tipster; (3) around 9:57 p.m. on March 31, 2013, the day after the McLelland murders, Kaufman County Crime Stoppers received an emailed tip which read "Do we have your full attention now. Only a response from Judge Bruce Woods [Kaufman County Judge] will be answered. You have 48 hours."; (4) the following day (April 1, 2013) at 10:15 a.m., law enforcement attempted to contact the tipster, sending an email message

McLelland were fatally shot multiple times with a high velocity rifle[17]; (11) a Texas

---

which read "You have our attention. How can the County Judge contact you"; (5) at 10:15 p.m. that day, the tipster sent the following reply: "The message through this secure format only. Your act of good faith will result in no other attacks this week"; (6) the next email message from the tipster demanded the resignation of one of the four elected judicial officers in Kaufman County, ostensibly for reasons of "less stress or family concerns or whatever sounds deniable"; (7) the tipster's email message continued "The media will understand. My superiors will see this as the first step to ending our actions. Do not report any details of this arrangement. You have until Friday at 4:00 p.m. We are not unreasonable, but we will not be stopped."; (8) law enforcement responded at 11:00 a.m. on April 2, 2013 with an email reading "We are working on your demands" and asked for additional details to verify the tipster's involvement; (9) the tipster never responded; and (10) until the FBI found the tip numbers inside Williams' residence, law enforcement did not know who had sent the messages claiming credit for the McLelland murders. 45 R.R. [ECF no. 118-9] 176-90.

A computer investigator with the Plano Police Department assigned to an FBI task force testified without contradiction that (1) one of the computers found inside the Williams residence was used to send the Crime Stoppers tips which took credit for the McLelland murders; (2) the Regional Forensic Computer Lab was able to verify that the computer in question was Williams' computer; (3) the tip was sent on a secure network ("TOR") created by the military; (4) law enforcement was able to verify the Internet Protocol "IP" Address through which the emails from the tipster were transmitted to Crime Stoppers; and (5) law enforcement officers were also able to obtain a browser history for Williams' computer which revealed that the computer had also been used to search for information on the Kaufman County Crime Stoppers program as well as to search for the Crown Victoria found in Unit 18. 46 R.R. [ECF no. 118-10] 81-102.

A Captain with the Kaufman County Sheriff's Office who was also a forensic computer and mobile device examiner testified without contradiction that (1) four laptops seized from the Williams home were examined; and (2) the computers contained evidence of a response sent to a Craigslist advertisement offering the Crown Victoria found inside Unit 18 for sale, as well as a receipt for the purchase of shoe coverings. 46 R.R. [ECF no. 118-10] 103-15.

[17] The medical examiner who performed the autopsy on Cynthia McLelland testified without contradiction in pertinent part that (1) Cynthia had eight gunshot wounds, including one which entered through the top of her skull, exited in fragments under her chin, and re-entered her chest, coming to rest near her sternum; (2) this wound was consistent with a high velocity rifle round, caused massive cranial trauma, and was instantly incapacitating; (3) another gunshot wound entered her right shoulder, went through her lung, and struck her spinal column; (4) there were multiple gunshot wounds to her abdomen, one of which struck and fractured her right hip bone; (5) this abdominal

Department of Public Safety dive team recovered a mesh bag containing a broken cell phone linked to Williams from a location in Lake Tawakoni off Highway 276 near Two Mile Bridge[18]; and (12) in December 2012 Williams asked a former colleague in the Texas State Guard for assistance in getting rid of an assault rifle upper receiver despite Williams' insistence that he no longer had possession of any firearms.[19]

Williams chose not to testify at the guilt-innocence phase of trial and his trial counsel rested without presenting any other witness.[20]

On December 4, 2014, Williams' jury received the trial court's guilt-innocence phase jury charge and returned its verdict, unanimously finding Williams guilty beyond a

---

wound would also have been incapacitating; (6) another gunshot wound fractured and deformed her right forearm; (6) Cynthia was shot a minimum of five times; and (7) her cause of death was multiple gunshot wounds and her manner of death was homicide. 44 R.R. [ECF no. 118-8] 161-89.

The medical examiner who performed the autopsy on Michael McLelland testified without contradiction in pertinent part that (1) there were sixteen gunshot wounds in Michael McLelland's body, all of which were consistent with a high velocity rifle; (2) several of these wounds, like some of Cynthia's gunshot wounds, resulted from a single bullet or set of fragments entering the body, exiting, and then re-entering the body; (3) one of Michael's gunshot wounds entered the left side of his neck, exited the anterior of the neck, re-entered the upper chest, and re-exited underneath the right armpit; (4) some of Michael's gunshot wounds traveled in a left-to-right direction and some traveled right-to-left; (5) another gunshot wound entered Michael's abdomen, passed through the diaphragm, and then passed through the Aorta; (6) two gunshot wounds entered through the right buttocks and one exited the left thigh; (7) some of Michael's gunshot wounds were consistent with Michael being on the ground when shot; and (8) Michael's cause of death was multiple gunshot wounds and his manner of death was homicide. 44 R.R. [ECF no. 118-8] 190-210.

[18] 46 R.R. [ECF no. 118-10] 57-68.

[19] 45 R.R. [ECF no. 118-9] 26-49.

[20] 46 R.R. [ECF no. 118-10] 145-49.

reasonable doubt of capital murder as charged in the indictment.[21]

**D. Punishment Phase of Trial**

The punishment phase of Williams' capital murder trial commenced later the same date.

**1. The Prosecution's Case-in-Chief**

During its case-in-chief, the prosecution presented testimony establishing that (1) on the morning of January 31, 2013, Mark Hasse was fatally shot multiple times while walking in a parking lot near an auto repair business a short distance from the Kaufman County Courthouse[22]; (2) the black mesh bag recovered from Lake Tawakoni with

---

[21] 47 R.R. [ECF no. 118-11] 58. The state trial court's guilt-innocence phase jury charge appears at Volume 11 of the Clerk's Record (henceforth "C.R.") at pages 4272-80 [ECF no. 96-6, at pp. 6-13 of 215]. The jury's guilt-innocence phase verdict form appears at 11 C.R. 4281 [ECF no. 96-6, at p. 14 of 215].

[22] Several eyewitness testified to the altercation between Hasse and the taller man who shot Hasse multiple times, including (1) an investigator with the Kaufman County District Attorney's Office who had worked with Hasse, who drove his vehicle as part of the search for the suspect vehicle following the shooting, 48 R.R, [ECF no, 118-12] 19-33; (2) a courthouse employee who was working out in the gym and saw (a) a masked man shooting into the air while walking to a vehicle before leaving the scene and (b) a woman attempting to perform CPR on the shooting victim, 48 R.R. [ECF no. 118-12] 35-53; (3) a female attorney who witnessed the shooting while driving in her car, briefly pursued the suspect's get-away vehicle for a couple blocks, and then returned to the scene and attempted to perform CPR on Hasse, 48 R.R. [ECF no. 118-12] 54-80; (4) an employee of the auto repair shop in front of which Hasse was shot, who was only about thirty feet from the two men when the shooting took place, 48 R.R. [ECF no. 118-12] 82-94; and (5) a Kaufman City Police Officer who was about six blocks away from the scene of the shooting, heard the gunshots, drove quickly to the crime scene, and took over performing CPR from a civilian female, 48 R.R. [ECF no. 118-12] 96-109. Unsurprisingly, these eyewitnesses disagreed on many of the details of the Hasse shooting, such as how many shots they heard fired, the words (if any) they heard the two men exchange, and the make and model of the getaway vehicle which the shooter entered after the shooting. Significantly, there was no testimony from any of these witnesses suggesting that Hasse

Williams' broken Razor phone inside also contained two revolvers, several cases of ammunition, and several speed strips bearing ammunition[23]; (3) three bullets recovered by

had engaged in any aggressive behavior or provocative conduct prior to the taller man confronting Hasse and shooting him multiple times. Nor was there any testimony suggesting or implying that Hasse made an attempt to reach for the handgun he was carrying.

A nurse at the hospital to which Hasse was taken testified without contradiction that, upon arrival there, Hasse (1) was ventilated, *i.e.*, not breathing on his own; (2) had a bleeding head wound that was likely fatal; and (3) was asystole, *i.e.*, had no cardiac activity. 48 R.R. [ECF no. 118-12] 111-24. This witness also identified a bullet which fell from Hasse's body as she and other ER personnel attempted to cut through and remove the many layers of bloody clothing Hasse had on when he arrived at the hospital's emergency department. *Id.*, at 123-24.

The testimony of the medical examiner who performed the autopsy on Hasse's body appears at 48 R.R. [ECF no. 118-12] 140-57. He testified without contradiction that (1) he observed at least four separate gunshot wound tracks in Hasse's body, *Id.*, at 145 & 153; (2) while his autopsy report identified five gunshot wounds, he believed Gunshot Wounds 4 and 5 were likely the results of a single bullet track, which entered the left side of Hasse's back, passed through the chest, exited in the armpit area, then entered Hasse's left arm, and exited the front of the arm, *Id.*, at 152-53; (3) Gunshot Wound 1, which showed signs of gunpowder residue and was fired at medium range, entered the left side of the head just in front of the ear, fractured the skull, fragmented, penetrated into the left side of the brain, and was both immediately incapacitating and fatal, *Id.*, at 145-49; (4) gunshot wound 2, which bore no sign of gunpowder residue, (a) entered Hasse's left side behind the upper left arm, (b) went through the left shoulder, (c) went through the left chest and the left lung into the mediastinum, (d) went through the trachea, the esophagus, and the brachiocephalic trunk (a large artery just off the Aorta which feeds blood to the right side of the brain and the face), (e) entered the right chest, (f) exited the anterior (front) of the right chest, and (g) was also fatal, *Id.*, at 149-51; (5) Gunshot Wound 3 entered toward the center of the left side of the back, went through both the upper and lower lobes of the left lung, exited the front of the left anterior chest, and was fatal, *Id.*, at 151-52; (6) he removed a medium caliber bullet during Hasse's autopsy, *Id.*, at 155; (7) Hasse measured five feet nine inches in length and 136 pounds at autopsy, *Id.*, at 157; (8) Hasse's toxicology screen was negative, *Id.*; and (9) Hasse's cause of death was multiple gunshot wounds and his manner of death was homicide, *Id.*

[23] The diver who found what he initially believed to be a black mesh bag in Lake Tawakoni testified without contradiction that (1) the two revolvers contained in the mesh bag with Williams' broken Razor phone consisted of a Ruger .357 magnum revolver and a Smith and Wesson .38 Special revolver; (2) the mesh bag also contained a considerable

law enforcement during the investigation of the Hasse murder were all fired by the same weapon, *i.e.*, the Ruger .357 magnum revolver recovered from Lake Tawakoni in the same mesh bag as Williams' broken Razor phone[24]; (4) during an exchange of emails between law enforcement and the Crime Stoppers tipster who claimed credit for the *McLelland* murders, the tipster responded to an inquiry (about how the Kaufman County Judge should

---

amount of .38 caliber ammunition which could have been fired in either of the two revolvers; (3) all five cartridges in the Ruger's chambers had been fired; (4) three of the cartridges in the Smith and Wesson revolver had been fired and two had not been fired; and (5) the black mesh bag he recovered containing the items in question was later determined to be a mesh Halloween grim reaper mask. 48 R.R. [ECF no. 118-12] 201-11.

[24] The same firearms and toolmark analyst who matched the toolmarks on all of the shell casings found at the McLelland home, the shell casings recovered near a highway overpass close to the Williams' residence, and the unfired .223 caliber round recovered from a blue bag inside Unit 18 testified without contradiction that (1) he was given three bullets by law enforcement officers investigating the Hasse murder, 49 R.R. [ECF no. 118-13] 10-13; (2) the three bullets, respectively, had been recovered (a) from the crime scene outside the Kaufman County courthouse, (b) during Hasse's autopsy, and (c) by ER personnel at the hospital to which Hasse was taken after the shooting, *Id.*; (3) when he examined the three bullets in February 2013, he was able to conclude that all three bullets had been fired by the same weapon, *Id.*, at 12-13; (4) at that time he did not have a weapon to compare with the bullets but could determine that the weapon which most likely fired the bullets was either a .38 special or a .357 caliber magnum, *Id.*, at 11-13; (5) in April 2013 he conducted test firings on three weapons found inside Unit 18 but those test results did not furnish a match to the three bullets, *Id.*, at 13-14; (6) in March 2014 he was given the two revolvers recovered from Lake Tawakoni that had been found in the same mesh bag/mask as Williams' Razor phone, *i.e.*, the Ruger .357 magnum revolver with a three-inch barrel and the Smith and Wesson .38 special, *Id.*, at 14-15; (7) after multiple test firings he concluded that all three of the bullets he had been given had been fired by the Ruger .357 magnum revolver with a three-inch barrel, *Id.*, at 14-16; (8) the matches were memorialized in photographs he took through the stereoscopic microscope he used to examine and compare side-by-side the bullets associated with the Hasse murder and the test bullets fired from the .357 magnum revolver, *Id.*, at 17-19; and (9) the Ruger .357 magnum revolver contained five spent cartridges while the Smith and Wesson .38 special contained three spent cartridges and two unfired rounds, *Id.*, at 19.

contact the tipster) by volunteering information detailing the weapon and type of ammunition used in the *Hasse* murder[25]; (5) during the searches of Unit 18 and the Williams' home, law enforcement officers found (a) a copy of a manifesto apparently

[25] The law enforcement officer who served as the liaison between the task force investigating the McLelland murders and Kaufman County's Crime Stoppers program testified that the emailed communications between the tipster who took credit for the McLelland murders and law enforcement authorities which had previously been admitted into evidence at the guilt-innocence phase of trial were redacted versions of those email exchanges. 48 R.R. [ECF no. 118-12] 213-14.

The prosecution then obtained admission of unredacted copies of the email exchanges in question and read them into the record. 48 R.R. [ECF no. 118-12] 212-18. Those exchanges and the liaison officer's punishment phase testimony established that (1) a tip came through Crime Stoppers on March 31, 2013 claiming credit for the McLelland murders, *Id.*, at 213-14; (2) that message read "Do we have your full attention now. Only a response from Judge Bruce Wood will be answered. You have 48 hours.", *Id.*, at 214; (3) law enforcement responded on April 1, 2013 around 10:12 a.m. with "You have our attention. How can the judge contact you?", *Id.*; (4) the tipster replied around 10:13 p.m. the same date as follows: "Your act of good faith will result in no other attacks this week. As proof Mark Hasse was killed with .38 caliber +P ammunition 147 grain Hydra-Shok ammunition fired from a 3 inch .357 5 shot revolver. Judge Wood must offer a resignation of one of the four main judges in Kaufman County, district or county court, list stress or family concerns or, whatever else sounds deniable. The media will understand. My superiors will see this as the first step to ending our actions. Do not report any details of this arrangement. You have until Friday at 4:00 p.m. We are not unreasonable[,] but we will not be stopped., *Id.*; (5) law enforcement responded the next day, April 2, 2013, around 11:28 a.m. with a message requesting that the tipster furnish additional details specific to the two murder cases but not known to the media, *Id.*; (6) there was no response from the tipster, *Id.*, at 215; (7) on April 4, 2013 law enforcement sent another email message to the tipster indicating they were still waiting to hear back from the tipster but never received any reply, *Id.*, at 215; (8) law enforcement was unaware as of April 1, 2013 whether the information the tipster furnished about the Hasse murder weapon and ammunition was correct but, subsequently, learned that it was accurate, *Id.*; (9) another tip received by Crime Stoppers on February 28, 2013 (prior to the McLelland murders) claimed to present information regarding a pair of suspects in the Hasse murder (described the lead suspect as a white male with a specific build, who frequently particular bars and drove a blue pickup truck), *Id.*, at 216-17; and (10) this purported tip on the Hasse murder appeared to be intended to confuse investigators and was also linked forensically to Williams, *Id.*., at 217-18.

written by Christopher Dorner, a former Los Angeles police officer who was involved in a series of shootings; (b) numerous boxes of ammunition; (c) multiple gun holsters; (d) an empty Smith and Wesson revolver box; (e) numerous knives and machetes; (f) a lot of tactical military gear; (g) a shotgun and shells; (h) multiple rifles; (i) a crossbow with a scope and projectiles; (j) multiple magazines for a variety of firearms; (k) multiple boxes containing cell phones; (l) multiple blue shoe covers or booties; (m) a green backpack containing bolt cutters, goggles, a pair of gloves, and two sealed mason jars of homemade napalm; and (n) a large quantity of component parts for assault rifles[26]; (6) a silver Mercury Sable which had been parked without permission inside the fence line at the rear of the Gibson Self Storage facility in Seagoville (from late-February 2013 until the facility

---

[26] 49 R.R. [ECF no. 118-13] 39-58; 49 R.R. [ECF no. 118-13] 59-77; 49 R.R. [ECF no. 118-13] 83-113.

During a consent search of the Williams' residence on April 11, 2013, a law enforcement officer surreptitiously recorded his conversation with Williams, which recording was played in open court at the punishment phase of trial and during which Williams could be heard plainly stated to officers that he had sold all of his firearms except for a single pistol but refused to identify the person or persons to whom he had sold his firearms. 49 R.R. [ECF no. 118-13] 64-64.

The same ATF Special Agent who testified during the guilt-innocence phase of trial testified without contradiction during the punishment phase that (1) the Ruger .357 magnum revolver recovered from Lake Tawakoni matched exactly the description of the weapon used in the Hasse assassination volunteered by the Crime Stoppers tipster who claimed credit for the McLelland murders (as was also true for the fired shell casings found inside the Ruger revolver when it was recovered), 49 R.R. [ECF no. 118-13] 103-04; (2) a search of ATF records revealed that the Smith and Wesson revolver recovered from Lake Tawakoni in the same mesh bag/mask as the Ruger .357 magnum revolver and Williams' broken Razor phone was purchased by Kim Williams nee Kim Lene Johnson on March 8, 1997, *Id.*, at 108; but (3) similar attempts to ascertain the current ownership of the Ruger .357 magnum revolver through a search of ATF transactional records and additional investigation (interviewing the last registered owner) were unsuccessful, *Id.*, at 106-08.

manager had it towed) contained a pair of ear plugs which bore Williams' DNA[27]; (7)

---

[27] The former owner of a silver 2001 Mercury Sable testified without contradiction that (1) he purchased the vehicle in question from a neighbor in November 2011, 48 R.R. [ECF no. 118-12] 158-59; (2) he decided to sell it in 2012 and listed the Sable on Craigslist. *Id.*, at 160-61; (3) the Mercury Sable bore a sticker indicating it had once been in Massachusetts and his Craigslist advertisement accurately stated that fact, *Id.*, at 162; (4) on January 27, 2013, he sold the Sable to a white male who appeared to be about five feet ten inches in height, 220 pounds, and in his mid-forties, *Id.*, at 163; (5) a woman who appeared with the buyer later that same day appeared to be in her mid-twenties, *Id.*, at (6) the Sable's buyer did not appear interested in either a test drive or learning any information about the Sable's repair record (which seemed strange to the seller since the buyer said he was purchasing the car for his daughter), *Id.*, at 164-65; and (7) when asked by police to identify either the buyer or his female companion from photo arrays, he was unable to do so, *Id.*, at 168-69.

The manager of Gibson's Self Storage in Seagoville where Unit 18 was located testified without contradiction that (1) the facility's gate records showed that, on January 30, 2013 (the date before the Hasse murder), the unique gate code assigned to Unit 18 was used several times, to wit, at 6:57 p.m., at 8:46 p.m., at 8:53 p.m., and at 9:02 p.m., 48 R.R. [EXF no. 118-12] 196; (2) on January 31, 2013, the facility's gate recorded showed someone used that gate code at 9:12 a.m. and then again (likely to leave) at 9:30 a.m., *Id.*, at 196-97; (3) in late-February, 2013, a Mercury Sable suddenly appeared inside the facility, parked behind the last building, *Id.*, at 197; (4) he searched the Mercury Sable, which was not locked, but found no keys and nothing inside except for trash, *Id.*, at 197-98; (5) he had not authorized anyone to park the Mercury Sable inside the facility and, after unsuccessfully attempting to have the local police take custody or remove it, he had the Mercury Sable towed on March 7, 2013, *Id.*, at 197-99; and (6) when police searched Unit 18 on April 13, 2013, no one asked him about the Mercury Sable but, later, he was asked and told law enforcement everything he knew about it, *Id.*, at 199.

An FBI Special Agent testified without contradiction that (1) the FBI examined the 2001 Mercury Sable on April 19, 2013, 49 R.R. [ECF no. 118-13] 23; (2) a pair of ear plugs were found inside the Mercury Sable, *Id.*, at 27; and (3) FBI agents also removed a piece of fiberboard from inside the vehicle, which bore a Massachusetts registration sticker, *Id.*, at 23-26.

Most significantly, a forensic scientist in the DNA Section of the Texas Department of Public Safety's Crime Lab testified without contradiction that (1) DNA was detected on the ear plugs found inside the 2001 Mercury Sable, 49 R.R. [ECF no. 118-13] 119-20; (2) the DNA profile on the ear plugs was consistent with Williams' DNA profile in that there was a one in 31.41 quintillion probability of a match among Caucasians and, therefore, she could declare with a reasonable degree of scientific certainty that Williams was the source of the DNA found on the ear plugs, *Id.*, at 121-22; (3) a swab of the driver's headrest in the Mercury Sable disclosed a mixture of DNA and Williams could not be ruled out as a

examination of computers taken from the Williams residence showed that Williams deactivated his Facebook account the day before the Hasse murder and, on April 1, 2013, Williams accessed online and downloaded a search warrant for the McLelland home[28]; (8) on the day Williams was arrested for burglary and theft, law enforcement officers executing a search warrant on Williams' Sport Trac discovered an AR 15 assault rifle and a 12 gauge

possible contributor to that mixture, with a one in 228.5 billion probability of a match among Caucasians, *Id.*, at 122-23; (4) DNA profiles were obtained from several items found inside a green backpack (which also contained jars of napalm), specifically goggles and a pair of gloves, *Id.*, at 124; (5) she could say with a reasonable degree of scientific certainty that Williams was the source of the DNA found on the right glove, *Id.*; (6) Williams could not be ruled out as a possible contributor to the mixture of DNA found on left glove, *Id.*, at 125; (7) she could say with a reasonable degree of scientific certainty that Williams was the source of the DNA found on the goggles in question, with a one in 31.41 quintillion probability of a match among Caucasians, *Id.*, at 125-26; (8) the person who told law enforcement that he sold the Mercury Sable on January 27, 2013 could not be ruled out as a possible source for the DNA found on a toothpick recovered from inside the Mercury Sable, *Id.*, 126-27; (9) in fact, there was a reasonable scientific certainty that the seller was the source of the DNA collected from the toothpick in question, with a one in 5.23 quintillion probability of a match among Caucasians, *Id.*; (10) there was an identical probability of a match between the Seller's DNA and the DNA recovered from a swab taken on the driver's side of the Mercury Sable, thus establishing to a reasonable scientific certainty that the Seller was also the source of the DNA in a swab of the driver's side of the Mercury Sable, *Id.*, at 127; and (10) DNA analysis alone cannot establish when DNA was deposited on any item, *Id.*, at 130.

[28] 49 R.R. 49 [ECF no. 118-13] 137-44. Additional forensic examination of the computers taken from the Williams home revealed multiple browser and Google searches for information on many subjects, including (1) Mark Hasse; (2) Hasse's former and current residential addresses; (3) license plate numbers on multiple vehicles belonging to Hasse's neighbors; (4) news stories about the McLelland murders; (5) a pair of female Dallas Morning News journalists; (6) the Kaufman County Crime Stoppers program; (7) Texas laws relating to possession of firearms by felons; (8) upper receiver groups for AR 15 rifles; (9) web sites selling guns; (10) Christopher Dorner's manifesto; and (11) the license plate and VIN for the 2001 Mercury Sable used as the getaway car during the Hasse murder. 49 R.R. [ECF no. 118-13] 148-84.

shotgun (both mounted in the ceiling of the vehicle), three Glock handguns with magazines, a Kel Tec handgun capable of firing .223 caliber ammunition, black gloves, and additional magazines containing ammunition[29]; (9) while attending a conference in Huntsville in the 1990's with his fellow state court employees Williams threatened a female conference attendee with whom he had previously shared a relationship[30]; and (10) Williams once lost

[29] 49 R.R. [ECF no. 118-13] 187-05. All the items seized from Williams' vehicle were later returned to him. *Id.*, at 195.

[30] 50 R.R. [ECF no. 118-14] 6-20. More specifically, the district clerk of Coryell County testified in pertinent part that (1) she met Williams at a time when she was divorced and Williams was not married and they both were serving as court coordinators for state district court judges, *Id.*, at 8-12; (2) their relationship was never exclusive and she chose to end it because she wanted to seek companionship with someone else who lived closer to her home, *Id.*, at 12; (3) initially Williams seemed to accept her decision, *Id.*, at 13; (4) at a conference in Huntsville not long thereafter, Williams approached her in the lobby of the hotel where the conference was held and spoke briefly with her, *Id.*, at 13-14; (5) Williams informed her that he wanted to show a her new gun he had acquired and proceeded to pull the handgun out in the lobby, *Id.*, at 14-15; (6) these actions surprised her, as she was unfamiliar with guns and was not aware that Williams had an interest in guns, *Id.*, at 15; (7) she thereafter politely declined Williams' invitation to have dinner with him, explaining she had previously agreed to go out with some female friends attending the conference, *Id.*, (8) later that evening while she was out with her friends, Williams approached her, tapped her on the shoulder, and asked her to speak with him, *Id.*, at 16-17; (9) she agreed to step back with him and talk but, when she did so, he told her "I have a gun and if you walk away I'll use it. I have nothing to lose.", *Id.*, at 17; (10) her friends saw her tearing up, approached her and Williams, and she stepped away from Williams with two of her friends on either side of her, *Id.*, at 17-18; (11) she reported Williams' threat to officials at the conference and to Huntsville police, *Id.*, at 18; (12) a police officer stayed outside her hotel that night and walked her to her class the next morning, where she observed Williams inside her classroom, *Id.*, at 18-19; (13) the officer directed her to go to the restroom and remain there until he came to get her, *Id.*, at 19; (14) she was informed by a Huntsville police that (a) he had spoken Williams' judge and (b) the judge had informed the officer he would get Williams back to Kaufman County so that no charges would ensue and the judge would make sure Williams did not bother her again, *Id.*, at 20; (15) she agreed with the arrangement and Williams never again contacted her, *Id.*, at 21; (16) she did not see Williams again until she was contacted by Kaufman County prosecutors (McLelland and Hasse) and testified for the prosecution at Williams burglary/theft trial, *Id.*, at 21-22; (17)

his temper and shouted out in the presence of others that he was going to kill a fellow attorney (who was not present), kill the other attorney's wife, kill the other attorney's children, and burn down their house.[31]

On December 10, 2014, the prosecution announced a series of joint stipulations addressing (1) the steps taken by experts to analyze the hazardous liquid (gasoline mixed with Styrofoam packing pellets) contained in the pair of glass jars with metal lids found inside Unit 18 and (2) the steps taken by various forensic electronics experts to successfully

---

she did not hear from Williams after she testified against him in 2012, *Id.*, at 23; (18) after Williams threatened her in Huntsville, she feared Williams, whom she described as behaving differently (agitated and nervous) in Huntsville from the very intelligent, likeable, genuinely nice guy she had met and gotten to know, *Id.*, at 24-25, 28; and (19) when she saw a televised interview in which Williams denied being involved with the McLelland murders, based on Williams' demeanor and her familiarity of him, she immediately turned to her husband and said "he did it", *Id.*, at 25, 28-29.

[31] 50 R.R. [ECF no. 118-14] 29-34. The attorney whom Williams threatened testified without contradiction that (1) at the time Williams made the threat, *i.e.*, September 2010, Williams had been appointed as mediator in a Kaufman County real estate case in which the attorney in question represented one party, 50 R.R. [ECF no. 118-14] 38; (2) two days before a mediation session scheduled for a Wednesday afternoon, Kim Williams telephoned him and informed him that Williams had been in the hospital and was about to get out, *Id.*, at 39; (3) he agreed to cancel the medication session that Wednesday and promptly called his client to inform them of the cancellation, *Id.*, at 39-40; (4) on Wednesday of that week the attorney on the other side of the real estate lawsuit (who was from Dallas) arrived at his office and angrily demanded to know what had happened, *Id.*, at 41; (5) when belatedly informed of the postponed mediation session, the Dallas attorney threatened to seek sanctions on Williams but the Kaufman County attorney urged calm, because accidents happened, *Id.*, at 41; (6) on Thursday or Friday of the same week, the attorneys whom Williams threatened learned from a fellow attorney about Williams' angry outburst, *Id.*, at 42; (7) the attorney whom Williams threatened was concerned for himself, his wife, and his children but not enough to have a security system installed at his home at that time, *Id.*, at 42-44; but (8) he subsequently did have an alarm system installed in his home, *Id.*, at 44-46.

reconstruct and download at least some pictures and text messages from the broken cell phone recovered from Lake Tawakoni.[32] At that point, the prosecution rested its case-in-chief.[33]

**2. The Defense's Evidence**

The same date, the defense (1) re-urged its motion for continuance, (2) moved for a mistrial based on the previous display of multiple weapons to the jury, (3) re-urged its motion requesting a separate punishment phase jury, and (4) moved again for a change of venue, all of which the trial court denied.[34] The defense then made its opening punishment phase statement and presented its first seven punishment phase witnesses: a Kaufman County attorney who expressed doubts about the validity of Williams' burglary and theft convictions; a pair of spiritual advisers who made clear they believed Williams was not a threat to them; and several jail administrators and other law enforcement personnel who explained Williams had been well-behaved during his pretrial detention.[35]

---

[32] 50 R.R. [ECF no. 118-14] 49-55.

[33] 50 R.R. [ECF no. 118-14] 55.

[34] 50 R.R. [ECF no. 118-14] 56-60.

[35] A female Kaufman County attorney who knew but was not close friends with Williams or his wife testified that she met Williams in the mid-1990's, found him to be a capable court administrator for Judge Ashworth (with whom Williams appeared to be good friends because the two men lunched together almost daily); (2) years later when Williams was a practicing attorney, she found him to be a capable family law practitioner to whom she could turn for legal advice and to whom she referred people when they had family law issues; (3) Williams' wife, whom she met at bar functions, was attractive; (4) Williams and his wife appeared to have a happy and loving relationship; (5) she believed Williams' prosecution for burglary and theft was political in nature and resulted from the aggressive and zealous attitudes of Hasse and McLelland; (6) after watching Williams' trial, she believed Williams' conviction on those charges was wrongful and "ridiculous"; and (7) it

was unfathomable to her that Williams could be involved in the Hasse and McLelland murders, in part, because she had never seen Williams, whom she described as "shy," get angry. 50 R.R. [ECF no. 118-14] 68-84.

Two church leaders from a Rowlett congregation who worked in jail ministry testified that (1) they had contact during Bible study sessions with Williams, whom they each described as attentive, during Williams' pretrial detention at the Rockwall County Jail; and (2) they had never felt fearful of Williams, who unlike many other inmates did not have tattoos. 50 R.R. [ECF no. 118-14] 84-109. One of these two individuals also testified that he did not believe he had ever met a dangerous inmate and he also believed inmates could find Jesus in prison. *Id.*, at 93, 95-99.

The head of the Rockwall County Sheriff's Department's Emergency Response Team who was involved in furnishing security for Williams' capital murder trial testified in pertinent part that (1) there had been no reports of any incidents or problems during the trial, save for Williams deliberately removing a collar stay from his shirt and dropping on the floor on one occasion; (2) the incident had not resulted in any disciplinary action against Williams; (3) Williams was still permitted to have stays inside his collar; (4) Williams had neither made a verbal threat nor engaged in any intimidating behavior; (5) Williams had been cooperative and compliant throughout the trial; (6) Williams had not attempted to escape; but (7) he was concerned by Williams' penchant for observing and commenting to guards about every action which took place around him. 50 R.R. [ECF no. 118-14] 109-23.

The jail administrator for Rockwall County testified, in pertinent part, that (1) his facility offered alcohol programs for inmate but Williams had scored a zero in alcohol and drug use; (2) Williams had committed no serious disciplinary infractions nor attempted an escape while at that facility; (3) Williams was housed in "medium custody" but in a segregated unit because he was an ex-law enforcement officer; (4) Williams uses a CPAP machine at night and has medical issues with his diabetes; and (5) there had not been any incidents involving Williams' clothing. 50 R.R. [ECF no. 118-14] 123-56. On cross-examination, however, he testified that (1) on one date Williams had identified himself as "Jesus Christ"; (2) Williams was on 24/7 monitoring to avoid self-harm; (3) there had been no incidents involving Williams which required documentation; and (4) Williams was a decently behaved inmate who created no problems. *Id.*, at 150-55.

The Kaufman County jail administrator testified in pertinent part that (1) Williams was barred from contact with other inmates and special visitation procedures had been establish for Williams; (2) Williams had been placed on fifteen-minute watch; (3) Williams' use of a CPAP machine had not involved any misuse; (4) a search of Williams' cell on November 2, 2013 had resulted in the confiscation of several items of contraband, including two extra bars of soap, two bowls of shampoo, and some string from a sheet; (5) Williams had been taken to the hospital on multiple occasions when he either fell (splitting open his nose on one occasion) or when he was found either unresponsive or unconscious; (6) jail staff learned of Williams' diabetes only after his second trip to the hospital; (7) shortly thereafter a search of Williams' cell resulted in the discovery and confiscation of a

On December 11, the defense continued its evidence, presenting two experts on inmate classification within prison systems who both opined that Williams could be managed safely within a modern prison system,[36] a pair of Williams' relatives who testified

large quantity of high carbohydrate snack foods Williams had purchased in the commissary, including six bags of chips, cookies, hard candy, Oat & Honey, banana chips, Raman noodles, and moon pies; (8) jail personnel suspected that Williams was deliberately manipulating his blood sugar to gain a trip to the hospital; (9) jail medical staff denied Williams' request to have his family bring him glucose tubes; (10 Williams made no attempt to escape on one occasion when the door to his unit was left unlocked for several hours; and (11) she knew Williams through his work for Judge Ashworth and Williams had once served as an unpaid reserve Sheriff's deputy. 50 R.R. [ECF no. 118-14] 157-94.

One of the officers responsible for security during Williams' trial testified in pertinent part that (1) Williams had consistently responded to verbal commands, not resisted any verbal commands or instructions, made no attempt to escape, and not been discovered with contraband in the courtroom; (2) Williams was very observant, keeping a detailed log of all his interactions with officers inside the Kaufman County Detention Center; and (4) she believed Williams had deliberately manipulated his blood sugar level to get himself taken to the hospital. 50 R.R. [ECF no. 118-14] 195-207.

[36] A correctional consultant from South Carolina with no experience in the Texas prison system but extensive experience in the South Carolina penal system, including time as a warden, as well as expertise gained consulting with state and federal prison administrators, (1) explained the nature of inmate classification systems generally; (2) testified that he had reviewed documents concerning Williams' offense and background; (3) testified that he had interviewed Williams, whom he found not to be manipulative; and (4) opined that, based on Williams' age, background, demeanor, and the other information he had reviewed (including the availability of rehabilitative programs in prisons, Williams' lack of any disciplinary infractions during his pretrial detention, Williams' potential vulnerability in prison as a former law enforcement officer, and Williams' medical condition), he believed Williams could be safely managed if sentenced to a term of life imprisonment. 51 R.R. [ECF no. 118-15] 24-40, 58-64. On cross-examination, he admitted that (1) he has never professionally consulted with anyone in the Texas prison system; (2) he has never been to a high security Texas prison facility; (3) Williams is highly intelligent; and (4) while prison officials can act to reduce the opportunities for violence inside prisons, they cannot control the thoughts of inmates. *Id.*, at 40-58.

A former Texas Department of Criminal Justice administrator with decades of experience dealing with TDCJ's inmate classification system since its inception in 1984 testified that (1) testified about the advent and evolution of that system over the past several decades; (2) explained the five-level TDCJ inmate classification system, including what

about Williams' family background,[37] and several of Williams' friends from high school

types of prison facilities could house particular classes of inmates and what types of restrictions on housing, work assignments, and accessibility exist for inmates at each level; (3) explained the significance of the prison construction boom in Texas in the 1990's and legislative adoption of life without parole as a possible sentence in capital murder cases; (4) explained there is currently no air conditioning in Texas prisons but suggested that could change in the future; (5) explained the TDCJ prison disciplinary system, the difference between major and minor infractions of TDCJ rules, and the potential consequences of same; (6) opined that, based upon the testimony of the defense's previous expert (which he had heard) and his own review of materials regarding Williams' offense and background, he believed Williams would most likely be classified as a G-3 level, general population inmate if given a life sentence; (6) explained that Williams would not thereafter be able to earn re-classification to a less restrictive level but could be re-classified to a more restrictive level by prison officials based on his behavior; and (7) explained the availability of administrative segregation as an option for TDCJ administrators confronting a recalcitrant TDCJ inmate. 51 R.R. [ECF no. 118-15] 62-124, 123-24. On cross-examination he (1) explained that, since his retirement from TDCJ, he has testified fifteen-to-twenty times in capital murder cases for defense counsel; (2) he believers Williams is intelligent and understands the situation he faces, thus making it unsurprising Williams has exhibited good behavior during his pretrial detention; (3) inmates sentenced to life without parole in Texas are not eligible to be furloughed; and (4) he was aware of several incidents in the past four decades in which even high security inmates (including those on death row or in administrative segregation units) have either escaped, killed others, or inflicted serious injury to others inside TDCJ facilities. *Id.*, at 93-123.

[37] Williams' paternal uncle testified that (1) Willims' paternal grandfather died at a young age; (2) Williams' father's family grew up in a rural, financially strapped environment and its members are reluctant to show emotion; (3) Williams is smarter than others in his family; (4) there were higher expectations placed on Williams growing up; (5) in recent years his family has become dependent upon Williams; and (5) he would prefer to be able to continue to communicate with Williams even if it is in a prison environment. 51 R.R. [ECF no. 118-15] 127-38.

Williams' cousin, an Army Colonel and instructor at the Department of National Security and Strategy, testified (1) he last saw Williams in 2009 at his own parents' fiftieth wedding anniversary; (2) he and Williams' parents were very close when they were growing up and they saw each other frequently; (3) he and Williams went through Reserve Officer Training together at TCU; (4) Williams majored in criminal justice, was commissioned as a military policeman after his graduation, and then worked as a law enforcement officer in a small town; (5) Williams then went to law school and graduated; (6) he visited Williams and Kim in their home at Christmas about tent-to-fifteen years ago, before Kim became ill; (7) he has not been close with Williams for 25 years; and (8)

and adults who knew Williams during his youth who all described Williams in very positive terms.[38]

---

Williams' family has been devastated by the charges against him. 51 R.R. [ECF no. 118-15] 159-73.

[38] Williams' former Scout Leader testified that (1) he last saw Williams in 1983; (2) Williams and his son were friends growing up; (3) Williams was very successful in scouting, actively participating in Cub Scouts and thereafter earning the Boy Scout rank of Eagle Scout, earning membership in the Order of the Arrow, and going to Philmont Scout Ranch in New Mexico; and (4) Williams' father participated in troop activities while Williams was active in his troop. 51 R.R. [ECF no. 118-15] 139-58.

A former high school classmate and friend of Williams, who took advanced physics and often hung out with Williams, but who had not seen Williams for almost thirty years, testified (1) Williams was on their school's math and science competition team; (2) Williams once stuck up for him and a group of several other minority students during a confrontation by a bully; and (3) he genuinely liked Williams. 51 R.R. [ECF no. 118-15] 174-82.

A Tarrant County Deputy Sheriff who attended high school with Williams in Azle testified (1) they were good friends, shared a taste in music, and hung out together in high school; (2) Williams was active on their school's math and science competition team, helping the team win interscholastic competitions; (3) Williams also participated in the Junior Engineering Technical Society and was an intelligent, well-rounded kid; (4) Williams worked hard in school, was focused, and performed well; (5) Williams had a sense of humor but could be blunt; (6) Williams worked the gate at a resort called Twin Points that was near a lake and popular with families in their area; (7) he never saw Williams get angry or threaten anyone in high school; (8) Williams regularly attended school and was never a discipline problem; (9) he worked in law enforcement with Williams briefly but they have had no contact since Williams started attending law school at night; (10) he and Williams once shared an interest in becoming private investigators together; (11) he knew Williams' parents; and (12) he was shocked when he heard of the charges against Williams because he could not reconcile them with the person he had known in high school and with whom he had shared many friends. 51 R.R. [ECF no. 118-15] 182-203.

Another former classmate of Williams at Azle High School testified (1) he became friends with Williams in high school because they shared common interests in science fiction, fantasy, and role playing games (such as Dungeons and Dragons), as well as computer games, which they often played together; (2) they were also in band together with Williams serving as a section leader for the trumpets (where Williams was one of the better players) while he played trombone; (3) they shared a group of friends who took science and math courses and were college-bound; (4) Williams was a regular school

On December 12, 2014, the prosecution moved to re-open and presented a witness who explained that some of the weapons displayed *en masse* to the jury earlier in the trial had been included in the display erroneously.[39] Just before the trial court granted the

---

attender and never a discipline problem; (5) Williams father was the president of SIE, a waterline services company – a division of Geo Source at that time; (6) he met Williams' parents at band functions; (7) once during their freshman year, Williams' father pulled several other youths off a group of students that included him and Williams (Williams had not started the confrontation but had tried to de-escalate the situation); (8) that was the only fight he can recall Williams being a part of in high school; (9) he and Williams played Dungeons and Dragons with a group of their friends and shot .22 rifles together; (10) Williams had a very wicked sense of humor but was also a rules follower; (11) he did not know when Williams began attending law school at night because, by then, he had graduated from college and moved away; (12) he was not surprised when he learned Williams had become an attorney; (13) Williams was the best man at his first wedding but they subsequently drifted apart; and (14) he felt disbelief when he heard of the charges against Williams, whom he had not seen since 1992. 51 R.R. [ECF no. 118-15] 203-17.

A retired teacher, who was also the mother of a pair of Williams' high school friends, testified (1) her family moved to Azle in 1982 and her sons met Williams when they were in high school; (2) her home was the focal point for the group of youths which included her sons, Williams, and several other smart boys (there were no girls hanging around) who enjoyed playing games for hours at a time; (3) that group did not make fun of others who were not as academically advanced as they were; (4) Williams was very well mannered; (5) she trusted Williams enough to allow him to drive her sons around when Williams got his driver's license; (6) Williams was willing to help out at their home was he was over there; (7) Williams was not a spoiled rich kid; (7) she met Williams' parents, whom she believed taught Williams right from wrong; (8) she saw no signs Williams was an abused child; and (9) she last saw Williams in 1991. 51 R.R. [ECF no. 118-15] 218-27.

[39] One of the prosecution witnesses who had identified the collection of weapons displayed in open court days before as those having been found in Unit 18 or the Williams residence returned to the stand and explained that an inventory of the weapons in question in recent days had revealed that, in addition to the 45 firearms found inside Unit 18 and the Desert Eagle handgun found inside the Williams home, the collection of firearms that was displayed for the jury in open court had inadvertently included an additional thirteen weapons: (1) the two guns recovered from Lake Tawakoni; (2) four pistols found inside the home of Kim Williams' parents down the street from the Williams residence on Overlook; (3) a gun recovered the Hasse residence; (4) a gun recovered by Seagoville police that was unrelated to Williams' case; and (5) several guns that had been in the custody of the Kaufman County Sheriff's Department. 52 R.R. [ECF no. 118-16] 10-15.

prosecution's motion and ordered the guns in question withdrawn, Williams' trial counsel unsuccessfully moved for a mistrial.[40] The defense then presented (1) four more of Williams' childhood or teenage friends to testify about Williams' stellar reputation and character as an adolescent and young man[41]; (2) one of Williams' former guardian *ad litem*

The prosecution moved to withdraw from evidence State Exhibit nos. 334, 347, 357, 361, 363, 368, 369, 372, 374, 375, 376, 379, and 382 after explaining that no photographs of the weapons in question had been admitted into evidence. *Id.*, at 14-15. The trial court ordered the weapons in question withdrawn from evidence but advised the parties the weapons "are still in the record." *Id.*, at 15.

[40] 52 R.R. [ECF no. 118-16] 14.

[41] A high school friend who was slightly older than Williams testified that (1) he was a trombone player in the same high school band as Williams; (2) Williams was frequently at his home (which had a pool table); (3) Azle High's math and science team was led by a charismatic physics teacher; (4) he dated a younger student at Azle High who, after he amicably broke up with her, dated Williams; (5) after he graduated from high school, he stayed in contact with Williams, as evidenced by a photograph showing the witness wearing a college shirt; (6) Williams was one of only four of his former Azle High students whom he invited to his wedding in 1992; (7) the last time he saw Williams was at that ceremony; (8) Williams always seemed friendly, never cold or indifferent; (9) he was shocked when he learned from his younger brother about Williams' arrest for murder; (10) Williams was often at his house when he came home from college; (11) Williams worked as a volunteer police officer in a small town near Azle; (12) Williams attended gun shows, something commonly done by their peers; (13) Williams did not always obey traffic laws as a young driver, commenting once that "it's only illegal if you get caught"; (14) he was never in Williams' home; and (15) since his own wedding, he has had no communication with Williams. 52 R.R. [ECF no. 118-16] 16-27.

The younger brother of the witness in the immediately preceding paragraph testified that (1) he was a friend of Williams and a member of the Azle High math and science team with Williams; (2) Williams spent a lot of time at his home, as part of a group of five or six math and science team members who gathered there to play games or go to the movies together; (3) for him, high school was a great experience, in part due to his very positive relationship with Williams; (4) after the witness's older brother graduated from high school and went away to college, Williams drove the two of them to school every day for at least a year; (5) during that time, Williams became a surrogate older brother to him; (6) Williams was friendly, polite, and a good student who never got angry; (6) Williams often helped others on their math and science team; (7) he was shocked to learn of Williams' crimes on

clients and an adult client whom Williams represented as an attorney in multiple legal proceedings, both of whom praised Williams' legal work and professionalism[42]; (3) a

---

a Facebook post; and (8) he last saw and spoke with Williams at his older brother's wedding in 1992. 52 R.R. [ECF no. 118-16] 41-49.

Yet another high school classmate of Williams testified that (1) he met Williams in seventh grade; (2) they were good friends who shared many road trips together, including trips to competitions as part of their school's math and science team and camping trips as Boy Scouts; (3) their math and science team once hosted a Haunted House for a group of elementary school children; (4) Williams' father helped lead their Boy Scout troop; (5) Williams was very smart and had a good, wry sense of humor; (6) he last saw Williams during his early college years; (7) after that he moved out of state and they lost contact with each other; (8) he returned from Colorado to testify on Williams' behalf; and (9) he is still struggling with Williams' crimes. 52 R.R. [ECF no. 118-16] 26-40.

One of the few female members of the Azle High math and science competition team with Williams testified that (1) she became a teacher; (2) she met Williams in high school through Williams' parents and their joint participation in the math and science team; (3) Williams never said a mean word and was friendly, respectful, helpful, caring, protective, gregarious, kind, and compassionate; (4) Williams worked at her family's business Twin Points Beach, a lakeside establishment where she served as a lifeguard and Williams worked as security; (5) Williams continued to help and care for her family and their business throughout the 1990's and into the early-2000's; (6) once they began dating, Williams took her to his senior prom and to her junior prom; (7) Williams once traveled some distance to cheer her on at one of her jujitsu competitions; (8) Williams was protective of her and she has never seen him get angry or get into a fight; (9) Williams accepted it and was not frustrated when she decided they should stop dating and they remained good friends thereafter; (10) she attended Williams' high school graduation as well as Williams' graduation from boot camp at Fort Sill; (11) Williams worked as a volunteer police officer and was very friendly and helpful to the public; (12) Williams worked hard to push himself through college and law school; (13) Williams is a proud member of MENSA; (14) she was shocked when she learned of the criminal charges against Williams; (15) even now she does not believe Williams is guilty because he told her he was not; (16) she is still Williams' friend and has visited Williams three or four times during his current detention; and (17) she would like to be able to continue to see and communicate with Williams. 52 R.R. [ECF no. 118-16] 50-68.

[42] A young woman whom Williams represented as guardian *ad litem* in a child custody dispute when she was thirteen testified that (1) her parents were fighting for her custody; (2) her mother had moved out and gone to San Antonio; (3) she wished to remain with her father locally; (4) Williams listened to her and was never cold or indifferent; and (5) while she was not permitted inside the courtroom during proceedings, Williams

person who once purchased Williams' house and was unable to meet the terms of her payment schedule who lauded Williams' patience[43]; (4) the former dean of the law school from which Williams graduated[44]; (5) a retired state district judge from Tyler who presided

---

advocated for her and she was allowed to remain with her father. 52 R.R. [ECF no. 118-16] 69-73.

A former client of Williams testified (1) Williams once represented him a divorce proceeding in which the custody of his one and a half year old son was in dispute; (2) Williams fought very hard through many hearings for two years; (3) Williams was always professional, showed up for hearings on time and was prepared; (4) Williams has met and loves all of his children; (5) when he ran out of money during the extended litigation, Williams continued to represent him effectively; (6) a psychiatrist helped Williams convince the court to grant him custody of his son; (7) he has since remarried and has several children; (8) Williams also successfully represented him in a civil lawsuit, defending him against a slander claim; (9) he last saw Williams in 2010 when his father passed away' (10) while he has not socialized with Williams as much as he would prefer in recent years that is because whenever he has invited Williams to come hunting, Williams was always too busy with his law practice; (11) he has not visited Williams during Williams' current detention but still considers Williams to be his friend; and (12) he would prefer to be able to communicate with Williams even if it is in prison. 52 R.R. [ECF no. 118-16] 74-83.

[43] The purchaser of Williams' former residence testified (1) she bought the home next door to her parents' home where Williams had previously lived; (2) she got significantly behind in her payments over the course of several years; but (3) she was evicted eventually by Williams' parents, not by Williams. 52 R.R. [ECF no. 118-16] 284-86.

[44] A professor of law at the Texas A&M School of Law in Fort Worth, and the former Dean of that institution, (1) testified about the history of that law school and important role it has played as the DFW area's first law night school; (2) explained the way the law school earned its accreditation from the ABA in stages over about five years; (3) explained that, at the time Williams enrolled in the school's night program, students were normally expected to earn their degrees in four years; (4) recalled that, when Williams graduated in 1999, there was not much opportunity for graduates of the law school to obtain highly prestigious job offers but, thanks to the quality of their graduates over the years, that has changed; (5) explained most students who attend the Texas A&M law school, which is a private institution, have to work to pay their way through; (6) explained many of their students borrow money to pay their way through their program; (7) explained the people who attended the Texas A&M law school at the time Williams did really wanted to become

as a senior judge over a complex child custody case in which Williams served for a time as the guardian *ad litem*[45]; (6) a Kaufman County attorney familiar with Williams' work on CPS cases[46]; (7) the Kaufman County District Clerk[47]; and (8) a Kaufman County state

---

lawyers or wanted to get a law degree but not practice law and night school was their only option; (8) opined that, either way, everyone who graduated back when Willians did had to work very hard to do so; (9) explained the Dean's List consists of the top fifteen percent of a class; (10) explained that, even during the early days of the law school, its graduates could take the bar exam and become attorneys in most states; and (11) admitted that he does not specifically recall Williams as a student. 52 R.R. [ECF no. 118-16] 87-99.

[45] A state district court judge from Tyler testified that (1) after she became a senior district judge, she began travelling to other counties to assist courts there; (2) her court back in Tyler was primarily a family law venue but she also handled criminal cases; (3) she presided over several family law cases in Kaufman County in which Williams participated, including one with a voluminous file which involved an issue of back child support owed by the father of a teenage boy; (4) Williams represented the boy as guardian *ad litem*; (5) the quality of the work Williams did in that case was fine; and (5) the results of that proceeding included orders that the father was permitted only supervised visitation with the boy and the father was directed to pay the child support owed. 52 R.R. [ECF no. 118-16] 100-08.

[46] A Kaufman County attorney who does work on CPS cases testified that (1) CPS cases usually involve allegations of child abuse; (2) for a period of time Williams received *ad litem* appointments in many, if not most, such cases in that County; (3) he worked on several cases in which Williams was also counsel and found Williams to be very competent as a guardian *ad litem*, in that Williams gave good representation, was knowledgeable about the law, and was prompt and prepared for hearings; (4) Kaufman County pays *ad litem* attorneys on an hourly basis; and (5) for a time Williams ran the Kaufman County law library, a small library. 52 R.R. [ECF no. 118-16] 109-18.

[47] The Kaufman County district clerk testified that (1) she had worked in the district clerk's office since 1995; (2) when she started Williams was working as a court coordinator for district court Judge Glen Ashworth; (3) court coordinators schedule hearings, set the docket, and pull files for the Judge; (4) Williams worked as a court coordinator for at least three years while he attended law school at night; (5) Williams performed his duties as a court coordinator well and always went out of his way to help others; (6) eventually Williams passed the bar and became an attorney, which was a big deal within the courthouse; (7) Williams was always very friendly and approachable, helpful, and got along with others; (8) as an attorney, Williams handled family law cases; (9) Williams and Judge Ashworth were once very close friends; (9) she sang at Williams' wedding; (10) she

district judge who had appointed Williams to serve as an *ad litem* or a mediator in numerous cases over nearly a decade in which Williams had practiced law.[48] All of these witnesses had good things to say about Williams and his work ethic.[49]

On December 15, 2014, the defense unsuccessfully made an offer of proof regarding the testimony of Kim Williams and again unsuccessfully moved for a continuance.[50] The

---

always thought of Williams as an intelligent, normal guy; (11) she could not believe it when she learned Williams was accused of the murders because it was out of character for him; and (12) she rejected an offer of security. 52 R.R. [ECF no. 118-16] 124-31.

[48] A Kaufman County district judge who had served since 2002 testified (1) he did not know Williams as a court coordinator but only as a practicing attorney; (2) CPS judges make appointments of attorneys *ad litem* in CPS cases; (3) he approved the vouchers to pay those attorneys in the amounts recommended by CPS Judges; (4) he had appointed Williams numerous times to serve as an *ad litem* or as a mediator in cases in which he presided, starting in 2002 when he took the bench and continuing until 2011 when Williams was arrested; (5) there were never any complaints about Williams' performance as an *ad litem* or mediator; (6) he was satisfied with Williams' performance in both those roles; (7) at some point he reviewed records and learned Williams had received around a hundred thousand dollars for his work for the county in a single year; (8) he believed that other attorneys in Kaufman County would likely wish to participate in the County's largesse; (9) thereafter a policy decision was made to ensure the appointments were spread among more attorneys; (10) that policy change in no way reflected any dissatisfaction or problems with the quality of Williams' legal work. 52 R.R. [ECF no. 118-16] 132-37.

At the conclusion of proceedings that day, the trial judge expressed concern to counsel outside the presence of the jury with the cumulative and redundant nature of many of the witnesses' testimony, particularly the multiple witnesses who had testified about Williams' years in high school. He admonished counsel to avoid burdening the jury and the court with redundant testimony and encouraged both sides to prepare to complete the testimony and get the case to the jury early the following week. 52 R.R. [ECF no. 118-16] 138.

[49] While the former Dean of Williams' law school did not recall Williams as a student, he made a strong case that anyone who could graduate from the night law school program as Williams did was necessarily a very focused, hard-working, individual. 52 R.R. [ECF no. 118-16] 91-98.

[50] 53 R.R. [ECF no. 118-17] 7-9.

defense then requested and received instructions to the jury to (1) disregard any of the weapons that had been withdrawn by the prosecution; (2) disregard any perceptions it may have drawn based on the trial judge's demeanor, facial expressions, or comments to counsel; and (3) decide the case solely on the evidence.[51] The defense then presented sixteen witnesses. These witnesses included (1) a pair of sisters who, as teenagers in 2002-03, spent two Summers living with Williams and his wife in an effort to escape an abusive stepfather at home[52]; (2) a resident of Quinlan who lived near Lake Tawakoni and the Two Mile Bridge (where the Hasse murder weapon was recovered) who felt grateful to Williams for his work as an *ad litem* which helped her stepdaughter adopt the little boy who became her grandson[53]; (3) the former elected District Attorney of Kaufman County, who described

[51] 53 R.R. [ECF no. 118-17] 10-13.

[52] The two sisters testified in fairly lock step with each other that (1) they were related by marriage to Kim Williams and considered themselves to be her "step-nieces"; (2) they stayed with Williams and Kim to get away from a physically abusive stepfather who was convicted multiple times for domestic violence wrecked on their mother and had been incarcerated for same; (3) during their stay in the Williams home, Williams was always working in his office and frequently missed meals; (4) Williams was always polite and civil to them, never angry, abusive, or hostile, but mostly kept to himself; (5) Kim was always shopping and appeared to be the one who wore the pants in the family; (6) for a time Kim's mother came to live with them after she experienced a seizure; and (7) Kim did not appear to be ill during the summers they stayed with the Williams but Kim did seem obsessed with her appearance and spent money freely. 53 R.R. [ECF no. 118-17] 13-30.

[53] 53 R.R. [ECF no. 118-17] 30-41. This witness was gushing in her praise for Williams' work on the adoption case in which her stepdaughter and her stepdaughter's husband ended up adopting the little boy in question despite opposition from the child's biological parents, pointing out that Williams had been very professional in his dealings with their family, very effective during multiple hearings over many months, and never angry. *Id.* On cross-examination, however, she admitted she had not seen Williams since the adoption was finalized in 2004. *Id.*, at 41.

the support Williams had lent him in an election campaign against McLelland in 2006[54]; (4) a Kaufman County attorney who practiced law with Williams and had knowledge of Williams' work as a district court coordinator prior to becoming an attorney[55]; (5) a judge familiar with Williams' work as an *ad litem* attorney in Kaufman County who described Williams' work in very positive terms[56]; (6) Williams' cousin, who described Williams as

---

[54] The former Kaufman County District Attorney (1) read the entire contents of a letter Williams wrote which was used as a political campaign ad during the 2006 runoff election; (2) explained the ad attacked McLelland's credentials and qualifications as an attorney and a Republican; (3) explained that, after winning that run off against McLelland and taking office, he was cited for a DUI in Dallas County and subsequently lost his re-election bid to McLelland at the next election cycle; (4) testified that he wrote Williams a campaign contribution check when Williams ran for JP and he actively supported Williams' candidacy for that office; and (5) he believed Williams was attempting to make positive changes to the office of Justice of the Peace in Kaufman County prior to his arrest for theft, which he implied was politically motivated. 53 R.R. [ECF no. 118-17] 46-54. The trial court repeatedly sustained the prosecution's objections during this witness's testimony to questions about the theft and burglary charges brought against Williams. *Id.*

[55] 53 R.R. [ECF no. 118-17] 66-79. This witness testified in pertinent part that (1) he was married to his law partner and they officed near the courthouse in Kaufman; (2) their firm hired Williams as an associate attorney primarily to assist his wife with her family law work; (3) his wife subsequently fired Williams as a result of a dispute over the division of attorney fees generated from Williams' work as an *ad litem*; (4) disputes over fees are common in law firms; (5) nonetheless, he believed that Williams, despite being a little withdrawn at times, worked well together with others, had no mean streak, and had no bad character traits; (6) Williams had done excellent work as a court coordinator while putting himself through law school and had made positive efforts to improve the Kaufman County law library; (7) once elected to the Justice of the Peace position (an election which replaced a Democrat who had been in office for two decades), Williams attempted to implement positive changes in that office; (8) Williams was always very professional, courteous, affable, and communicative and never made threats; (9) he did not take seriously Williams' comments about killing and burning down the house of another attorney; and (10) after being convicted of theft, Williams became isolated. *Id.*

[56] 53 R.R. [ECF no. 118-17] 80-87. This witness also (1) explained for the jury the important role attorneys fill as guardians *ad litem*; (2) opined that Williams seemed to care about the children he represented; and (3) testified that Williams was always very thorough,

a child in positive terms and offered her observations on Williams' marriage[57]; (7) Williams' self-described best friend from childhood who reiterated the views of Williams' other high school classmates about Williams' good character and described their many trips together on the Azle High math and science team as well as their many joint camping trips in Boy Scouts[58]; (8) the faculty adviser for the Azle High math and science competition

---

interviewed everyone involved in his cases, and furnished good and valuable legal services. *Id.*

[57] 53 R.R. [ECF no. 118-17] 88-103. This witness testified (1) she typically saw Williams four or five times a year, at the holidays and on birthdays; (2) as a child Williams was reserved, did not draw attention to himself, was not a troublemaker, and was perfectly happy playing by himself; (3) she never saw Williams get a spanking; (4) as a child, Williams did not break rules or cause trouble and was gentle and caring; (5) Williams' family lost their home and everything they owned in a housefire when Williams was still a child; (6) when Williams was age eight or nine, she pulled him out of a lake as he was near drowning; (7) when Williams was about age ten or eleven, she and Williams were bucked off a horse and she landed on top of Williams, who had the wind knocked out of him; (8) as an adult, Williams was quiet, shy, and a hard worker; (9) Williams' military career came to an end when he was diagnosed with diabetes; (10) she saw Williams in 2007 but then not again until 2009 at her parents' fiftieth wedding anniversary; (11) she did not see Williams after that until she visited him in jail in November 2014; (12) Williams worked hard in his professional life and was devastated when he was convicted and lost his job and (13) she would like to have the opportunity to visit Williams in prison or to correspond with him because the person she knew growing up was a good kid and would not have done it. *Id.* She also testified that (1) when she first met Williams' wife Kim, she found Kim to be vivacious and outgoing; (2) she believed Kim helped Williams to become more outgoing himself; (3) after Kim became ill, Kim became quieter and did not participate as much; and (4) Williams took care of Kim and Kim's parents after Kim became ill. *Id.*

[58] 53 R.R. [ECF no. 118-17] 105-31. This witness testified (1) he and Williams met in elementary school and quickly became best friends; (2) he and Williams participated in Cub Scouts and Boy Scouts together, taking many camping trips together and even spending time at Philmont Scout Ranch in New Mexico; (3) they both achieved the rank of Eagle Scout and were "tapped out" together into the Order of the Arrow, Scouting's honor fraternity and service organization (both of which were significant achievements); (4) they participated together in band and the Azle High math and science competition team; (5) Williams spent so much time at his house (including many nights) that his own

team who described Williams as a high school student in glowing terms[59]; (9) a former attorney who was familiar with Williams' work as both a court coordinator and attorney who testified in glowing terms about Williams' professionalism and role as a caring husband for his ill wife[60]; (10) the parents of a female member of the Azle math and science

---

mother began referring to Williams as her second son; (6) he often spent time at Williams' house, which became a second home for him; (7) Williams swore him into the Air Force when he graduated from college and was commissioned; (8) Williams had previously earned his own commission into the Army; (9) Williams attended the funeral for his mother in 2009; (10) subsequent to that time, however, he and Williams drifted apart; and (11) while they are no longer best friends, if Williams were sent to prison, he would visit and write to Williams if Williams desired same. *Id.*

At the conclusion of this witness's testimony, outside the jury's presence, the trial judge once again admonished Williams' trial counsel (as the judge previously had done on multiple occasions in recent days) to eliminate redundant testimony and to focus the testimony of defense witnesses on their interactions with, and observations about, Williams – not on lengthy discussions about field trips and other matters unrelated to the issues before the jury. *Id.*, at 154-56.

[59] 53 R.R. [ECF no. 118-17] 132-59. This witness testified (1) Williams was active on the math and science team (participation was strictly voluntary) all four years at Azle High and qualified for the UIL state finals his senior year, a significant achievement; (2) as a student, Williams was very successful, goal-oriented, respectful, trustworthy, hard-working, serious, dependable, helpful, and cheerful (even happy-go-lucky); (3) Williams mentored younger members of the math and science team; (4) he was very much saddened and surprised when he learned of the charges against Williams because he had never seen Williams angry or vengeful; (5) if Williams were to reach out, he would respond, whether by mail or visiting Williams in prison; (6) he believes Williams was fully capable of helping other adults inside prison in educational programs; but (7) he had not seen Williams since Williams' high school graduation some 27 years ago. *Id.*

[60] 53 R.R. [ECF no. 118-17] 156-84. This witness testified that (1) she met Williams when he was working as a court coordinator for Judge Ashworth; (2) everyone she knew believed Williams was going a great job and was diligent; (2) as an attorney, Williams was respectful to the court, always prepared, prompt, always knew the law, cordial to other attorneys, and zealous in his representation of his clients; (3) Williams was always helpful whenever she sought to get legal advice or brain storm an issue; (4) Williams occasionally organized poker parties for groups of other attorneys where the only price of admission was to bring something good to eat; (5) those parties were opportunities for socializing and

team, who employed Williams in their family business during high school and for many years thereafter, who testified in glowing terms about Williams' character, work ethic, and his continuing close relationship with their family[61]; (11) a former *ad litem* client of

---

catching up on people's families, not legal discussions; (6) she believed Williams was an excellent husband because he stayed with and took care of Kim when she became ill; (7) Williams had lunch with Judge Ashworth almost daily, even after Williams began practicing law; (8) even now she believes Williams is a good person; (9) Williams stood by her when she lost her law license by offering her support through encouraging phone calls and emailed messages; (10) she tried to return the favor when Williams was charged with theft; (11) several weeks after Williams' conviction on those charges, she was inside the Kaufman County District Attorney's Office and saw a makeshift Wanted poster on a wall featuring Williams' face which she felt was completely inappropriate and unprofessional; (12) she believed the changes Williams was attempting to enact in the Justice of the Peace court were desirable; (13) she remained friends with Williams even after his theft conviction and she reached out to Williams, whom she thought was humbled by the experience and uncomfortable taking help from others; (14) Williams nonetheless seemed to appreciate her gesture; (15) she was shocked and surprised when she learned of the murder charge against Williams because (a) she had known him for 19 years and had never seen him angry in that time and (b) she had always believed Williams to be upbeat, optimistic, happy, serious about his work, helpful, outgoing, and willing to take an interest in others; (16) she had not seen Williams since about two weeks after his theft conviction; and (17) she believes Williams has a conscience, has regard to human life, and is a good husband; (18) she believes Williams could help others if given a term of life imprisonment and she would be willing to write or visit him in prison. *Id.* Near the midpoint of this witness's testimony, the trial court held a hearing outside the jury's presence and thereafter limited the scope of her examination. *Id.*, at 164-74.

[61] The mother of the female member of the Azle High math and science team with Williams (who had herself already appeared as a witness for the defense) testified that (1) all the members of the math and science team were wonderful people, especially Williams; (2) she and her husband got to know the math and science team members when they accompanied the team on several out of town trips; (3) their daughter was on the team and a year behind Williams academically; (4) she and her husband both thought highly of Williams and hired him to work at their family's recreational park – Twin Point; (5) Williams was extremely capable as an employee and became a de facto assistant manager because he could do anything they needed him to do, he was never too busy to help, and he was honest and sincere; (6) she loves Williams like a son; (7) they invited Williams to go on several family camping trips and he did go, including one trip where Williams broke his collarbone while riding dirt bikes with her biological son; (8) Williams was good for

Williams who testified that Williams capably advocated for him during his parents' divorce proceedings[62]; and (12) a female co-worker of Williams in law enforcement who testified about her long-standing, non-romantic, relationship with Williams.[63]

---

their daughter when they dated and did not have a hard time accepting their daughter's decision to stop dating him; (9) thereafter Williams continued to go on their family excursions with them; (10) their daughter and Williams remain close friends to this day; (11) she attended Williams' graduation from college; (12) she last visited Williams in jail just a week or so before; (13) after he obtained his law license, Williams did some legal work for their family; (14) she stays in contact with Williams primarily through correspondence; (15) Williams remains in her view honest and hard-working; (16) she and husband continued to employ Williams long after Williams became an adult; and (17) prior to her last visit to see Williams in jail, she last saw him in person prior to his election as a JP. 53 R.R. [ECF no. 118-17] 180-203.

Her husband testified that (1) he and his wife met Williams through the Azle High math and science team; (2) Williams came to work for them and dated their daughter; (3) Williams was a good worker and helpful; (4) at their business Williams did maintenance work, helped with security, and worked the gate and the cafe; (5) Williams always helped others if he could; (6) he last saw Williams the Sunday before he testified; (7) he still believes Williams is a good person who worked hard his whole life; and (8) given the opportunity, he would write to and visit Williams in prison, 53 R.R. [ECF no. 118-17] 204-09.

[62] 53 R.R. [ECF no. 118-17] 210-14. This witness testified that (1) Williams sat down and really listened to him; (2) Williams appeared sincerely interested in making sure the judge made the best decision for his family's situation; and (3) he was very satisfied with the outcome of the case. *Id.*

[63] 53 R.R. [ECF no. 118-17] 217-35. This witness testified in pertinent part that (1) she met Williams when they both worked in law enforcement in White Settlement; (2) even at that time, they spent considerable time together off the job because they each worked nights and their sleep schedules were atypical but in sync; (3) she nicknamed Williams "Opie" because of his baby face and considered Williams completely dependable when they worked together; (4) Williams supported her during her divorce, including driving her to Oklahoma to see her children when her car broke down; (5) Williams also baby sat for her on occasion; (6) Williams used a day of sick leave to take her to the doctor when she injured her back and was unable to get to her appointment; (7) the chief of police called Williams in the next day and fired Williams for violating the department's sick leave policy, thus ending Williams' probationary employment with that city; (8) she saw Williams later that day and while he was upset, he was not violently so; (9) she thereafter

Williams' defense counsel also gained admission of a ninety-minute video deposition of Williams' mother, which was played in open court for the jury.[64] In her deposition, Williams' mother testified about her memories of Williams' childhood, the many awards and honors he earned in school and Scouting, the many friends he had growing up, his many achievements and accomplishments, as well as his marriage and his supportive relationship with his in-laws.[65]

---

continued to stay in touch with Williams, even after she moved to New Jersey to pursue a new romantic relationship; (10) she frequently called to talk with Williams and saw him whenever she returned to Texas, which happened three or four times a year for many years; (11) she met Kim Williams and thought her odd; (12) after he became an attorney, Williams assisted her by advising her daughter on a legal matter arising at the daughter's college and referring her daughter to an attorney; while Williams could be standoffish initially, she has only ever seen him angry the day he was fired by the City of White Settlement; (8) Williams was excited to run for JP; (9) Williams' dog died as a result of a medication problem at a vet office; (10) she is still friends with Williams and is not afraid of him; (11) she was shocked, felt sick, and could not believe it when she learned of the murder charge against Williams; (12) she continues to write to Williams and would do so if Williams were sent to prison; (13) she would visit Williams in prison if given the opportunity; (14) she wants to continue to send Williams birthday cards; and (15) she still believes Williams is a good man and her friend, explaining "I don't want to lose him." *Id.*

[64] 53 R.R. [ECF no. 118-17] 214-17. The defense also presented a transcribed version of the deposition of Williams' mother, which the trial court admitted into evidence as defense exhibit 68. *Id.*, at 215. A portion of the transcript appears herein at ECF no. 137-4, at pp. 48-123 of 123. A complete version of the oral deposition of Williams' mother (minus the lengthy word index) appears at ECF no. 212-1, at pp. 48-139 of 164.

[65] In her deposition, Williams' mother testified in pertinent part that (1) their family's house burned down when Williams was only four years old and her husband barely had a chance to grab Williams from his room as they fled the burning house; (2) Williams' dog was struck and killed in the road when he was a child; (3) the fact Williams as a young child carried a doll around their house and referred to it as his sister Tara; (4) around age eight Williams once got into his grandmother's car and asked to see her driver's license; (5) around age seven or eight Williams helped his father remove a dead skunk stuck in the wall of their barn after his father decapitated the animal; (6) Williams was a self-directed, good student who did not need encouragement to study and excelled in math

After presenting all of the foregoing evidence in mitigation, Williams' defense counsel rested.[66]

---

and science in school; (7) had good friends who liked to play Dungeons & Dragons together; (8) Williams' closest childhood friend drifted away from Williams after getting married; (9) in middle and high school Williams preferred to participate in band rather than sports; (10) Williams was actively involved in Cub Scouts and Boy Scouts, earning the rank of Eagle Scout while in high school and attending many camping trips, including twice taking trips to Philmont Scout Ranch; (11) everyone in their family was proud of Williams and attended his award ceremony when he earned his Eagle rank; (12) she attended the ceremony when Williams was inducted into the National Honor Society in high school; (13) Williams enjoyed working at Twin Point resort at Eagle Mountain Lake; (14) Williams earned many emblems when competing with the Azle High math and science team, which was led by a charismatic teacher; (15) Williams dated a female member of the math and science team and they remain good friends to this day; (16) she attended Williams' high school graduation in 1985; (17) Williams earned a chemistry scholarship and attended TCU; (18) she attended Williams' college graduation, shortly after which Williams and his cousin were both commissioned into the military; (19) at age 27, Williams was diagnosed with Type I diabetes, which effectively ended his military career, much to his disappointment because his father and grandfather had both served, as had several of his uncles; (20) losing his military career really bothered Williams; (21) thereafter Williams did "okay" on insulin and worked in law enforcement for the Terrell Police Department; (22) she attended Williams' graduation from law school; (23) Williams met Kim before he graduated from law school and they married in Las Vegas; (24) she did not attend the wedding because she did not know about it until after it took place; (25) while Kim did not seem to her to be Williams' type, the couple seemed happy at first; (26) she really likes Kim's parents because they seem down to earth like her and her husband; (27) Williams' work as an attorney involved representing children and, when her husband retired, at Williams' urging, she and her husband volunteered in the Court Appointed Special Advocates ("CASA") program; (27) during most of their marriage, Williams was the lone breadwinner in his marriage; (28) Williams often took Kim's father to the doctor; (29) as a landlord, Williams was too lenient in her opinion; (30) Wiliams was a good child who had a normal childhood; (31) Williams is still her child, she continues to visit him in jail, and she will continue to visit him in prison if possible; and (32) she believes Williams still has much to give others and will do so if given the chance. ECF no. 137-4, at pp. 48-123 of 123.

[66] 53 R.R. [ECF no. 118-17] 235. Before resting, Williams' trial counsel also made an unsuccessful proffer of testimony from Kim Williams, whom they asserted would testify about the good relationship between her and Williams as well as Williams' good character. 53 R.R. [ECF no. 118-17] 7. Williams made a formal written proffer regarding Kim's

### 3. State's Rebuttal Evidence

On December 16, 2014, the prosecution presented four rebuttal witnesses: (1) Kim Williams, who testified to the matters summarized in Section I above; (2) the FBI Special Agent who supervised the search of Unit 18, who identified photographs of several items discovered during that search, including a ballistics vest, a tactical helmet, other tactical gear and clothing, and a key (the key was admitted into evidence)[67]; (3) a Kaufman County Deputy Sheriff, who testified he tested the key in question and found that it unlocked the front gate and a storage trailer on a farm owned by Judge Ashworth[68]; and (4) the then-current Kaufman County District Attorney, who testified that, when he was a judge in that county's courts, he once confronted Williams over an allegation that Williams had padded a billing to the county in a CPS case.[69]

---

testimony earlier in the trial which appears herein at 11 C.R. 4300-32 [ECF no. 96-6, at pp. 33-35 of 215] and was based in part on the fact Kim had testified in a similar manner during Williams' theft trial.

[67] 54 R.R. [ECF no. 118-18] 110-17.

[68] 54 R.R. [ECF no. 118-18] 118-23. This witness admitted on cross-examination that Williams had once worked for Judge Ashworth. *Id.*, at 120-22.

[69] 54 R.R. [ECF no. 118-18] 123-38. This witness testified, in part that (1) when he confronted Williams over a two-hour billing for producing a two-page document, Williams insisted that he had made calls and done other work to produce the document in question; (2) he advised Williams that he believed the two-hour charge was excessive; (3) Williams then requested to be taken off the county's list of attorneys eligible for appointment as an *ad litem*; (4) about six months later, Williams approached him in a hallway and asked to be re-instated on the county's *ad litem* list; and (5) he agreed immediately, telling Williams to be sure administrative staff had his current contact information. *Id.*

The prosecution rested and both parties closed.[70] The jury received the state trial court's punishment phase jury charge, heard the parties' closing jury arguments, and began its punishment phase deliberations.[71]

#### 4. The Punishment Phase Verdict

The jury sequestered for the evening, returned on December 17, continued its deliberations, and returned its verdict at the punishment phase of Williams' capital murder trial, finding (1) unanimously and beyond a reasonable doubt that there was a probability Williams would commit criminal acts of violence that would constitute a continuing threat to society and (2) unanimously that taking into consideration all of the evidence, including the circumstances of the offense and the defendant's character, background, and personal moral culpability, there was not a sufficient mitigating circumstance to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed.[72]

### E. Motion for New Trial

On January 16, 2015, Williams filed a motion for new trial premised on claims that (1) brain scans showed Williams exhibits significant brain abnormalities and (2) the trial judge was biased against Williams.[73] The state trial court held a three-day evidentiary

---

[70] 54 R.R. [ECF no. 118-18] 139.

[71] 54 R.R. [ECF no. 118-18] 143-203. The state trial court's punishment phase jury charge appears at 11 C.R. 4292-97 [ECF no. 96-6, at pp. 25-30 of 215].

[72] 55 R.R. [ECF no. 118-19] 5-6. The jury's punishment phase verdict form appears at 11 C.R. 4298-99 [ECF no. 96-6, at pp. 31-32 of 215].

[73] Williams' motion for new trial appears at 11 C.R. 4367-74 [ECF no. 96-6, at pp. 100-07 of 215] & [ECF no. 97-2, at pp. 7-14 of 184]. The exhibits which accompanied the motion for new trial appear at 11 C.R. 4375-4402 [ECF no. 96-6, at pp. 108-36 of 215] &

hearing on the motion.

On February 25, 2015, Williams called a neuroradiologist who testified in pertinent part that (1) he reviewed two CT scans and an MRI scan of Williams' brain in January 2015 using software which allowed him to engage in volumetric analysis of the brain's structure; (2) the scans showed (a) significant atrophy in the limbic region (the part of the brain associated with emotional control and making moral decisions) and (b) evidence of a shearing injury or lesion in the frontal lobes (consistent with traumatic brain injury); (3) the injury to Williams' frontal lobe could cause Williams' cognitive difficulty and result in poor judgment and diminished empathy; and (4) Williams' brain scans show abnormalities associated with poor moral intuition, inappropriate social emotions, decreased empathy, aggression, violent outbursts, decreased cognition with personality changes, poor judgment, and decreased emotional control.[74]

---

[ECF no. 97-2, at pp. 15-41 of 184].

[74] More specifically, the defense expert neuroradiologist testified in pertinent part that (1) he had reviewed Williams' medical records from Kaufman County, a pair of CT scans (dated June 17, 2011 & December 1, 2013), and an MRI done on Williams; (2) in his opinion, prior to January 9, 2015 when he examined the scans, Williams had experienced brain trauma and possibly additional insult from low glucose or low oxygen; (3) more specifically, Williams' brain showed evidence of atrophy in the Hippocampus; (4) other areas of Williams' brain which showed abnormalities included the limbic system (the emotional part of the brain) and the frontal lobes (which showed evidence of shearing injury); (5) he agreed with another expert who did not believe Williams' brain required treatment; (6) the atrophy in Williams' Hippocampus was evident from the MRI scan; (7) the limbic system (which involves several interconnected regions of the brain) is the emotional response center of the brain; (8) the limbic system includes the Hippocampus which (a) gives you value and morals and (b) in Williams was atrophied to the point Williams was in the bottom fifth percentile compared to the rest of the population; (9) the Para hippocampal Gyrus, another part of the limbic system, was also well below normal in size; (10) the Amygdala, yet another part of the limbic system and a key to controlling

On February 26, 2015, Williams' counsel called three more expert witnesses. First, a family physician who was retained by Williams' trial counsel prior to trial testified in pertinent part that (1) he examined Williams, reviewed Williams' medical records from a

---

emotions, was severely abnormal (atrophied or diminished in size); (11) Williams' Insula, another limbic region of the brain which deals with emotional development such as moral integration and empathy, was significantly smaller than in normal brains; (12) in sum, Williams brain had atrophied in the areas that deal with making moral decisions; (14) Williams' limbic system was significantly atrophied and abnormal; (15) as a result, Williams could be expected to have significant behavior abnormalities; (16) Williams' temporal lobe was also abnormal; (17) Williams' temporal lobe scans show a shearing injury or lesion consistent with traumatic injury to the front of the brain; (18) this is consistent with Williams' medical records, which reveal Williams has sustained multiple head injuries; (19) abnormal frontal lobes can cause people to have difficulty controlling their emotions and the way they perceive information; (20) Williams is mildly low or decreased in his front lobes, which can result in cognitive difficulty and poor judgment; (21) frontal lobe abnormality is also associated with poor moral intuition, inappropriate social emotions, decreased empathy, aggression, violent outbursts, decreased cognition with personality changes, poor judgment, and decreased emotional control; (22) Williams may have been born with this condition; (23) he may have developed this condition during childhood, due to poor brain development; (24) it may have arisen due to poorly controlled diabetes resulting in episodes of low blood sugar leading to loss of consciousness; (25) loss of consciousness results in decreased respiration (reduced breathing), which lowers oxygen in the brain; (26) one possible cause of loss of consciousness is alcohol intake which, when excessive, can also lead to head trauma; (27) alcohol intake is a particular problem for diabetics; (28) Williams has sleep apnea, which is chronic oxygen deprivation; (29) while Williams underwent a battery of neuropsychological tests previously, those tests look at the thinking of reasoning portions of the brain, not its emotional center; (30) therefore, normal results during neuropsychological testing are nonetheless consistent with the brain scan results he noted in Williams; (31) Williams also showed abnormal results on Diffusion Tensor Imaging (DTI); (32) he was available and could have testified during Williams' December 2014 trial; (33) he consulted with two mental health professionals for the defense prior to his testimony; (34) he was first contacted by the Williams' counsel in January 2015; (35) he has never interviewed Williams; (36) he has seen brain damage of the type exhibited in Williams' scans in other patients, particularly older patients; and (37) patients with the brain abnormalities shown in Williams' brain scans are often diagnosed with psychiatric-type disorders such as long-term depression, manic depression, and schizophrenia. 57 R.R. [ECF no. 119-1] 8-46 & 65-71.

Kaufman hospital, and administered tests prior to trial; (2) Williams' test results showed (a) strong indications that his Type I diabetes was not adequately controlled by his diet and medications, (b) high blood pressure or hypertension, (c) high cholesterol or hyperlipidemia, and (d) a profound Vitamin D deficiency; (3) Williams furnished a life history which included multiple head injuries (one of which at age eighteen months was not independently confirmed by medical records); (4) he urged Williams' counsel to obtain scans of Williams' brain to look for indications of traumatic brain injury; (5) the defense obtained a brain scan prior to Williams' trial which was reportedly unremarkable; (6) Williams' defense team obtained another brain scan after trial (an MRI scan) which was more detailed than the CT scans done prior to trial; (7) subsequent examination of Williams' brain scans by the neuroradiologist who had previously testified showed significant abnormalities in Williams' brain; (8) Williams' abnormalities affect the limbic region of the brain which deals with emotional and impulse control; (9) Williams was given a battery of neuropsychological tests prior to trial which test results led Williams' defense counsel to choose not to present neuropsychological evidence at trial; and (10) his examination of Williams' mental acuity showed Williams was alert and oriented time three.[75]

---

[75] More specifically, the family physician retained by the defense prior to trial testified in pertinent part that (1) he had experience as a former military emergency medical physician in diagnosing traumatic brain injury and as a family practitioner in dealing with diabetes; (2) the two Types of Diabetes are very different in origin but result in the same problem – hyperglycemia; (3) Type I Diabetes, which is Williams' condition, arises from the body's complete inability to produce insulin; (4) Type II Diabetes is the result of the body producing insulin but, because of s lack of receptors, being unable to use it; (5) Williams' A1C level when tested in the Kaufman County Jail was 8.7, which is

Second, the neuropsychologist who administered a battery of neuropsychological tests to Williams prior to trial testified that (1) she administered about a dozen test to Williams on August 1-2, 2014; (2) the tests she administered were designed to measure Williams' cognitive strengths and weaknesses; (3) she believed the testing environment was good and that Williams gave adequate effort; (4) many of Williams' test scores were

---

significantly higher than the recommended or optimal range of 6.5 to 7; (6) Williams' resting blood sugar level when tested was 173 but jumped up well above 200 when re-tested, all of which is above the recommended ceiling of 115-30; (7) Williams showed no outward symptoms of hypoglycemia even when his blood sugar fell below the recommended range, which suggested Williams may have episodes of asymptomatic hypoglycemia or low blood sugar; (8) both hypoglycemia and hyperglycemia are bad for the brain; (9) hyperglycemia is associated with depression, bi-polar disorder, and schizophrenia; (10) Vitamin D deficiency, which Williams also exhibits, is associated with dementia, early heart disease, and early cancer; (11) he had reviewed the report of the neuropsychologist who tested Williams prior to trial but those tests would not have addressed the injuries to the regions of the brain shown in Williams' brain scans (which regions affect emotional control, not thinking per se); (12) Williams began experiencing diabetic neuropathy in the legs and feet in 2008; (13) Williams' Type I Diabetes had an onset of 1995; (14) while Williams denied drug abuse, his examination of Williams and Williams' test results lead him to conclude Williams has, in fact, abused alcohol and a lot of drugs; (15) Williams was alert and oriented times three during his examination; (16) Williams' types of brain atrophy and damage (which impact the emotional centers of the brain) do not lend themselves to diagnosis through neuropsychological testing, which focuses instead on the cognitive functions of the brain; (17) therefore, the neuropsychological testing done on Williams prior to trial which showed normal results, is consistent with the brain scans which disclosed significant abnormalities in the emotional centers of Williams' brain; (18) in 2011 Williams experienced a loss of consciousness and a resulting fall in which his head struck a counter and he sustained an injury to the front of his head which required sutures; (19) a routine MRI does not always show everything that the neuroradiologist found during his review of Williams' brain scans; (20) Williams has (a) long-term Type I Diabetes, (b) a history of hypertension, head injury, and hyperlipidemia, and (c) atrophy of the limbic region of the brain which impacts his emotional and impulse control; and (21) during his pretrial examination, Williams volunteered that he was not guilty of the murders with which he was charged. 58 R.R. [ECF no. 119-2] 4-58.

in the average range but some were below average and the overall evaluation was that Williams is in the average or normal range; (5) Williams tested at an I.Q. level of 115, one standard deviation above the norm; (6) she was surprised by the report of the neuroradiologist who found injury to the Hippocampus because her tests of Williams' memory function were in the normal range; (7) she was also surprised by the finding of frontal lobe injury because her tests of Williams' attention, problem solving, and inhibition were all in the normal range and there was no indication Williams suffers from severe language impairment; (8) she did not do any emotional testing because she was not asked to do so; and (9) based on her testing Williams appears to operate cognitively in the normal range.[76]

Third, the neuroradiologist who made the initial evaluation of Williams' January 8, 2015 MRI scan performed at UTMB-Galveston (admitted as State Exhibit 1 at the hearing) testified that (1) he routinely reads seventy to eighty scans daily; (2) he examined Williams' scan visually and concluded there was no major or significant disruption of the major tracts in the brain; (3) the neuroradiologist who found significant abnormalities in Williams' brain employed a volumetric approach which utilizes software which he does not employ; (4) he does not employ volumetric analysis of the type in question because there is too much variability in the boundaries used in volumetric analysis; (5) there is no trace on

[76] 58 R.R. [ECF no. 119-2] 59-72. In addition, the neuropsychologist also testified that (1) she routinely administers the same standardized neuropsychological tests she administered to Williams; (2) some structural anomalies in the brain may not affect a person's day-to-day activities; and (3) emotional testing would typically employ the MMPI . *Id.*

Williams' MRI scan of blood products in the brain which might indicate traumatic brain injury; (6) while Williams may have mild atrophy of the Hippocampus the cause of same is nonspecific, *i.e.*, there may have been many different possible causes; and (7) based upon the MRI scan Williams has a normal brain.[77]

On March 2, 2015, the defense gained the admission of an affidavit from its expert neuroradiologist and DVD's of trial footage and then rested. The prosecution presented the state trial court with four scholarly journals articles addressing MRI and DTI scans and obtained their admission. The trial court then heard arguments from both sides. At the conclusion of the March 2, 2015 proceedings, the state trial court denied Williams' new trial motion.[78] On April 16, 2015, the state trial court issued its findings of fact and conclusions of law addressing the judicial bias claim.[79]

### F. Direct Appeal

Williams appealed his conviction and sentence.[80] The Texas Court of Criminal

---

[77] 58 R.R. [ECF no. 119-2] 73-87.

[78] 59 R.R. [ECF no. 119-3] 41-42.

[79] 1 Supp. C.R. [ECF no. 96-7] 22-23.

[80] Williams' Appellant's Brief appears at ECF no. 97. Attorneys John Tatum and Brady Thomas Wyatt III filed Williams' Appellant's Brief on April 29, 2016, asserting forty points of error, consisting of claims arguing (1) the trial court erred in denying the defense's challenges for cause to various jury venire members (Claims 1-13); (2) the trial judge was biased against Williams (Claims 14-15); (3) the trial court erred in denying Williams' request for a separate verdict form on each Count of the Indictment (Claim 16); (4) the trial court erred in overruling the defense's objections to the admission of evidence relating to the Hasse murder at the guilt-innocence phase of trial (Claims 17-18); (5) the trial court erred in overruling the defense's objection to the admission of an incendiary device found inside Unit 18 (Claim 19); (6) the trial court erred in overruling the defense's objections to the testimony of the prosecution's ballistics expert (Claim 20); (7) the trial

Appeals affirmed. *Williams v. State*, AP-77,053, 2017 WL 4946865 (Tex. Crim. App. November 1, 2017). On May 14, 2018, the United States Supreme Court denied Williams' certiorari petition. *Williams v. Texas*, 584 U.S. 980 (2018).

**G. State Habeas Proceeding**

---

court erred in overruling the defense's objections to in-court identifications (Claim 21); (8) there was insufficient evidence to support Williams' capital murder conviction (Claim 22); (9) a pair of claims attacking the trial court's failure to grant Williams' punishment phase motions requesting a continuance to allow the defense to investigate Williams' background for mitigating evidence and to secure the assistance of experts (Claims 23-24); (10) the trial court erred in denying Williams' motion for new trial based upon alleged judicial bias by the trial judge (Claim 25); (11) the trial court erred in overruling the defense's punishment phase objection to the admission of a video of the Hasse crime scene (Claim 26); (12) the trial court erred in overruling the defense's punishment phase objection to the admission of victim impact evidence regarding Mark Hasse (who was not named in the indictment) (Claim 27); (13) the trial court erred in overruling the defense's objection to the prosecution's cross-examination of the defense's expert on the TDCJ inmate classification system regarding historical acts of violence in, and escapes from, high security TDCJ facilities (Claim 28); (14) the trial court erred in overruling the defense's punishment phase objection to the admission and display of all the weapons removed from Unit 18 (Claim 29); (15) the trial court erred in denying the defense's motion for mistrial premised upon the trial court erroneously overruling the defense's punishment phase objection to the mass display of weapons (which included several weapons erroneously included in the display) (Claim 30); (16) a pair of claims attacking the trial court's exclusion of the defense's proffered evidence relating to the validity of Williams' prior theft and burglary conviction (including a transcript from the earlier trial and related testimony) (Claims 31-32); (17) the trial court erred in excluding the defense's proffer of a video from Williams' high school graduation (Claim 33); (18) the trial court erred in excluding the defense's proffers of testimony regarding the allegedly political motivation behind Williams' earlier prosecution for theft and burglary (Claims 34 & 37); (19) a pair of claims attacking the trial court's exclusion of proffered testimony from two defense witnesses that their allegedly abusive stepfather was in the courtroom during their testimony (Claims 35-36); (20) a pair of claims attacking the trial court's denial of Williams' requested punishment phase jury instruction and in denying Williams' objection to the punishment phase jury charge, *i.e.*, arguing the Texas capital sentencing Special Issues are vague and require definitions of key terms (Claims 38-39); and (21) there was insufficient evidence to support the jury's affirmative answer to the first Special Issue, *i.e.*, the future dangerousness Special Issue.

Williams filed a 450-page application for state habeas corpus relief on March 8, 2018, asserting (1) a host of prosecutorial misconduct claims, including multiple complaints about the prosecution's alleged suppression of favorable evidence (*Brady* claims), the prosecution's allegedly knowing use of false or perjured evidence (*Gigli/Napue* claims), and related complaints of alleged prosecutorial misconduct; (2) his trial counsel engaged in a multitude unprofessional acts and omissions which constituted ineffective assistance – at both phases of trial; (3) he was constructively denied counsel when his trial counsel were overwhelmed by the volume of discovery; (4) his due process rights were violated by the sheer volume of the discovery furnished by the prosecution; (5) the trial court's demeanor showed a lack of impartiality; (6) his state appellate counsel also rendered ineffective assistance; (7) his jury was exposed to external influences by the State's *ex parte* communication during deliberation; (8) the Texas capital sentencing system is arbitrary and unconstitutional; (9) his constitutional rights were violated when the state trial court refused to instruct the jury at the punishment phase of trial on the effect of a single holdout juror; (10) the Texas future dangerousness Special Issues is unconstitutionally vague and fails to adequately narrow the category of individuals eligible for the death penalty; and (11) the definition of mitigating evidence in his punishment phase jury instructions addressing the second Special Issue was unconstitutionally narrow.[81]

---

[81] A copy of Williams' state habeas application appears among the state court records herein at volume 1 of the Clerk's Record from Williams' State Habeas proceeding (henceforth "SHCR") at pp. 40- 491 [ECF no. 98, at pp. 40-491]. Ashley Steele, Erin Eckhoff, and Jennae Swiergula, attorneys for the Texas Office of Capital and Forensic

The state habeas trial court held an evidentiary hearing on Williams' claims on August 12-16, 2019, heard testimony from a dozen witnesses, admitted many voluminous documentary exhibits (including a number of affidavits), and heard closing argument from Williams' state habeas counsel.[82] On May 21, 2020, the state habeas trial court issued its amended findings of fact and conclusions of law (henceforth "FFCL"), recommending the denial of Williams' state habeas application.[83]

The Texas Court of Criminal Appeals thereafter denied Williams' state habeas corpus application after (1) concluding Williams' third through fifth and eighth through eleventh claims were procedurally defaulted, either because they had been raised and rejected on direct appeal or because they could have been raised on direct appeal but were not; (2) expressly adopting all but two of the state habeas trial court's 1301 FFCL; and (3) rejecting on the merits Williams' first, second, sixth, and seventh claims in his state habeas application based upon the state trial court's extensive and detailed FFCL.[84] *Ex parte Williams*, WR-85,942-01, 2020 WL 5540714, *1-*2 (Tex. Crim. App. Sept. 16, 2020). On

Writs, filed Williams' state habeas application.

[82] The record of the evidentiary hearing held in Williams' state habeas proceeding on August 12-16, 2019 appears in the Reporter's Record from Williams' State Habeas proceeding (henceforth "SHRR") at 5 SHRR [ECF no. 99-6] through 9 SHRR [ECF no. 99-10].

[83] The state habeas trial court's FFCL appears at 1 Supp. SHCR 4-243 [ECF no. 99, at pp. 4-243 of 245].

[84] The TCCA declined to adopt the trial court's FFCL 1234, which addressed the relevance of alleged victim impact evidence on the question of whether Cynthia McLelland had the ability to resist her attacker, and corrected a clerical error in FFCL 1265, which addressed Williams' claim of ineffective assistance by his state appellate counsel.

June 1, 2021, the United States Supreme Court denied Williams' certiorari petition. *Williams v. Texas*, 141 S, Ct. 2706 (2021).

**H. Relevant Proceedings in this Court**

Williams filed his amended federal habeas corpus petition in this court on March 14, 2022, asserting that (1) the trial court violated his Due Process rights when it denied his motions for continuance; (2) his rights under the Supreme Court's holding in *Brady v. Maryland*, 373 U.S. 83,87 (1963), were violated by the prosecution's failure to organized and index the massive discovery furnished to defense counsel prior to trial; (3) he was effectively or constructively denied his right to counsel by virtue of the trial court's denial of adequate time for his counsel to prepare for trial; (4) his rights under *Brady* were violated by the prosecution's failure to disclose to the defense that a Mercury Sable had been the getaway car on the Hasse murder; (5) his rights to Due Process were violated by the fact that members of the recused and disqualified Kaufman County District Attorney's Office assisted the prosecution in its trial preparations; (6) his trial counsel rendered ineffective assistance during the guilt-innocence phase of trial; (7) his trial counsel rendered ineffective assistance during the punishment phase of trial; (8) his state appellate counsel also rendered ineffective assistance; (9) his rights under *Brady* were also violated by the prosecution's suppression from the defense of knowledge that Kim Williams had reached a deal with prosecutors in exchange for her testimony at trial against Williams; (10) the expert DNA, fingerprint, ballistics, and toolmark testimony admitted into evidence during his trial was scientifically unreliable; (11) the trial judge's demeanor demonstrated a lack of impartiality and constituted judicial bias depriving Williams of Due Process; (12) the

lack of a separate jury verdict form for each of the two counts of the indictment against Williams deprived him of Due Process and violates the Eighth Amendment because Williams was entitled to complete jury unanimity with regard to the theory of capital murder under which he was convicted; and (13) he is entitled to federal habeas relief under the cumulative error rule. (ECF no. 76).

The respondent filed his response or answer to Williams' amended petition on May 11, 2023 (ECF no. 92). Williams filed his reply brief on December 1, 2023 (ECF no. 125).

## II. STANDARD OF REVIEW

Because Williams filed this federal habeas corpus action after the effective date of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), this Court's review of his claims for federal habeas corpus relief is governed by AEDPA. *Penry v. Johnson*, 532 U.S. 782, 792 (2001).

The legislative history of AEDPA indicates that it was intended as a limitation upon the scope of federal habeas review, not as an enactment intended to broaden the scope of federal habeas review or to reconfigure federal habeas courts as super state appellate courts. One of the principal purposes of AEDPA was to reduce delays in the execution of state and federal criminal sentences, especially capital sentences. *Ryan v. Valencia Gonzales*, 568 U.S. 57, 76 (2013); *Schriro v. Landrigan*, 550 U.S. 465, 475 (2007); *Rhines v. Weber*, 544 U.S. 269, 276 (2005). Another purpose of AEDPA was to encourage litigants to pursue claims in state court prior to seeking federal collateral review. *Duncan v. Walker*, 533 U.S. 167, 181 (2001); *see also Hernandez v. Johnson*, 108 F.3d 554, 558 n.4 (5th Cir. 1997) (AEDPA imposes the burden on a petitioner to litigate to the maximum extent possible,

including fairly presenting all available evidence supporting, his claims in state court). AEDPA was also intended to prevent piecemeal litigation and gamesmanship. *Maywood v. Patterson*, 561 U.S. 320, 334 (2010). Thus, under AEDPA, federal habeas review of claims is limited to the record that was before the state court which adjudicated the prisoner's claims on the merits. *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011). "The AEDPA statute of limitations promotes judicial efficiency and conservation of judicial resources, safeguards the accuracy of state court judgments by requiring resolution of constitutional questions while the record is fresh, and lends finality to state court judgments within a reasonable time." *Day v. McDonough*, 547 U.S. 198, 205-06 (2006). Collectively, the provisions of AEDPA further the principles of comity, finality, and federalism. *Panetti v. Quarterman*, 551 U.S. 930, 945 (2007); *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003).

Under AEDPA's standard of review, this Court cannot grant federal habeas corpus relief in connection with any claim that was adjudicated on the merits in state court proceedings (either on direct appeal or during a state habeas corpus proceeding), unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Davenport*, 569 U.S. 118, 135-36 (2022); *Brown v. Payton*, 544 U.S. 133, 141 (2005); *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000); 28 U.S.C. § 2254(d).

The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of Title 28 U.S.C. § 2254(d)(1) have independent meanings. *Bell v. Cone*, 535 U.S.

685, 694 (2002). Under the "contrary to" clause, a federal habeas court may grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Brown*, 544 U.S. at 141; *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) ("A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'"). A state court's failure to cite Supreme Court authority does not, per se, establish the state court's decision is "contrary to" clearly established federal law: "the state court need not even be aware of our precedents, 'so long as neither the reasoning nor the result of the state-court decisions contradicts them.'" *Mitchell*, 540 U.S. at 16.

Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Brown*, 544 U.S. at 141; *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) ("A federal habeas court can only set aside a state-court decision as 'an unreasonable application of . . . clearly established Federal law,' § 2254(d)(1), if the state court's application of that law is 'objectively unreasonable.'"); *Wiggins*, 539 U.S. at 520-21. The focus of this inquiry is on whether the state court's

application of clearly established federal law was objectively unreasonable; an "unreasonable" application is different from a merely "incorrect" one. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold."); *Wiggins*, 539 U.S. at 520; *Price v. Vincent*, 538 U.S. 634, 641 (2003) ("[I]t is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner"). "Under the Antiterrorism and Effective Death Penalty Act, a state prisoner seeking a writ of habeas corpus from a federal court 'must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Bobby v. Dixon*, 565 U.S. 23, 24 (2011) (quoting *Harrington v. Richter,* 562 U.S. 86, 101 (2011)).

Legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the dicta, of Supreme Court decisions existing at the time of the relevant state-court decision establish those principles. *Brown*, 596 U.S. at 136 ("It is not enough that the state court decision offends lower federal court precedents. This Court's dicta cannot supply a ground for relief." (citation omitted)); *Yarborough v. Alvarado*, 541 U.S. 652, 660-61 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

AEDPA also significantly restricts the scope of federal habeas review of state court

fact findings. Subsection 2254(d)(2) of Title 28, United States Code, provides federal habeas relief may not be granted on any claim that was adjudicated on the merits in the state courts unless the state court's adjudication of the claim resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Wood v. Allen*, 558 U.S. 290, 301(2010) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."); *Williams v. Taylor*, 529 U.S. at 410 ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law."). Even if reasonable minds reviewing the record might disagree about the factual finding in question (or the implicit credibility determination underlying the factual finding), on habeas review, this does not suffice to supersede the trial court's factual determination. *Wood*, 558 U.S. at 301; *Rice v. Collins*, 546 U.S. 333, 341-42 (2006).

In addition, § 2254(e)(1) provides that a federal habeas petitioner challenging state court factual findings must establish by clear and convincing evidence that the state court's findings were erroneous. *Schriro*, 550 U.S. at 473-74 ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'"); *Rice*, 546 U.S. 333, 338-39 (2006) ("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'"); *Miller-El v. Dretke,* 545 U.S. 231, 240 (2005) ("[W]e presume the Texas court's factual findings to be sound unless Miller-El rebuts the 'presumption of correctness by clear and convincing evidence.'"); 28 U.S.C. § 2254(e)(1). It remains unclear at this juncture whether §

2254(e)(1) applies in every case presenting a challenge to a state court's factual findings under § 2254(d)(2). *See Wood*, 558 U.S. at 300-01 (choosing not to resolve the issue of § 2254(e)(1)'s possible application to all challenges to a state court's factual findings); *Rice*, 546 U.S. at 339 (likewise refusing to resolve the Circuit split regarding the application of § 2254(e)(1)).

The deference to which state-court factual findings are entitled under AEDPA does not imply an abandonment or abdication of federal judicial review. *See Miller-El*, 545 U.S. at 240 (the standard is "demanding but not insatiable"); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief.").

Before a federal court may grant a state prisoner habeas corpus relief on a claim that was adjudicated on the merits in state court, the petitioner must not only satisfy the requirements of AEDPA but must also convince the court that the error committed by the state court during its adjudication of the petitioner's criminal case was not harmless within the meaning of *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *Brown v. Davenport*, 596 U.S. 118, 122 (2022). In *Shinn v. Jenkins*, 596 U.S. 366, 378 (2022), the Supreme Court held that when a federal habeas petitioner has properly exhausted state court remedies on a federal constitutional claim through direct appeal or a state habeas corpus proceeding, federal habeas review of that claim is circumscribed in that the federal court is limited to reviewing the record before the state court that resolved the claim on the merits and the petitioner must establish that, under Supreme Court precedent, no fair-minded jurist could

have reached the same result as the state court. *See also Shoop v. Twyford*, 596 U.S. 811, 819-20 (2022) (where a petitioner failed to develop the factual bases for his claims in state court, he is entitled to present new evidence in support of his claims before the federal habeas court only in the two limited circumstances outlined in Subsection 2254(e)(2)); *Shinn*, 596 U.S. at 371 (holding the same).

Absent a showing that there is an absence of available state corrective process or that circumstances exist that render such process ineffective to protect the rights of a petitioner, this Court is statutorily precluded from granting federal habeas corpus relief on any claim that has not been fairly presented to the state courts. *Davila v. Davis*, 582 U.S. 521, 527 (2017) (the exhaustion requirement is designed to avoid the unseemly result of a federal court upsetting a state court conviction without first affording the state courts an opportunity to correct a constitutional violation); 28 U.S.C. § 2254(b)(1). Nonetheless, this Court is authorized to *deny* federal habeas relief on the merits notwithstanding a petitioner's failure to exhaust available state court remedies. *See Rhines v. Weber*, 544 U.S. 269, 277 (2005) (a federal habeas court abuses its discretion if it grants a petitioner a stay when his unexhausted claims are plainly meritless); 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

If the state courts failed to adjudicate a claim on the merits that Williams now presents to this court (such as claims (1) the state courts summarily dismissed under the Texas writ-abuse statute or Texas rules of procedural default or (2) which Williams failed to fairly present to the state courts), then this court's review of the un-adjudicated claim is

de novo. *See Porter v. McCollum*, 558 U.S. 30, 39 (2009) (de novo review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state court failed to address the prejudice prong of *Strickland*); *Rompilla v. Beard*, 545 U. S. 374, 390 (2005) (de novo review of the prejudice prong of *Strickland* was required where the state court rested its rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins*, 539 U.S. at 534 (same).

**III. LACK OF JURY UNANIMITY (*De Novo* Review)**

In his twelfth claim in his amended petition Williams argues his constitutional rights were violated when the trial court refused Williams' request to submit separate verdict forms to the jury at the guilt-innocence phase of trial on each of the two theories of capital murder alleged in the indictment, *i.e.*, that Williams murdered Cynthia McLelland either (1) during the course of committing or attempting to commit a burglary or (2) during the same criminal transaction in which he also killed another person – Michael McLelland. (ECF no. 76, at pp. 178-79). Respondent argues Williams fairly presented only a portion of the legal basis for this claim to the state court (ECF no. 92, at pp. 177-79). Whether this claim was fully exhausted is immaterial, however, because even when viewed under the less exacting standard of *de novo* review, it is legally frivolous.

In *Schad v. Arizona*, 501 U. S. 624, 631 (1991), the Supreme Court recognized that: "Our cases reflect a long-established rule of the criminal law that an indictment need not specify which overt act, among several named, was the means by which a crime was committed." The four-Justice plurality in *Schad* cited several of that court's prior opinions, as well as Rule 7(c)(1) of the *Federal Rules of Criminal Procedure*, for the rule that, in

cases of murder, it is "immaterial whether death was caused by one means or the other." *Id.*[85] Concurring separately, Justice Scalia explained the rationale for this long-established rule: "As the plurality observes, it has long been the general rule that when a single crime can be committed in various ways, jurors need not agree upon the mode of commission. That rule is not only constitutional, it is probably indispensable in a system that requires a unanimous jury verdict to convict." *Schad*, 501 U. S. 649-50 (Scalia concurring and citations omitted).[86] Thus, where a defendant is charged with multiple factual theories underlying the same capital offense, there is no constitutional requirement of jury unanimity with regard to a particular theory of capital murder.[87]

---

[85] The Supreme Court plurality in *Schad* explained the principle in question applied to both the manner in which an offense was charged in an indictment and the manner in which the jury was charged at the guilt-innocence phase of trial: "We have never suggested that in returning general verdicts in such cases the jurors should be required to agree upon a single means of commission, any more than the indictments were required to specify one alone." *Schad*, 501 U. S. at 631. "We see no reason, however, why the rule that the jury need not agree as to mere means of satisfying the *actus reus* element of an offense should not apply equally to alternative means of satisfying the element of *mens rea*." *Id.*, 501 U. S. at 632 (emphasis in original).

[86] Justice Scalia explained the practical application of the rule as follows: "When a woman's charred body has been found in a burned house, and there is ample evidence that the defendant set out to kill her, it would be absurd to set him free because six jurors believe he strangled her to death (and caused the fire accidentally in his hasty escape), while six others believe he left her unconscious and set the fire to kill her." *Id.*, 501 U. S. at 650. Likewise, in Williams' trial there was no constitutional mandate that the jury unanimously agree on a particular theory of capital murder.

[87] While a different aspect of the opinion in *Schad* has since been abrogated by the Supreme Court, *see Edwards v. Vannoy*, 593 U.S. 255, 265-66 & n.4 (2021) (recognizing the Court's rejection of state laws permitting a criminal conviction based on a less than unanimous jury verdict), the holding in *Schad* discussed above remains in full force. Williams was convicted of capital murder by a jury which *unanimously* agreed the evidence showed beyond a reasonable doubt that Williams intentionally murdered Cynthia

Moreover, Williams' twelfth claim herein is also foreclosed by the nonretroactivity doctrine announced in *Teague v. Lane*, 489 U.S. 288 (1989), which forecloses adoption of the new principles of federal constitutional criminal procedure in federal habeas corpus proceedings. Under *Teague*, federal courts are generally barred from applying new constitutional rules of criminal procedure retroactively on collateral review. *Caspari v. Bohlen*, 510 U.S. 383, 389-90 (1994). A "new rule" for *Teague* purposes is one which was not dictated by precedent existing at the time the defendant's conviction became final. *O'Dell v. Netherland*, 521 U.S. 151, 156 (1997) (holding a "new rule" either "breaks new ground," "imposes a new obligation on the States or the Federal Government," or was not "dictated by precedent existing at the time the defendant's conviction became final"). Under this doctrine, unless reasonable jurists hearing the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to rule in his favor, a federal habeas court is barred from doing so on collateral review. *Id.*

The holding in *Teague* is applied in three steps: first, the court must determine when the petitioner's conviction became final; second, the court must survey the legal landscape as it then existed and determine whether a state court considering the petitioner's claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule he seeks was required by the Constitution; and third, if the rule

McLelland. For the reasons discussed by Justice Scalia in his concurring opinion in *Schad*, there is no constitutional principle (or rule of logic) which required Williams' jury to unanimously agree on which of the two theories of capital murder charged in the indictment was established beyond a reasonable doubt by the evidence.

advocated by the petitioner is a new rule, the court must determine whether the rule falls within one of the two narrow exceptions to the nonretroactivity principle. *Caspari v. Bohlen*, 510 U.S. at 390.

The only two exceptions to the *Teague* nonretroactivity doctrine are reserved for (1) new rules forbidding criminal punishment of certain primary conduct and rules prohibiting a certain category of punishment for a class of defendants because of their status or offense and (2) "watershed" rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding, i.e., a small core of rules requiring observance of those procedures that are implicit in the concept of ordered liberty. *O'Dell v. Netherland*, 521 U.S. at 157.

Williams' proposed new rule would mandate separate verdict forms and a separate unanimous verdict for each theory of a single capital murder contained in an indictment. A conviction becomes final for *Teague* purposes when either the United States Supreme Court denies a certiorari petition on the defendant's direct appeal or the time period for filing a certiorari petition expires. *Caspari v. Bohlen*, 510 U.S. at 390. Williams' capital murder conviction became final for *Teague* purposes no later than May 14, 2018, *i.e.*, the date the United States Supreme Court denied his petition for writ of certiorari following the Texas Court of Criminal Appeals' affirmation of his conviction and sentence on direct appeal. *See Beard v. Banks*, 542 U.S. 406, 411-12 (2004) (recognizing a state criminal conviction ordinarily becomes final for *Teague* purposes when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for writ of certiorari has elapsed or a timely filed petition for certiorari has been denied); *Caspari v.*

*Bohlen*, 510 U.S. at 390 ("A state conviction and sentence become final for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied."). Neither of the two exceptions to *Teague* foreclosure applies to the new rule advocated by Williams in his twelfth claim herein.

*Teague* remains applicable after the passage of AEDPA. *See Horn v. Banks*, 536 U.S. 266, 268-72 (2002) (applying *Teague* in an AEDPA context); *Robertson v. Cockrell*, 325 F.3d 243, 255 (5th Cir. 2003) (recognizing the continued vitality of the *Teague* nonretroactivity doctrine under AEDPA). As of the date Williams' conviction and sentence became final for *Teague* purposes no federal court had ever held a Texas capital murder jury must return separate verdicts on each factual theory of capital murder charged in an indictment or that the jury must unanimously agree on a particular theory of capital murder. On the contrary, such a rule is at odds with the Supreme Court's reasoning in *Schad*. Williams' twelfth claim is denied.

## IV. JUDICIAL BIAS (*De Novo* Review)

In his eleventh claim in his amended federal habeas petition, Williams re-urges with some additional gloss the same judicial bias claim that he asserted in his motion for new trial discussed in Section I.E. above (ECF no. 92, at pp. 174-77). When Williams raised an abridged version of this same judicial bias claim as his twenty-fifth point of error on direct appeal, the TCCA summarily dismissed that point as inadequately briefed and procedurally defaulted. *Williams*, 2017 WL 4946865, *26. Likewise, the state habeas trial court rejected basically the same claim, both on the merits and as procedurally barred, when

Williams raised it as his fifth claim in his state habeas application.[88] The TCCA thereafter dismissed Williams' fifth claim for state habeas relief as procedurally defaulted. *Ex parte Williams*, 2020 WL 5540714, *2. Nonetheless, the TCCA did expressly adopt the state habeas court's factual findings and conclusion that this claim lacked any merit. *Id.* For the reasons discussed below, even under a *de novo* standard of review, this claim does not warrant federal habeas relief.

Even before the advent of AEDPA, federal habeas courts were required to respect the factual findings of a state court which had denied a federal habeas petitioner's claims when those findings had evidentiary support in the record before the state court. *Marshall v. Lonberger*, 459 U.S. 422, 432 (1983) ("This deference requires that a federal habeas court more than simply disagree with the state court before rejecting its factual determinations. Instead, it must conclude that the state court's findings lacked even 'fair[ ] support' in the record."); *Sumner v. Mata*, 451 U.S. 591, 598 (1982) ("we deal here with a statute [the predecessor to Section 2254(d)] that requires the federal courts to show a high measure of deference to the factfindings made by the state courts").

In the course of Williams' state habeas proceeding, the state habeas trial court heard extensive testimony, reviewed the video and photographs that were admitted during the hearing on Williams' motion for new trial, and found that (1) Williams made no objection at trial based upon any allegedly improper demeanor displayed or any disparaging comments or inconsistent rulings made the trial judge in the jury's presence; (2) Williams'

[88] 1 Supp. SHCR 211-22, ¶¶ 1079-1145 [ECF no. 99, at pp. 211-22 of 245].

lead trial counsel, attorney Matthew Seymour testified before the state habeas court that while Judge Snipes was at times brusque, he believed the judge tried to be uniform in his rulings and afforded Williams a fair trial; (3) Williams co-counsel, attorney Doug Parks, also testified before the stater habeas court that Judge Snipes gave Williams a fair trial; (4) a different judge, who presided over a hearing on a motion for recusal, found that Judge Snipes had not shown judicial bias; (5) *Judge Snipes's comments and demeanor during Williams' trial did not show judicial bias*; (6) that the judge may have expedited or limited testimony and ordered breaks during certain testimony does not establish bias; (8) the trial expressions of frustration and annoyance with defense counsel did not establish judicial bias because they were fully justified; (9) attorney Seymour, Williams' lead trial counsel, testified during the state habeas hearing that the third member of the defense team, who was in charge of mitigation, (a) called an unusually large number of punishment phase witnesses, (b) had a strategy to bring as many witnesses as he could even if they were all saying the same thing or had little or nothing to add to what had already been said, (c) had a hard time managing his witness list, (d) presented punishment phase witnesses in a manner that was repetitive and not well-prepared, (e) presented many witnesses who had not seen Williams in many years, making the jury grow restless and lose interest, (f) ignored admonishments from the trial judge as well as co-counsel, and (g) allotted too much time when planning for each witness, which resulted in huge gaps in the schedule and annoyed the judge; (10) Judge Snipe's frustration stemmed from delays and inefficiency in the presentation of evidence, a perfectly reasonable response from the person responsible for overseeing the proceedings; (11) Judge Snipes's attempted to focus

the defense's efforts on the development of novel information relevant to Williams; (12) Judge Snipes treated the parties similarly, did not reserve his expressions of frustration for the defense, imposed restrictions on the State's presentation of evidence, including limiting cross-examination of a defense witness and limiting the State's presentation of an audio-recording of Williams' conversation with a Texas Ranger and a police chief; (13) the record is replete with Judge Snipes's comments showing his high regard for Williams' trial counsel, repeatedly complimenting them and lauding their efforts on Williams' behalf; (14) Judge Snipes's comments at sentencing comparing Williams to a trio of notorious murderers do not support a challenge for judicial bias because judges are human beings who may form opinions critical of, disapproving, or even hostile to a defendant so long as those opinions are not derived from an extrajudicial source; (15) there is no evidence Judge Snipes's opinion expressed at sentencing was acquired extra-judicially; (16) neither Judge Snipes's reference to the fact he had presided over Williams' capital murder trial in a letter to a Congressman expressing his interest in serving as a United States Attorney nor Judge Snipes's attendance at a 2017 book signing hosted by an author related to the then-Kaufman County District Attorney reflected judicial bias; (17) the letter did not reflect any opinion as to Williams' guilt or punishment and mentioned Williams' trial in the context of Judge Snipes's describing his career as including presiding over 300 jury trials; (18) the book signing Judge Snipes attended was open to the public, took place three years after the end of Williams' trial, and took place after Judge Snipes had left the bench and returned to private life; (19) the fact Judge Snipes attended the book signing and was photographed with the author did not indicate his endorsement of the book's contents; (20) there was

conflicting evidence in the record before the state habeas trial court as to whether Judge Snipes's facial expressions during the trial about which Williams complained were directed at the defense or both parties; (21) defense co-counsel, attorney Parks, testified that he did not observe any unusual behavior from Judge Snipes during Williams' trial and never saw Judge Snipes making faces or rolling his eyes; (22) the defense's lead counsel, attorney Seymour, likewise testified that he did not remember Judge Snipes making any unusual facial expressions during the trial; (23) one of Kim Williams' attorneys, attorney Lalon Peale testified that he watched many days of Williams' trial and took detailed notes, none of which contained any mention of Judge Snipes making inappropriate facial expressions; (24) Williams presented no evidence that any allegedly inappropriate facial expressions exhibited by Judge Snipes during trial were seen by the jury or influenced the jury's view of the evidence; and (25) Williams' due process rights were not violated by any aspect of Williams' multi-faceted judicial bias claim.[89] The Texas Court of Criminal Appeals expressly adopted all of the foregoing factual findings and legal conclusions. *Ex parte Williams*, 2020 WL 5540714, *2. This court is not free to disregard same. *See Halprin v. Davis*, 911 F.3d 247, 254-55 & n.2 (5th Cir. 2018) (holding AEDPA deference applied to a claim which the state court both dismissed as procedurally defaulted and found to lack merit).

Furthermore, this court's independent review of the record from Williams' trial reveals that (1) at the start of proceedings in Williams' trial on December 15, 2014 (the

[89] 1 Supp. SHCR 211-22, ¶¶ 1079-1145 [ECF no. 99, at pp. 211-22 of 245].

final day of Williams' presentation of mitigating evidence at the punishment phase of trial), the trial judge instructed Williams' counsel to craft a jury instruction designed to address reports in the media about the judge's demeanor during trial; (2) Williams' trial counsel did so; and (3) the trial judge then read to the jury the following oral instruction: "Also, of you have seen anything in my demeanor or attitude which leads you to conclude that I have certain opinions about the case or certain beliefs about what lawyers are doing in the case, you're to wholly disregard that and consider only the evidence that's before you from the witness stand."[90] Juries are presumed to follow their instructions. *Zafiro v. United States*, 506 U.S. 534, 541 (1993); *Richardson v. Marsh*, 481 U.S. 200, 211 (19870 ("The rule that juries are presumed to follow their instructions is a pragmatic one, rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable practical accommodation of the interests of the state and the defendant in the criminal justice process.). Thus, insofar as Williams seeks to rely upon the trial judge's facial expressions or overall demeanor to support his judicial bias claim, he is not on solid ground. The trial judge expressly admonished the jury in open court against allowing such matters to impact its verdict.

The state habeas trial court's foregoing findings and conclusions on this subject, which the TCCA expressly adopted, are fully supported by this court's independent review of the state court record.[91] They are also fully consistent with Supreme Court precedent.

---

[90] 53 R.R. [ECF no. 118-17] 9-13.

[91] If anything, the testimony of Williams' lead trial counsel and co-counsel during the state habeas hearing understated the degree to which a substantial portion of the forty

In *Liteky v. United States*, 510 U.S. 540, 550-51 (1994), an opinion discussing the standard for the recusal of federal judges, the Supreme Court recognized that judges are not required to remain completely stoic to the point they cease to exhibit ordinary human emotions:

> The judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person. But the judge is not thereby

---

defense witnesses at the punishment phase of trial recounted the same information or spent many minutes testifying about their own life stories and experiences separate and apart from their interactions with Williams. For instance, Williams' fellow Eagle Scout and childhood friend was questioned extensively about his own academic and employment careers after high school and his memories of camping trips which may or may not have impacted Williams. 53 R.R. [ECF no. 17] 105-31, The teacher who served as the faculty adviser for the Azle High math and science team spent considerable time discussing his own background and the choices which led him to become a teacher, then proceeded to identify a whole series of virtually identical math and science team group photographs which included Williams. 53 R.R. [ECF no. 118-17] 132-54. The teacher's testimony came *after* more than a half dozen former math and science team members testified in response to the same script of questions about their experiences in high school and on the math and science team.

By the time the defense rested at the punishment phase of Williams' trial, his jury could reasonably have wondered if there had been any members of the Azle math and science team during Williams' years in high school who had not been called to testify. Moreover, as attorney Seymour accurately noted during his testimony at the state habeas hearing, the vast majority of Williams' former high school classmates who testified had experienced only nominal contact with Williams since his high school graduation. The lone teacher from Azle High called by the defense had not had any contact with Williams since Willams' high school graduation in 1985.

Furthermore, Williams' defense counsel appeared at times tone deaf to the trial judge's completely reasonable efforts to streamline the presentation of evidence and avoid rehashing the same points in front of the jury. Near the close of proceedings on December 12, 2014, a Friday afternoon, the trial judge admonished the defense to avoid presenting repetitive testimony and to focus on the witness's relationship with Williams. 52 R.R. [ECF no. 118-6] 138. Yet the following Monday morning, the defense continued its case in mitigation by calling a pair of sisters who more than a decade before had spent a couple of their teenage summers living with Williams and his wife, ostensively to help them avoid problems within their own home. These two witnesses gave virtually identical testimony which described Williams as basically buried in his office and barely interacting with them during their visits. 53 R.R. [ECF no. 118-17] 13-30.

> recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes (as in a bench trial) necessary to completion of the judge's task. As Judge Jerome Frank pithily put it: "Impartiality is not gullibility. Disinterestedness does not mean child-like innocence. If the judge did not form judgments of the actors in those court-house dramas called trials, he could never render decisions." *In re J.P. Linahan, Inc.,* 138 F.2d 650, 654 (CA2 1943). Also not subject to deprecatory characterization as "bias" or "prejudice" are opinions held by judges as a result of what they learned in earlier proceedings. It has long been regarded as normal and proper for a judge to sit in the same case upon its remand, and to sit in successive trials involving the same defendant.

Judge Snipes's unkind comments to Williams at sentencing fall squarely within the parameter of these principles. *See Liteky*, 510 U.S. at 555:

> [O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.

Williams alleges no facts and presents no evidence the state habeas court found credible which showed that Judge Snipes owned any biases or opinions deriving from an extra-judicial source.

Likewise, Williams' complaints about the trial judge's rulings on particular motions and objections do not, standing alone, warrant a finding of judicial bias. *Liteky*, 510 U.S. at 555 ("judicial rulings alone almost never constitute a valid basis for a bias or partiality motion.").

Finally, Judge Snipes's efforts to rein in the attorneys for both sides and attempt to

get the defense to focus the attention of its witnesses on their relationships with Williams was well within the proper scope of judicial administration and cannot form the basis for a bias claim. *Liteky*, 510 U.S. at 556 ("A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.).

The state habeas trial court's findings and conclusions, adopted by the TCCA, were fully supported by the state habeas hearing testimony of Williams' own trial counsel and fully supported the state habeas trial court's alternative finding of no merit on Williams' judicial bias claim. After conducting *de novo* review of the whole record from Williams' trial, motion for new trial, and state habeas proceedings, this court concludes that Williams' eleventh claim is denied.

## V. FLAWED FORENSIC TESTIMONY (AEDPA & *De Novo* Review)

In his tenth claim in his amended federal habeas petition, Williams argues cryptically that new developments in the sciences of DNA comparisons, ballistics, and toolmark analysis show those sciences are more subjective than once believed, thus making unreliable all such evidence presented during either phase of his capital murder trial and depriving him of Due Process (ECF no. 76, at pp. 166-77). Respondent correctly points out that Williams included no point of error in his direct appeal brief which even tangentially approaches the broadness of this claim. Likewise, while Williams did include some assertions in support of his first claim for relief in his state habeas application which arguably could be construed as similar to those included in his tenth claim in his amended

federal habeas petition, that assertion if far from compelling.[92] It is unnecessary to resolve the issue of whether Williams fairly presented his tenth claim herein to the state courts because, regardless of what standard of review is applied, that claim lacks any arguable merit.

### A. AEDPA Review

Williams failed to present the state habeas trial court with any evidence showing that any of the prosecution's experts (either DNA, fingerprint, or firearms and toolmark) furnished any false or misleading testimony at Williams' trial. The same is true for the record currently before this court.

Thus, the TCCA's rejection on the merits of this aspect of Williams' multi-faceted first claim for state habeas relief was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the

---

[92] Williams' state habeas application included a multi-faceted first claim asserting a variety of acts of prosecutorial misconduct and which contained multiple subparts. On pages 50-52 of his state habeas application Williams alleged without any factual support that the prosecution used its firearms and toolmark expert, its DNA expert, and its fingerprint expert to present unidentified false testimony at the guilt-innocence phase of his trial. 1 SHCR 108-11 [ECF no. 98, at pp. 108-11 of 493.

The state habeas trial court made findings of fact and conclusions of law regarding this cryptic assertion, specifically determining that Williams had (1) alleged no specific facts in support of what the state habeas court construed as a *Giglio/Napue* claim; (2) presented no evidence in support of this claim; (3) failed to present facts that entitled him to relief; and (4) failed to prove the State presented any false or misleading testimony at the guilt-innocence phase of trial. 1 Supp. SHCR [ECF no. 99] 85, ¶¶ 254-61 The state habeas trial court also found the State's experts did not present false or misleading testimony, and this claim should be denied. 1 Supp. SHCR [ECF no. 99] 85, ¶ 262 [ECF no. 99, at p. 85 of 245]. As explained above, the TCCA expressly rejected Williams' first claim for state habeas relief on the merits when it denied state habeas relief. *Ex parte Williams*, 2020 WL 5540714, *2.

United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Williams' trial and state habeas corpus proceeding. Williams is not entitled to relief under AEDPA.

### B. *De Novo* Review

New scientific developments may very well render questionable the science underlying the admission of forensic evidence in a criminal trial. Such advances in science may well warrant applications for executive clemency. But they do not warrant federal habeas relief, absent the showing of a constitutional violation.

The proper legal standard for determining whether the admission of false or misleading evidence violates a criminal defendant's Due Process rights is found in the Supreme Court's precedent. A state denies a criminal defendant due process when it *knowingly* uses perjured testimony at trial or allows untrue testimony to go uncorrected. *Giglio v. United States*, 405 U.S. 150, 153-54 (1972); *Napue v. Illinois*, 360 U.S. 264, 269-70 (1959). To succeed in showing a due process violation from the use of allegedly perjured testimony, a defendant has the burden of establishing that (1) the witness in question actually gave false testimony, (2) the falsity was material in that there was a reasonable likelihood that it affected the judgment of the jury, and (3) the prosecution used the testimony in question *knowing* that it was false. *Giglio v. United States*, 405 U.S. at 153-54; *Canales v. Stephens*, 765 F.3d 551, 573 (5th Cir. 2014) (a conviction obtained through false evidence known to be such by representatives of the State violates a defendant's constitutional rights); *Kinsel v. Cain*, 647 F.3d 265, 271 (5th Cir. 2011) ("The Supreme Court has held that the Due Process Clause is violated when the government knowingly

uses perjured testimony to obtain a conviction."); *Reed v. Quarterman*, 504 F.3d 465, 473 (5th Cir. 2007).

Rule 2(c)(2) of the *Rules Governing Section 2254 Cases in the United States District Courts* requires that the petition "state the facts supporting each ground." *Mayle v. Felix*, 545 U.S. 644, 655 (2005); *Harper v. Lumpkin*, 64 F.4th 684, 691 (5th Cir. 2023). This is very different from the "notice pleading" requirement of Rule 8, FED. R. CIV. P. *See Murphy v. Dretke*, 416 F.3d 427, 436-38 (5th Cir. 2005) (holding generic reference to individual voir dire of entire jury venire insufficient to support a *Batson* claim (citing *Koch v. Puckett*, 907 F.2d 524, 530 (5th Cir. 1990) (conclusory allegations fail to establish a valid claim of ineffective assistance of counsel)); and *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983) (conclusory allegations do not raise a constitutional issue in a habeas proceeding)).

The Fifth Circuit has reaffirmed this rule in a wide variety of contexts. *See, e.g., Fahle v. Cornyn*, 231 F.3d 193, 196-97 (5th Cir. 2000) (conclusory due process allegations that petitioner was denied the presumption of innocence insufficient to support claims for federal habeas relief); *Little v. Johnson*, 162 F.3d 855, 862 (5th Cir. 1998) (conclusory assertions regarding alleged destruction of exculpatory evidence failed to show State destroyed the evidence in bad faith, i.e., with knowledge of its exculpatory value); *Perillo v. Johnson*, 79 F.3d 441, 444 (5th Cir. 1996) ("A habeas petitioner must make specific allegations; 'conclusory allegations unsupported by specific facts' or 'contentions that in the face of the record are wholly incredible' will not entitle one to discovery or a hearing." (quoting *Blackledge v. Allison*. 431 U.S. 63, 74 (1977)).

The fundamental flaw in Williams' tenth claim is that he has failed to allege any specific facts, as required by Rule 2(c) showing that the prosecution *knowingly* used false or misleading testimony from any of its expert witnesses (or any other false or misleading evidence) to secure Williams' conviction and sentence. Thus, this claim is without arguable merit, even when reviewed *de novo*. Williams' tenth claim is denied.

## VI. DISQUALIFIED/INTERESTED PROSECUTOR (*De Novo* Review)

In his fifth claim in his amended federal habeas petition, Williams argues that his Due Process rights were violated when attorney Sue Korioth, an employee of the Kaufman Coun ty District Attorney's Office (which Office had been voluntarily recused in conformity with applicable state statute), assisted Williams' prosecutors (ECF no. 76, at pp. 57-71). Williams did include this claim as a subpart of his multi-faceted first claim in his application for state habeas relief.[93] The state habeas trial court heard testimony from several attorneys, including attorney Korioth, and made extensive findings of fact and conclusions of law relating to this claim.[94]

The state habeas trial court's FFCL included findings that (1) after the Hasse murder, attorney Korioth recommended to Kaufman County District Attorney McLelland that his Office voluntarily recuse; (2) McLelland filed a recusal motion on behalf of his Office after approaching an experienced criminal defense attorney who also had experience as a special prosecutor (attorney Bill Wirskye) to serve as attorney *pro tem* for the

[93] 1 SHCR [ECF no. 98] 111-23.

[94] 1 SHCR 85-116, ¶¶ 263-486 [ECF no. 99, at pp. 85-116 of 245].

investigation into Hasse's murder and any ensuing prosecution; (3) Korioth, who was at that time serving as the lone appellate attorney in McLelland's Office, was a longtime friend and colleague of Wirskye and recommended Wirskye to McLelland; (4) Wirskye and his law partner Toby Shook accepted the roles of attorneys *pro tem* for the Hasse investigation; (5) after the McLelland murders, the acting Kaufman County District Attorney filed a recusal motion with regard to the McLelland murders and the responsibilities of attorneys *pro tem* Wirskye and Shook expanded to include supervision of the investigation of all three murders; (6) throughout the investigation of the murders and Williams' subsequent prosecution, attorney Korioth served the *de facto* liaison between the Kaufman County District Attorney's Office and the two attorneys *pro tem*; (7) in that role, attorney Korioth (a) answered Wirskye's questions about individuals and procedures within Kaufman County, (b) furnished Wirskye with information about the Kaufman County District Attorney's Office and its prosecution of Williams for burglary and theft, and (c) was the person to whom Wirskye directed people in Kaufman County who questioned him about the ongoing investigation; (8) Korioth was copied on many group emails sent out by the attorneys pro tem to their team, including emails about meetings, but attended very few of those meetings; (9) Korioth also did not attend the daily law enforcement briefings regarding the ongoing investigation; (10) Wirskye emailed and called Korioth, whom he described as a very knowledgeable criminal lawyer, and often called her late at night because she was a night owl and the only person he knew who was available at one a.m. when he needed to discuss legal matters; (11) Wirskye also asked Korioth to review and comment on a variety of documents generated during the

investigation, including search warrants and indictments, because he otherwise did not have access to the forms employed by the Kaufman County District Attorney's Office; (12) Korioth did nothing to steer or direct the investigation toward Williams; (13) rather, when interviewed by the FBI, Korioth furnished information about other possible suspects and communicated that she believed that, prior to his death, McLelland had been too focused on Williams as a possible suspect in the Hasse murder; (14) Korioth had no personal animus or bias against Williams; (15) while Korioth had represented the State in Williams' appeal of his burglary and theft convictions, that was because she was the only attorney handling appeals in the Kaufman County District Attorney's Office; (16) Korioth did not have any role as a decision-maker within Wirskye's and Shook's investigative and prosecutorial team; (17) while Wirskye called or emailed Korioth seeking her thoughts and recommendations on many matters relating to the case, Wirskye did not abdicate his responsibility as the primary decision-maker for the prosecution team; (18) Korioth did not investigate or prosecute the murders of Hasse or the McLelland's; (19) Korioth was at home at the time of both the Hasse and McLelland murders, did not have actual knowledge of the murders, and was not a fact witness; (20) Korioth's testimony that she did not have a personal animus or resentment against Williams was supported by the record; (21) Korioth had no personal or financial interest in the outcome of Williams' prosecution; and (22) neither Wirskye nor Korioth had an actual conflict of interest regarding Williams' prosecution.[95]

[95] *Id.* More specifically, the state habeas trial court determined (1) Williams failed to show that attorney Korioth had an actual conflict of interest; (2) Williams failed to show

attorney Korioth was a decision-making member of the prosecution's team; (3) Williams failed to show that prosecutor pro tem Wirskye had an actual conflict of interest rising to the level of a Due Process violation; (3) the Kaufman County District Attorney's Office voluntarily recused itself and recruited attorneys Bill Wirskye and Toby Shook to serve as attorneys pro tem in the Hasse murder case; (4) Korioth had extensive dealings with Wirskye earlier in her legal career, was familiar with Wirskye's capabilities, and recommended to McLelland that Wirskye and Shook be approached about serving as attorneys pro tem; (5) after the McLelland murders, the Kaufman County District Attorney's Office filed a recusal motion virtually identical to one it had filed in the Hasse case and Wirskye and Shook were appointed as pro tem in the McLelland case; (6) in April 2013 Judge Erleigh Wiley was appointed as the new Kaufman County District Attorney; (7) Korioth and Wirskye exchanged many emails about the Williams case and many in which Korioth and Wirskye discussed other cases in which Wirskye was serving as a defense counsel; (8) the emails establish that Korioth assisted Wirskye but that she did not serve as a decisionmaker on the prosecution team; (9) Wirskye's testimony and Korioth's testimony established that Korioth did not make critical controlling decisions about the investigation or prosecution of Williams; (10) Wirskye's and Korioth's testimony also establishes that Korioth had no personal interest in investigating and prosecuting Williams and Wirskye and his team were not under her influence; (11) Williams failed to establish that Korioth was a decisionmaker for the prosecution team or that she influenced Wirskye such that he was not making his own independent decision; (12) Williams failed to establish that Korioth had an actual conflict of interest; (13) Williams failed to establish that Wirskye had an actual conflict of interest that rose to the level of a Due Process violation; (14) Korioth served as Wirskye's point of contact with the Kaufman County DA's Office and helped him relay information to the Kaufman County DA's Office; (15) Wirskye testified that Korioth reassured people in the Kaufman County DA's Office that Wirskye and Shook were investigating the cases; (16) Korioth testified that she tried to be a resource for Wirskye since she was familiar with people in the Kaufman County courthouse and that she obtained files for Wirskye and Shook when they requested them; (17) Korioth testified that when people in a DA's office are killed, the DA's Office itself and its personnel become part of the crime scene; (18) Korioth described her role for Wirskye and Shook as that of a legal researcher and a paralegal; (19) Korioth never attended the daily law enforcement briefings/meetings; (20) after McLelland's murder Korioth told the FBI that McLelland had believed Williams was responsible for the Hasse murder but the same information was known to others; (20) in fact, Korioth was worried in the weeks after the Hasse murder that McLelland was too focused on Williams as a suspect in the Hasse murder; (21) there was no evidence Korioth swayed the investigation to focus on Williams; (22) on the contrary, Korioth gave investigators information about another possible suspect in the McLelland case; (23) independent of Korioth's information, the evidence of Williams' involvement in the McLelland murders was strong; (24) there is no showing the investigation improperly focused on Williams because of anything Korioth did or said; (25) Wirskye kept Korioth in the loop on the investigation because he had told

The state habeas trial court concluded that Williams' due process rights had not been violated by virtue of Korioth's participation in the investigations of the Hasse and

---

everyone in Kaufman County to contact Korioth to get the latest on the investigation; (26) Wirskye testified that Korioth was included in emails about meetings not as an invitation to attend but to keep her informed; (27) Wirskye remembered Korioth attending only meetings where the evidence was discussed; (28) the reasons Korioth was kept in the loop included her role within the Kaufman County DA;s Office, including her role as open records attorney for Kaufman County; (29) Wirskye described Korioth as a friend and one of the smartest criminal lawyers in Texas; (30) Korioth testified she did not use their friendship to inject herself into the case; (31) Korioth reviewed and advised Williams' arrest warrant but there was no evidence showing the nature of her editing; (32) Wirskye testified that he called Korioth late at night for legal advice because she was the only person who was up at one a.m. but they had boundaries in their friendship and professional relationship; (33) whether Korioth drafted the indictments, there was no evidence she decided the course of the litigation; (34) while Korioth was copied on emails and asked to review and comment on draft documents in the case, there is no showing that she made critical, controlling decisions in the investigation or prosecution or that Wirskye and Shook abdicated their responsibilities as attorneys pro tem; (35) Williams failed to prove that Wirskye had an actual conflict of interest; (36) Williams failed to show that Korioth was an "interested" prosecutor; (37) Korioth did not investigate or prosecute the murders of Hasse or the McLelland's; (38) Williams failed to show that Korioth committed misconduct toward Williams' prosecution based on her friendship with Hasse; (39) Korioth testified that while they had worked together, she and Hasse were not friends because they saw things very differently; (40) Williams failed to establish that Korioth had an actual conflict of interest because she worked for the Kaufman County DA's Office after the Hasse and McLelland murders; (41) Korioth was at home at the time of both the Hasse and McLelland murders, did not have actual knowledge of the murders, and was not a fact witness; (42) Korioth's interview with the FBI after the McLelland murders did not make her a fact witness; (43) any conflict of interest attributable to Erleigh Wiley (because she was a witness at Williams' trial and named as a potential future victim) was not attributable to Korioth; (44) Korioth's speculation to the FBI about how the McLelland murders may have taken place did not make her a fact witness; (45) excerpts from Wiley's book were not credible, reliable evidence; (46) Korioth did not have a personal ax to grind against Williams; (47) Korioth lived in Dallas , did not have much contact with Williams, and did not have an opinion about him; (48) Korioth handled Williams' appeal in the burglary case because she handled all appeals; (49) no evidence shows that Korioth contaminated Williams' murder prosecution because of his burglary or theft convictions; and (50) Korioth's testimony that she did not have a personal animus or resentment against Williams was supported by the record. *Id.*

McLelland murders and Williams' subsequent prosecution.[96] The TCCA expressly adopted all of the state habeas trial court's findings and conclusions when it denied Williams' state habeas application. *Ex parte Williams*, 2020 WL 5540714, *2. Those findings and conclusions were fully supported by the testimony of attorneys Wirskye and Korioth before the state habeas court.[97]

As respondent accurately points out, Williams identifies no clearly established Supreme Court precedent holding that a due process violation results from the arguably improper participation of an attorney disqualified under state statute from participation in a defendant's criminal prosecution.[98] Respondent correctly argues that adoption of such a

---

[96] 1 SHCR 85-116, ¶¶ 263-486 [ECF no. 99, at pp. 85-116 of 245].

[97] Attorney Wirskye's testimony before the state habeas trial court appears herein at 8 SHRR [ECF no. 99-9] 59-157. Attorney Korioth's state habeas testimony appears herein at 6 SHRR [ECF no. 99-7] 57-156.

[98] For instance, Williams' citation to *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787 (1987), ignores the fact that case was an instance in which the Supreme Court acted not as an arbiter of federal constitutional principles but, rather, in its supervisory capacity over federal criminal contempt proceedings to hold that a party with a direct financial interest in the outcome of a federal criminal contempt proceeding may not have its counsel serve as appointed prosecutor in the criminal contempt proceeding from which that party stands to benefit.

> The exercise of supervisory authority is especially appropriate in the determination of the procedures to be employed by courts to enforce their orders, a subject that directly concerns the functioning of the Judiciary. We rely today on that authority to hold that counsel for a party that is the beneficiary of a court order may not be appointed as prosecutor in a contempt action alleging a violation of that order.

*Young*, 481 U.S. at 809.

Likewise, in *Marchall v. Jerrico, Inc.*, 446 U.S. 238 (1980), the Supreme Court held that the strict neutrality requirements imposed by due process which apply to judicial officers do not likewise govern the behavior of prosecutors for federal administrative agencies and that there was no requirement that such prosecutors be disqualified simply

new rule of constitutional criminal procedure in the context of this federal habeas proceeding is foreclosed by the nonretroactivity doctrine of *Teague*.

Williams' reliance on Korioth's possible violations of state statutes mandating attorney disqualification is misplaced. Generally, violations of state law do not furnish a basis for federal habeas relief. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (holding complaints regarding the admission of evidence under California law did not present grounds for federal habeas relief absent a showing that admission of the evidence in question violated due process); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (recognizing that federal habeas relief will not issue for errors of state law); *Pulley v. Harris*, 465 U.S. 37, 41 (1984) (holding a federal court may not issue the writ on the basis of a perceived error of state law). In the course of reviewing state criminal convictions in federal habeas corpus

---

because the agencies stood to benefit financially from enforcement proceedings brought under the Fair Labor Standards Act. *Marshall*, 446 U.S. at 248-50. The Court went on to hold that the financial interest federal administrator's might have in the decision to enforce child labor laws did not require the agency to disgorge itself of any funds recovered during such administrative proceedings:

> In this case, we need not say with precision what limits there may be on the financial or personal interest of one who performs a prosecutorial function, for here the influence alleged to impose bias is exceptionally remote. No governmental official stands to profit economically from vigorous enforcement of the child labor provisions of the Act. The salary of the assistant regional administrator is fixed by law.

*Marshall*, 446 U.S. at 250.

Finally, in *Kinsella v. U.S. ex rel. Singleton*, 361 U.S. 234, 249 (1960), the Supreme Court held that the civilian spouse of a member of the U.S. military stationed in Germany could not be prosecuted and tried in a court-martial for a criminal offense.

Neither collectively nor individually do any of these cases stand for the new rule or constitutional due process principle urged by Williams herein.

proceedings, a federal court does *not* sit as a super-state appellate court. *Estelle*, 502 U.S. at 67-68; *Lewis*, 497 U.S. at 780; *Pulley*, 465 U.S. at 41.

> When a federal district court reviews a state prisoner's habeas corpus petition pursuant to 28 U.S.C. § 2254 it must decide whether the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States." The court does not review a judgment, but the lawfulness of the petitioner's custody *simpliciter*.

*Coleman v. Thompson*, 501 U.S. 722, 730 (1991).

The cases cited by Williams in his pleadings in this court do not establish the existence of a clearly established constitutional due process right to a new trial when a disqualified prosecutor plays a role vis-à-vis a criminal prosecution such as the one Korioth accurately described in her state habeas testimony as that of a "legal researcher and paralegal" in Williams' case. Obviously, the attorney *pro tem* needed a liaison in the recused Kaufman County District Attorney's Office. That Office had prosecuted Williams for burglary and theft and both Hasse and McLelland had worked there prior to their murders. The attorney pro tem also benefitted from picking Korioth's brain on the nuances of the Kaufman County law enforcement bureaucracy and for obtaining forms used for securing search warrants, indictments, and the like in Kaufman County. Korioth was kept in the loop on what was happening in the investigation because Wirskye had designated her as the point person within the Kaufman County District Attorney's Office, *i.e.*, the person to whom those in Kaufman County having questions about the investigation should go for answers. The state habeas trial court's findings that Korioth played no decision-making role within the team of Williams' prosecutors and had no personal animus or other type of conflict of interest with regard to Williams' case were fully supported by the

testimony before that court. Accordingly, Williams' fifth claim is without merit and is denied.

## VII. DENIAL OF MOTIONS FOR CONTINUANCE (*De Novo* Review)

In his first claim in his amended federal habeas petition, Williams argues that he was denied due process by the trial court's repeated denials of his continuance motions premised upon his counsels' inability to complete (1) their review of the massive discovery furnished by the prosecution and (2) their examination of Williams' mental health as part of their search for mitigating evidence (ECF no. 76, at pp. 39-48). Williams presented a slightly different version of this argument as his twenty-third and twenty-fourth points of error on direct appeal (which focused collectively on how the denial of his continuance motions impacted his counsel's ability to develop the brain scan evidence he presented at the hearing on his motion for new trial).[99] The TCCA detailed the entire history of Williams' trial counsel's requests for funding to investigate Williams' mental health, including their request for funding for brain scans, and concluded the trial court had not abused its discretion in denying Williams' December 8, 10, and 15, 2014 motions for continuance to permit completion of Williams' brain scans.[100]

[99] Appellant's Brief, at 113-18, 1 Supp. SHCR 399-410 [ECF no. 97, at pp. 142-47 of 204].

[100] *Williams*, 2017 WL 4946865, *23-26. More specifically, the TCCA held: "When defense counsel again moved for continuances on December 8, 10, and 15, 2014, counsel provided details concerning the defense team's efforts to obtain the scans following the court's December 3 funding grant. However, nothing in these subsequent motions indicated that counsel had exercised diligence in trying to obtain funding for the scans before trial or that circumstances had conspired to prevent counsel from realizing sooner that he needed

In his state habeas application, Williams shifted course slightly and argued in his fourth claim that his due process rights were violated by the trial court's denials of his many motions for continuance made throughout jury selection and trial, which caused his counsel's inability to review the "unprecedented amount of discovery" furnished by the prosecution.[101] The state habeas trial court issued extensive findings and conclusions which recommended dismissal of this claim as procedurally defaulted or, alternatively, rejection of the claim on the merits.[102]

The state habeas trial court's FFCL including findings that (1) Williams failed to raise this same claim on direct appeal; (2) Williams failed to show that the discovery was so voluminous it could not be reviewed in the time allotted; (3) Williams failed to establish that the prosecution thwarted a complete review of the discovery by failing to provide guidance as to what information was contained on the many computer drives and discs; (4) on the contrary, the State obtained the services of the Tarrant County Criminal District Attorney's Office to process, organize, and deliver the discovery to the defense team; (5) although the discovery did not come with an index, it was organized; (6) with the assistance of the Tarrant County CDA's Office, which professionally managed and duplicated the discovery, the State delivered the discovery to the defense team; (7) Wirskye prepared and delivered to the defense a "person of interest" spreadsheet which identified all persons of

---

them." *Id.*, at 26.

[101] State Habeas Application, at 341-52 [ECF no. 98, at pp. 399-410 of 493].

[102] 1 Supp. SHCR 206-10, ¶¶ 1042-78 [ECF no. 99, at pp. 205-10 of 245].

interest and where information relating to those persons could be found in the discovery; (8) Wirskye also emailed the defense team to transmit items that were time sensitive, such as required disclosures under *Brady*, and directed defense counsel to items or information defense counsel were having difficulty locating in the discovery; (9) while some of the discovery was furnished to the defense in duplicate that was so the defense team members could have their own copies of same; (10) Williams furnished no evidence showing that any of the discovery files were inaccessible and the testimony of lead defense attorney Seymour refutes such argument; (11) Williams failed to establish the State failed to produce the discovery in a timely manner; (12) the discovery was not dumped on the defense right before trial; (13) Seymour testified he received regular deliveries of discovery between August 2013 and November 2014; and (14) Williams failed to demonstrate how much of the discovery was not reviewed by his defense team, what the remainder contained, or what the remainder contained that was significant.[103] The TCCA expressly adopted all of the foregoing findings when it dismissed as procedurally defaulted Williams' fourth claim for state habeas relief. *Ex parte Williams*, 2020 WL 5540714, *2. Those findings were fully supported by the testimony given before the state habeas court by prosecutor pro tem Wirskye and lead defense counsel Seymour.[104]

In *Morris v. Slappy*, 461 U.S. 1, 11 (1983), a case involving a habeas petition

---

[103] *Id.*

[104] The testimony of attorney Bill Wirskye during Williams' state habeas proceeding appears at 8 SHRR [ECF no. 99-9] 59-157. The testimony of defense lead counsel Matthew Seymour appears herein at 7 SHRR [ECF no. 99-8] 7-144.

alleging a state trial court deprived the petitioner of the assistance of counsel by denying a motion for continuance designed to help get the defendant's original trial counsel back on the case, the Supreme Court made the following observations about federal habeas review of state court denials of motions for continuance:

> Not every restriction on counsel's time or opportunity to investigate or to consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel. *See Chambers v. Maroney,* 399 U.S. 42, 53–54, 90 S. Ct. 1975, 1982–1983, 26 L.Ed.2d 419 (1970). Trial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsels against continuances except for compelling reasons. Consequently, broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary "insistence upon expeditiousness in the face of a justifiable request for delay" violates the right to the assistance of counsel. *Ungar v. Sarafite,* 376 U.S. 575, 589, 84 S. Ct. 841, 849, 11 L.Ed.2d 921 (1964).

While the foregoing observations were made in the context of an analysis of a Sixth Amendment claim, the same policy considerations rationally apply to a federal habeas court's analysis of challenges to the denial of a continuance premised on due process considerations. *See Weatherford v. Bursey*, 429 U.S. 545, 559 (1977) ("There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one; as the Court wrote recently, 'the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded. . . .'" (quoting *Wardius v. Oregon*, 412 U.S. 470, 474 (1973)).

"When a denial of a continuance is the basis for a habeas petition, the petitioner must show an abuse of discretion that was so arbitrary and fundamentally unfair as to violate the constitutional principles of due process." *Newton v. Dretke*, 371 F.3d 250, 255

(5th Cir. 2004) (citing *Skillern v. Estelle*, 720 F.2d 839, 850 (5th Cir. 1983)); *Johnson v. Puckett*, 176 F.3d 809, 822 (5th Cir. 1999). To prevail, a petitioner must show that the failure to grant a continuance harmed the defense. *See Newton*, 371 F.3d at 255 (citing *United States v. Pollani*, 146 F.3d 269, 272 (5th Cir. 1998)). If an abuse of discretion is established, the petitioner must establish "a reasonable probability that the granting of a continuance would have permitted him to adduce evidence that would have altered the verdict." *Schrader v. Whitley*, 904 F.2d 282, 288 (5th Cir. 1990); *Kirkpatrick v. Blackburn*, 777 F.2d 272, 279 (5th Cir. 1985).

Williams' trial counsel repeatedly made or re-urged the same conclusory motion for continuance, insisting they had not yet been able to completely review all the discovery furnished by the prosecution. Yet the state habeas court found the defense never identified for the trial court how much data had been reviewed or how much was yet to be reviewed. The prosecutor testified during Williams' state habeas hearing that he personally reviewed all the relevant discovery and others within his office had done so, as well. Moreover, other than identifying the number of terabytes of data that had been delivered to the defense team, Williams' counsel failed to offer the trial court any information on what they were looking for in the electronic data they had not yet reviewed or its possible significance to the case. Williams' assertion before this court, apparently for the first time, that that the identity of a suspect unknown to the defense was somewhere in the massive discovery is belied by the state habeas court's factual finding, supported by attorney Wirskye's testimony, that his "person of interest" spreadsheet delivered to the defense identified all the suspects of which the prosecution was aware. Williams has wholly failed to allege any

specific facts establishing that he was harmed at the guilt-innocence phase of his trial by the denial of his motions for continuance generically seeking more time to review unidentified discovery. The TCCA reasonably rejected on the merits Williams' complaint on direct appeal about the denial of his December 2014 motions for continuance designed to allow the defense team to complete their efforts to obtain brain scans on Williams. The state trial court was furnished with no specific facts by the defense which showed those denials to be an abuse of discretion.

In any event, after *de novo* review of the entire record in this case, this court concludes there is no reasonable probability that the granting of any of Williams' motions for continuance would have impacted the outcome of either phase of Williams' capital murder trial. Any additional information Williams' defense team could have gleaned from the unreviewed discovery about the identity of the shooter in the Hasse murder or the make, model, or color of the getaway vehicle used in the Hasse murder would have had zero impact on the guilt-innocence phase of Williams' trial. The prosecution scrupulously avoided any mention of the Hasse murder during its guilt-innocence prosecution of Williams for the capital murder of Cynthia McLelland.

Assuming that Williams has shown that the granting of his December 2014 motions for continuance would have permitted him to present his jury with the brain scan data Williams presented during the hearing on his motion for new trial (*i.e.*, the testimony of the defense's neuroradiologist and physician suggesting Williams suffers from atrophy in his limbic region and shows signs of traumatic injury to his frontal lobes), there is still no reasonable probability of a different outcome at the punishment phase of his trial. Such

testimony would likely have guaranteed an affirmative answer to the future dangerousness special issue. And, at best, it may have suggested Williams was susceptible to emotional outbursts. The problem with that contention, however, is that the evidence presented during the punishment phase of Williams' trial showed beyond any reasonable doubt that the murders of Cynthia McLelland and her husband were *not* the result of an emotional outburst but, rather, the products of intensive planning, careful preparation, and ruthless execution.

There is not a scintilla of evidence currently before this court suggesting Williams has ever expressed sincere contrition or genuine remorse for his capital offense. None of the experts called to testify by Williams at the hearing on his motion for new trial and none of the witnesses who testified during his state habeas evidentiary hearing opined that Williams' brain abnormalities render him physiologically incapable of experiencing empathy or experiencing remorse for his capital offense. Under such circumstances, the brain scan data presented by Williams at his motion for new trial hearing would not, in all reasonable probability, have resulted in jury answers favorable to the defense on either of the Texas capital sentencing special issues.

After *de novo* review of the extensive record, this court concludes Williams' first claim in his amended federal habeas petition is without arguable merit. Williams never gave his state trial court a rational explanation for why his defense team failed to review all of the data relevant to the capital murder charge against Williams. Thus, there was no abuse of discretion in the denial of continuances. In this court, Williams has never offered a rational explanation for why his defense team needed to review all the video footage from

business and residential home security cameras around the Hasse murder site in preparation for Williams' trial on the McLelland murders. Williams' right to due process was not violated by the state trial court's denials of his motions for continuance. Williams' first claim is denied.

## VIII. CONSTRUCTIVE DENIAL OF COUNSEL (*De Novo* Review)

In his third claim in his amended federal habeas petition, Williams argues that the state trial court's denials of his motions for continuance also deprived him of his Sixth Amendment right to the effective assistance of counsel (ECF no. 76, at pp. 53-56). Williams included virtually the same claim as his third claim in his state habeas application.[105]

The state habeas trial court issued findings and conclusions which echoed those detailed in Section VI above and recommended that Williams' third claim for state habeas relief be dismissed as procedurally defaulted or, alternatively, rejected on the merits.[106]

---

[105] State Habeas Application, 331-40, 1 Supp. SHCR 389-98 [ECF no. 98, at pp. 389-98 of 493].

[106] 1 Supp. SHCR 198-206, ¶¶ 999-1048 [ECF no. 99, at pp. 198-206 of 245]. More specifically, the state habeas trial court's FFCL provided in pertinent part that (1) Williams procedurally defaulted on this claim by failing to raise it on direct appeal; (2) while most of the members of the prosecution team participated in the review of discovery materials, most of the discovery review by the defense team was undertaken by only two individuals, attorney Seymour and an investigator; (3) Williams failed to prove that no counsel could have rendered effective assistance without additional time to complete review of the discovery; (4) Williams failed to prove that his trial counsel failed to subject the prosecution's case to meaningful adversarial testing; (5) the State provided more discovery than it was required; (6) Williams' claim is predicated on the failure of his trial counsel to review materials the State was not required to produce to the defense; (7) just because the State collects and reviews something does not mean the defense is required to do so; (8) much of the investigative materials generated by the prosecution between the Hasse and

The TCCA expressly adopted all of the foregoing findings when it dismissed as procedurally defaulted Williams' third claim for state habeas relief. *Ex parte Williams*, 2020 WL 5540714, *2.

---

McLelland murders which the prosecution produced to the defense had very little relevance to the McLelland murders; (9) the State dd not bury the defense in immaterial information; (10) the State assisted the defense in document review by having the Tarrant County Criminal District Attorney's Office process, organize, and deliver the discovery to the defense team; (11) with the assistance of the Tarrant County CDA, the discovery was professionally managed, duplicated, and delivered; (12) the State did not oppose Williams' first two motions for continuance; (13) Wirskye prepared a "person of interest" spreadsheet which identified where the defense could locate information in the discovery related to each person of interest; (14) Wirskye emailed items to the defense that were time sensitive, including *Brady* material; (15) on request, Wirskye directed the defense to items of information counsel had difficulty locating; (16) the State utilized its resources to assemble, organize, and summarize a substantial amount of data, this simplifying the work of the defense team; (17) the court gave four months of additional time to the parties to prepare for trial; (18) the amount of discovery was not so great that its review could not be completed by the defense team before trial; (19) all of the documentary evidence was completely reviewed by Wirskye personally during the Summer of 2014 ; (20) Wirskye did not review all of the electronic data of "digital media evidence"; (21) while all of the discovery was available to Williams' defense team only Seymour and a defense investigator reviewed most of the discovery; (22) Williams failed to show what portion of the discovery was not reviewed by his defense team; (23) Williams also failed to show the nature or subject matter of the unreviewed discovery; (24) Williams' state habeas counsel have had the discovery for years and have produced nothing to address those issues; (25) Williams failed to show that competent counsel could not complete the discovery review in the allotted time; (26) apparently the defense team prioritized other tasks than completing the discovery review; (27) the trial record reveals that Williams' defense team did subject the prosecution's case to meaningful adversarial testing, challenging the reliability of the forensic evidence presented by the prosecution and emphasizing the circumstantial nature of the State's case during the guilt-innocence phase of trial; (28) Williams' defense counsel also presented a substantial case in mitigation which showed that (a) Williams would not be a future danger because he had already exacted revenge on those he blamed for his prior conviction, (b) experts believed prison officials could control Williams, and (c) Williams' life still had value; (29) Seymour's testimony refuted Williams' assertion that some of the discovery was inaccessible; (30) the discovery was not dumped on the defense right before trial; and (31) Williams' *Cronic* claim should be denied. *Id.*

A convicted criminal defendant's complaints about the performance of his trial counsel are ordinarily examined under the dual prongs of the test announced in *Strickland v. Washinton*, 466 U.S. 668, 687 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

In *United States v. Cronic*, 466 U.S. 648 (1984), decided the same day as *Strickland*, the Supreme Court recognized an exception to the requirement of a showing of prejudice, holding a presumption of "prejudice" sufficient to satisfy the second prong of *Strickland* exists when a criminal defense counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing." *Cronic,* 466 U.S. at 659. As the Supreme Court explained in its opinion in *Bell v. Cone*, 535 U.S. 685 (2002), however, in order to satisfy the presumed prejudice standard recognized in *Cronic,* a defendant must show his trial counsel's failure to test the prosecution's case was complete; and this type of failure goes significantly beyond a mere alleged failure to challenge particular portions of the prosecution's case. *Bell,* 535 U.S. at 697. Thus, a criminal defendant is entitled to a presumption of prejudice in only extraordinary situations, none of which approach the types of complaints Williams has raised concerning his trial counsel's performance. *See Bell*, at 695-97 (holding a presumption of prejudice applies only when there has been a complete denial of counsel, when counsel entirely failed to subject the prosecution's case

to meaningful adversarial testing, or circumstances rendered even competent counsel unlikely to be able to perform effectively); *Smith v. Robbins,* 528 U.S. 259, 287 (2000) (holding a presumption of prejudice applies only when there has been a complete denial of counsel, there has been state interference with counsel's assistance, or counsel is burdened by an actual conflict of interest).

Moreover, the state habeas trial court expressly found, and the TCCA adopted, that Williams had failed demonstrate his trial counsel were prevented from rendering effective assistance at trial because the trial court denied the defense's motions for continuance. On the contrary, the state habeas trial court found after hearing testimony from two of Williams' trial counsel and the prosecution's lead counsel,[107] that Williams' defense team made a conscious choice to invest their time in other matters rather than completing their review of the discovery materials. The state habeas trial court also pointed out that one member of the prosecution (attorney Wirskye) was able to complete review of all the documentary discovery in a few months in the Summer of 2014 and that other members of the prosecution team completed the review of the digital media information prior to trial.

Williams fails to allege any specific facts showing the outcome of either phase of his capital murder trial would or even could have been different had his trial counsel completed their review of the discovery furnished by the prosecution prior to the start of

[107] The state habeas testimony of Williams' lead trial counsel, attorney Matthew Seymour, appears herein at 7 SHRR [ECF no. 99-8] 7-144. The testimony of co-counsel for Williams, attorney John Wright, appears at 5 SHRR [ECF no. 99-6] 19-94. The testimony of lead prosecutor Bill Wirskye appears at 8n SHRR [ECF no. 99-9] 59-157.

Williams' trial. Williams alleges no specific facts showing how much of the discovery in question had been examined by his trial counsel prior to trial or how much was left for defense counsel to review at the start of trial. Likewise, Williams alleges no specific facts showing what information was contained in the portion of the discovery his trial counsel examined prior to trial or what information was contained in the discovery yet to be reviewed. Nor does Williams allege any specific facts showing there was any new or additional information contained in the unexamined portion of the discovery which might have benefitted or aided his trial counsel in their defense of Williams.

Most importantly, the state habeas trial court found that Williams failed to prove that his trial counsel completely failed to subject the prosecution's case to adversarial testing. The state habeas trial court found, and this court's *de novo* review of the trial record confirms, that Williams' trial counsel did subject the prosecution's case to meaningful adversarial testing by (1) challenging the reliability of the forensic evidence presented by the prosecution; (2) vigorously cross-examining prosecution witnesses; (3) emphasizing the circumstantial nature of the State's case during the guilt-innocence phase of trial; and (4) presenting a substantial case in mitigation which showed (a) Williams would not be a future danger, in part, because his actions in 2013 were aberrational and inconsistent with his life history of hard work and achievement; (b) multiple experts believed prison officials could adequately manage Williams if he were given a life sentence; (c) Williams possessed many good character traits; and (d) Williams' life still had value, in part, because he had the potential to be a positive influence on others. Under such circumstances, Williams is not entitled to a presumption of prejudice under the

holding in *Cronic*.

Williams' complaint that his trial counsel failed to completely review the discovery materials in their entirety prior to trial fails to satisfy the prejudice prong of *Strickland* because Williams fails to allege specific facts showing, much less proving, what benefit he would have derived had his trial counsel completed their review of all the discovery materials furnished by the prosecution. Thus, he has wholly failed to allege any specific facts showing a reasonable probability exists that either phase of his capital murder trial would have concluded differently had his trial counsel chosen to complete their review of the discovery furnished by the prosecution. Williams' third claim thus does not satisfy the requirements of a Sixth Amendment ineffective assistance claim. Williams' constructive denial of counsel claim lacks arguable merit under *de novo* review. Williams' third claim is denied.

## IX. *BRADY* CLAIMS (AEDPA & *De Novo* Review)

In his second, fourth, and ninth claims in his amended federal habeas petition, Williams alleges violation of his due process rights under the Supreme Court's holding in *Brady v. Maryland*, 373 U.S. 63 (1963), when the prosecution (1) furnished a massive amount of discovery in an inaccessible form (Claim 2) (ECF no. 76, at 48-53); (2) failed to disclose evidence of a third-party perpetrator, both at trial and during his state habeas proceeding (Claim 4) (ECF no. 76, at 56-57); and (3) failed to disclose material impeachment evidence relating to key prosecution witness Kim Williams (Claim 9) (ECF no. 76, at 161-66).

**A. The Constitutional Standard**

" '[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' " *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (quoting *Brady*, 373 U.S. at 87). The Supreme Court has consistently held the prosecution's duty to disclose evidence material to either guilt or punishment applies even when there has been no request by the accused. *Banks*, 540 U.S. at 690; *Strickler v. Greene*, 527 U.S. 263, 280 (1999); *United States v. Agurs*, 427 U.S. 97, 107 (1976). This duty also applies to impeachment evidence. *Strickler*, 527 U.S. at 280; *United States v. Bagley*, 473 U.S. 667, 676 & 685, (1985). The rule in *Brady* encompasses evidence known only to police investigators and not personally known by the prosecutor. *Strickler*, 527 U.S. at 280-81; *Kyles v. Whitley*, 514 U.S. 419, 438 (1995). " '[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police.' " *Strickler*, 527 U.S. at 281 (quoting *Kyles*, 514 U.S. at 437).

Under clearly established Supreme Court precedent, there are three elements to a *Brady* claim: (1) the evidence must be favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be "material," *i.e.*, prejudice must have ensued from its non-disclosure. *Banks*, 540 U.S. at 691; *Strickler*, 527 U.S. at 281-82. Evidence is "material" under *Brady* where there exists a "reasonable probability" that had the evidence been disclosed, the result at trial would have been

different. *Smith v. Cain*, 565 U.S. 73, 75 (2012); *Cone v. Bell*, 556 U.S. 449, 469-70 (2009); *Banks*, 540 U.S. at 698-99. A reasonable probability does not mean that the defendant would more likely than not have received a different verdict with the evidence, but only that the likelihood of a different result is great enough to undermine confidence in the outcome of the trial. *Smith*, 565 U.S. at 75; *Kyles*, 514 U.S. at 434.

The Supreme Court has emphasized four aspects of the *Brady* materiality inquiry. First, a showing of materiality does *not* require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted in the defendant's acquittal. *See Bagley*, 473 U.S. at 682 (expressly adopting the "prejudice" prong of the *Strickland* analysis of ineffective assistance claims as the appropriate standard for determining "materiality" under *Brady*). Second, the materiality standard is *not* a sufficiency of the evidence test. *Kyles*, 514 U.S. at 434-35. Third, once materiality is established, harmless error analysis has no application. *Id.* at 435-36. Finally, materiality must be assessed collectively, not item by item. *Id.* at 436-37.

**B. Large Scale Discovery**

In his second claim, Williams argues that his due process rights were violated when the prosecution furnished a massive amount of discovery in an inaccessible format. Williams included basically the same claim as his fourth claim for state habeas relief.[108] The state habeas trial court made findings of fact and conclusions of law and recommended

[108] State Habeas Application 341-52, 1 Supp. SHCR 399-410 [ECF no. 98, at pp. 399-410 of 493].

dismissal of this claim as procedurally defaulted or, alternatively, denial of the claim on the merits.[109] As explained in Section VII above, the TCCA adopted the state habeas trial court's findings and conclusions addressing this claim and summarily dismissed the claim as procedurally defaulted.

For the reasons discussed at length in Sections VII and VIII above, this claim lacks any arguable merit under *de novo* review. The state habeas court expressly found, and this court's independent review of the record confirms, that Williams has wholly failed to allege any specific facts, much less furnish any evidence, showing there is a reasonable probability that the outcome of either phase of his capital murder trial would have been different if his defense team had completed their review of all the discovery furnished by the prosecution prior to the start of Williams' trial. Williams cannot satisfy the materiality prong of *Brady,* which the Supreme Court has likened to the prejudice prong of *Strickland* analysis.

Insofar as Williams relies upon Circuit Court and District Court decisions recognizing a right to be free from "discovery dumps," as Respondent correctly points out, Williams' argument is unsupported by ant United States Supreme Court precedent, clearly established or otherwise. *United States v. Skilling*, 554 F.3d 529, 576 (5th Cir. 2009) ("As a general rule, the government is under no duty to direct a defendant to exculpatory evidence within a larger mass of disclosed evidence."). Thus, Williams is urging the

[109] 1 Supp. SHCR 206-10, ¶¶ 1049-78 [ECF no. 99, at pp.206-10 of 245]. These are the exact same findings and conclusions detailed in Section VII above.

adoption of a new rule of constitutional criminal procedure. *Teague* forbids this in a federal habeas proceeding. Under *de novo* review, Williams' second claim is denied.

**C. Evidence of a Different Vehicle Used in the Hasse Murder (*Der Novo* Review)**

In his fourth claim in his amended federal habeas petition, Williams argues that the prosecution failed to disclose to the defense that an FBI agent had reached the conclusion the getaway car in the Hasse murder was actually a Kia Forte or a Volkswagen Passat, and not the 2001 Mercury Sable identified during the punishment phase of Williams' trial.

This claim is new and wholly unexhausted. It was not included in Williams' original petition in any cognizable form. Because this claim is without even arguable legal merit, there is no reason to delve into the question of whether it relates back for limitations purposes to any of the multi-faceted claims contained in Williams' original petition.

First, Williams admits the information in question was included in the discovery materials which the prosecution actually furnished to the defense prior to his trial. The state habeas court expressly found that the prosecution did *not* dump voluminous discovery material on the defense in an attempt to obscure information beneficial to the defense. That factual determination is fully supported by the testimony before the state habeas court from both lead prosecutor, attorney Wirskye, and Williams' lead defense counsel, attorney Seymour, the latter of whom expressed genuine appreciation for the work done by the prosecution to help the defense in terms of identifying material within the discovery. Thus, Williams' factually erroneous "discovery dump" contention cannot satisfy the suppression prong of *Brady* analysis. *Skilling*, 554 F.3d at 576.

Furthermore, as the record from the punishment phase of trial makes abundantly clear, Williams knew full well the identity of the getaway car used in the Hasse murder. As a matter of law, the prosecution cannot suppress information from the defense which is in the personal knowledge of the defendant himself. Put another way, it is legally impossible for the prosecution to "withhold" or "suppress" information for *Brady* purposes when the same information is within the defendant's personal knowledge. *See Castillo v. Johnson,* 141 F.3d 218, 223 (5th Cir.1998) ("Under *Brady,* the prosecution has no obligation to produce evidence or information already known to the defendant, or that could be obtained through the defendant's exercise of diligence."); *Brown v. Cain,* 104 F.3d 744, 750 (5th Cir.1997) ("The prosecution had no obligation under *Brady* to produce for Brown evidence or information already known to him, or that he could have obtained from other sources by exercising reasonable diligence.").

Additionally, insofar as Williams argues there was a constructive suppression of the information resulting from the massive volume of discovery furnished to the defense, for the reasons explained in Section VII above, that argument amounts to a request for adoption of a new rule of constitutional criminal procedure which is foreclosed by the rule in *Teague.*

Second, as was explained in Section I.C. above, there was considerable confusion among the eyewitnesses to the Hasse murder who testified at trial regarding the make, model, and color of the getaway vehicle used in that assassination. The new information showing the same confusion extended to investigators in the weeks immediately following the Hasse murder was, therefore, of no real benefit to Williams at trial. There is no allegation before this court that the FBI agent who expressed an erroneous opinion about

the identity of the Hasse getaway vehicle claimed to have personal knowledge of the identity of the Hasse getaway vehicle. The defense was already aware of the confusion regarding the make and model of the Hasse getaway car. In fact, the manager of the storage facility where Williams hid the Hasse getaway vehicle in the weeks after the murder testified without contradiction during the punishment phase of trial that it was his statement to law enforcement several days after the search of Unit 18 which led investigators to the Mercury Sable Williams and his wife used to assassinate Hasse.

Third, as explained in Section I.C. above, there was no mention of the Hasse murder during the guilt-innocence phase of Williams' capital murder trial. The testimony from eyewitnesses to the Hasse murder at the punishment phase of Williams' trial regarding the make and model of the getaway car was very inconsistent and confusing. Information showing that confusion on this subject extended to law enforcement had no relevance or materiality to the testimony presented during the guilt-innocence phase of Williams' capital murder trial (when Hasse's murder was never mentioned) and thus was immaterial for *Brady* to the outcome of that portion of Williams' trial.

Moreover, as explained in Section I.D. above, during the punishment phase of trial, the prosecution presented overwhelming evidence of Williams' guilt in the Hasse murder, as well as the McLelland murders. Information showing law enforcement was confused in the weeks after the Hasse murder about the identity of the Hasse getaway vehicle was thus immaterial to either of the two special issues before the jury at the punishment phase of Williams' capital murder trial. In fact, an argument could be made that such information could have been used by the prosecution to bolster its future dangerousness argument. The

jury could reasonably have construed such information as showing Williams' penchant for careful planning and execution in the Hasse assassination indicated his future dangerousness. But even then, the evidence already before the jury during the punishment phase of trial made a strong case that Williams and his wife managed to hoodwink law enforcement in the weeks after the Hasse murder. It is apparent to this court that only Williams' decision to dispose of the Hasse murder weapons on the evening of the McLelland murders allowed law enforcement to obtain positive gunshot residue test results on Williams' hands. The allegedly suppressed information contained in the FBI document erroneously speculating on the identity of the Hasse getaway vehicle was immaterial for *Brady* purposes.

Accordingly, Williams' fourth claim fails to satisfy any of the three prongs of *Brady* analysis and is denied.

**D. Additional Impeachment Evidence Regarding Kim Williams (*De Novo* Review)**

In his ninth claim herein, Williams asserts that the prosecution suppressed evidence showing that his spouse (1) had made a deal with prosecutors regarding her own criminal charges prior to her testimony at Williams' capital murder trial and (2) committed additional crimes while in jail and in her past and showed indications of mental health problems. Williams argues his trial counsel could have used this information for impeachment purposes when Kim testified at the punishment phase of his trial.

Williams presented this same claim as a subpart to his first claim for state habeas

relief.[110] The state habeas trial court heard extensive testimony regarding these assertions and made factual findings and conclusions of law on the subject.[111] Among the state habeas trial court's factual findings were determinations that (1) Kim Williams testified in rebuttal for the prosecution during the punishment phase of Williams' capital murder trial that she did not have a deal with prosecutors and she had not been given immunity; (2) Kim also testified on cross-examination that she hoped she would be given some consideration for her cooperation; (3) after Williams' trial, Kim was offered and accepted a forty-year sentence in exchange for her guilty plea; (4) Wirskye testified that he did not offer Kim a deal before she testified and was very careful in all his conversations with her prior to trial to emphasize there was no deal; (5) Kim's two criminal defense counsel, attorneys Paul Johnson and Lalon Peale, each testified Kim had no deal with prosecutors prior to her testimony at Williams' trial; (6) Williams' state appellate counsel, attorney Brady Wyatt, testified that he was good friends with Kim's lead counsel Johnson, who never told Wyatt there was a deal for Kim prior to her trial testimony; (7) any expectations by her defense counsel that Kim would receive a plea bargain offer after her trial testimony were based on their professional experience and not on any promises or assurance by the State; (8) the fact Kim's attorneys did not expect her to go to trial once she began cooperating with investigators and participated with her lead counsel in a ride-along with law enforcement

[110] State Habeas Application at 31-50, 1 Supp. SHCR 89-107 [ECF no. 98, at pp. 89-107 of 493].

[111] FFCL at 50-79, 1 Supp. SHCR 53-82, ¶¶ 28-229 [E CF no. 99, at pp. 53-82 of 245].

is not evidence of a deal between Kim and prosecutors; (9) Johnson testified he did allow Kim to go on a ride-along with law enforcement without him to the location where the guns were disposed with the stipulation there would be no questioning of Kim during the trip and she would only be asked to point; (10) Williams failed to offer any evidence showing Kim entered into a secret plea deal during that ride-along; (11) the testimony of two of Kim's fellow jail inmates suggesting Kim made such a secret deal is unpersuasive; (12) the State did not make a secret plea deal with Kim during that ride-along; (13) an email exchange after Williams' trial between Wirskye and Hasse's brother about Kim's possible sentence in which Wirskye explained that plea negotiations would soon begin and Hasse's brother expressed the view that Kim would not likely receive a death sentence was not evidence a deal existed with Kim prior to her testimony at Williams' trial; (14) Kim's letters from jail speculating on what prosecutors might do in her case did not establish that she had an explicit or implicit deal prior to her trial testimony; (15) an article Wirskye wrote after Williams' trial does not establish that Kim had a deal prior to her trial testimony; (16) the speculative testimony of Williams' lead trial counsel, attorney Seymour, does not establish Kim had a deal prior to her testimony; (17) the personal opinions and speculation of Williams' co-counsel, attorney John Wright, does not establish Kim had a deal prior to her testimony; and (18) Williams failed to prove the State withheld any information showing that Kim once stole a baby or had illicit drugs in her possession in jail, in part, because Wirskye testified he never had any knowledge of those allegations.[112]

[112] FFCL at 50-70, 1 Supp. SHCR [ECF no. 99] 53-73, ¶¶28-166.

The state habeas trial court recommended denial of Williams' *Brady* claim on the merits.[113] The TCCA adopted all of the state habeas trial court's findings and conclusions on this claim and denied relief on the merits. *Ex parte Williams*, 2020 WL 5540714, *1-*2.

Williams offered only highly speculative assertions by individuals lacking personal knowledge of Kim Williams' dealings with prosecutors in support of this *Brady* claim. The state habeas court reasonably relied upon the firm assurances of Kim's defense attorneys in finding there was no deal before she testified at Williams' trial. Kim's lead defense counsel testified without contradiction (in fact attorney Seymour somewhat corroborated this aspect of Johnson's testimony) that, generally, prosecutors wait until *after* they have seen a cooperating co-defendant's actual testimony to enter into plea negotiations. Because the state habeas court reasonably found there was no plea deal between prosecutors and Kim at the time of Williams' trial, Williams cannot satisfy any of the prongs of *Brady* analysis.

Williams' argument the prosecution withheld evidence showing Kim was guilty of prior criminal acts and suffered from mental health issues likewise fails to satisfy any of the prongs of *Brady* analysis because Williams failed to present any evidence the state habeas court found credible showing the prosecution was aware of same. Moreover, this argument ignores the reality that Kim testified candidly at the punishment phase of Williams' trial that (1) she had actively assisted Williams in the commission and

[113] FFCL at 70, 1 Supp. SHCR [ECF no. 99] 70, ¶ 166.

concealment of three murders after she helped Williams plan and prepare to commit those offenses; (2) she was a long term drug abuser; and (3) she had her own list of people she wished to murder that was separate from the one Williams carried in his head. Thus, there is no reasonable probability that, but for the failure of the prosecution to disclose this additional impeachment information to the defense, the outcome of Williams' punishment phase would have been any different. The jury was well aware Kim abused drugs and there was no credible evidence she had a deal with prosecutors prior to her testimony at Williams' trial.

Because Kim Williams did not testify during the guilt-innocence phase of Williams' trial, any failure by the prosecution to disclose impeachment material relating to her had absolutely no impact on the outcome of that phase of Williams' trial.

Viewed in the light most favorable to the jury's verdict, the evidence at the punishment phase of trial showed that Williams (1) murdered all three of his victims by shooting them multiple times; (2) undertook extensive planning and preparation before the murders (including (a) using false names to obtain two different getaway vehicles and (b) lying to a friend to gain his assistance in getting a storage facility for Williams' many weapons which Williams still possessed illegally following his felony conviction); (3) showed a complete and utter lack of remorse or contrition following the murders; (4) was well aware that Cynthia McLelland would be present when he arrived to shoot Michael McLelland but accepted Cynthia's death as necessary "collateral damage"; (5) took steps to conceal his involvement in both murders (including (a) donning a sling the morning of the Hasse murder when police arrived and falsely stating he had recently undergone

shoulder surgery and (b) disposing of the upper AR receiver he used to murder the McLelland's); and (6) had made plans to murder his former mentor, Judge Ashworth, and had undertaken preparations to do so (including (a) obtaining a cross bow and practicing with it, (b) digging a hole in his backyard to see if it would accommodate a body, and (c) making homemade napalm). The evidence of Williams' propensity for future violence and lack of remorse was, therefore, overwhelming. There is no reasonable probability that, but for the failure of the prosecution to disclose the information Williams presented to the state habeas court on these subjects, the outcome of the punishment phase of Williams' capital murder trial would have been any different.

Thus, the TCCA's rejection on the merits this aspect of Williams' multi-faceted first claim for state habeas relief was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Williams' trial and state habeas corpus proceeding. Williams is not entitled to relief under AEDPA. Accordingly, Williams' ninth claim is denied.

## X. INEFFECTIVE ASSISTANCE CLAIMS

In his sixth, seventh, and eighth claims in his amended habeas petition, Williams argues (1) his trial counsel rendered ineffective assistance during the guilt-innocence phase of trial (ECF no. 76, at 71-85); (2) his trial counsel rendered ineffective assistance during the punishment phase of trial (ECF no. 76, at 85-155); and (3) his state appellate counsel rendered ineffective assistance during Williams' direct appeal (ECF no. 76, at 155-61).

**A. The Constitutional Standard**

Williams' ineffective assistance claims reference or are premised upon his trial counsels' alleged failure to comply with the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases. Insofar as Williams relies upon ABA's Guidelines, those recommendations for the performance of trial counsel do not set forth the operative standard of *judicial* review for the performance of trial counsel. *Bobby v. Van Hook*, 558 U.S. 4, 8 (2009) (the ABA Guidelines are "only guides" to what reasonableness means, not its definition); *Druery v. Thaler*, 647 F.3d 535, 541 n.2 (5th Cir. 2011) ("Best practices urged by the ABA do not necessarily track the contours of the Sixth Amendment. Consequently, the guidelines do not function as 'inexorable commands' with which all capital defense counsel 'must fully comply.'").

> No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions.

*Strickland v. Washington*, 466 U.S. at 688-89.

As explained in Section VIII above, the constitutional standard for determining whether a criminal defendant has been denied the effective assistance of trial counsel, as guaranteed by the Sixth Amendment, was announced by the Supreme Court in *Strickland*. *Id.*, 466 U.S. at 687.

To satisfy the first prong of *Strickland*, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins v.*

*Smith*, 539 U.S. 510, 521 (2003); *Williams v. Taylor*, 529 U.S. 362, 390-91 (2000). In so doing, a convicted defendant has the burden of proof and must overcome a strong presumption that the conduct of his trial counsel "falls within [a] wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Bobby*, 558 U.S. at 7 (quoting *Strickland*, 466 U.S. at 688-89). Under the well-settled *Strickland* standard, the Supreme Court recognizes a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *See Wiggins*, 539 U.S. at 523; *Bell v. Cone*, 535 U.S. 685, 698 (2002); *Strickland*, 466 U.S. at 690.

To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins*, 539 U.S. at 534; *Strickland*, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Thornell v. Jones*, 602 U.S. 154, 144 S. Ct. 1302, 1310 (2024); *Strickland*, 466 U.S. at 694. "This requires a substantial, not just conceivable, likelihood of a different result." *Jones*, 144 S. Ct. at 1310; *Pinholster*, 563 U.S. at 189.

In instances in which the state courts failed to adjudicate either prong of the *Strickland* test (such as those complaints the state courts summarily dismissed under the Texas writ-abuse statute or which the petitioner failed to fairly present to the state courts), this Court's review of the un-adjudicated prong is de novo. *See Porter v. McCollum*, 558

U.S. 30, 39 (2009); *Rompilla v. Beard*, 545 U. S. 374, 390 (2005).

Under the AEDPA's deferential standard of review, claims of ineffective assistance adjudicated on the merits by a state court are entitled to a doubly deferential form of federal habeas review. AEDPA, by setting forth necessary predicates before state-court judgments may be set aside, "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow,* 571 U.S. 12, 19 (2013). Under 28 U.S.C. § 2254(d)(1), "'a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *White v. Wheeler,* 577 U.S. 73, 77 (2015) (quoting *White v. Woodall,* 572 U.S. 415, 419-20 (2014)); *Harrington v. Richter,* 562 U. S. 86, 103 (2011).

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.
>
> A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court."

*Harrington*, 562 U. S. at 101 (Citations omitted).

**B. Ineffective Assistance at Guilt-Innocence Phase**

In his sixth claim in his amended petition, Williams argues that his trial counsel rendered ineffective assistance during the guilt-innocence phase of trial by (1) agreeing to a change of venue to Rockwall County and thereafter failing to make a meritorious motion for a second change of venue; (2) failing to adequately investigate and challenge the prosecution's ballistics evidence; (3) failing to investigate cell tower evidence and location evidence; (4) failing to investigate and challenge the prosecution's fingerprint evidence; (5) failing to object at trial to judicial bias; (6) proceeding to trial despite knowing they were not adequately prepared; and (7) by virtue of the cumulative effect of the foregoing deficient performance.

**1. Agreeing to a Change of Venue to Rockwall County (*De Novo* Review)**

Respondent accurately points out Williams alleges no specific facts showing that he fairly presented this complaint to the state courts, either in his direct appeal or state habeas application. Nor does Williams allege any specific facts showing his state habeas counsel was ineffective in not presenting this ineffective assistance claim during Williams' state habeas proceeding. It is unnecessary to determine whether this unexhausted claim is procedurally defaulted (and thereby invite the filing of a Rule 60(b) motion)[114] because,

[114] *See Ruiz v. Lumpkin*, 653 F.Supp.3d 331 (N.D. Tex. 2023) (addressing a Rule 60(b) motion filed practically on the eve of a scheduled execution which asserted new evidence had been discovered to support a claim that a prosecution expert witness had tested falsely about the details of the TDCJ's inmate classification system during Ruiz's trial). Generally, Rule 60(b) motions attacking a final judgment in a habeas proceeding brought under Section 2254 must attack either (1) a defect in the integrity of the federal

habeas proceeding or (2) a procedural ruling that precluded a merits determination (such as a finding that an unexhausted claim was procedurally defaulted). *Ruiz*, 653 F.Supp.3d at 338 (citing *Will v. Lumpkin*, 970 F.3d 566, 571 (5th Cir. 2020)). Perhaps as a result, it has become popular for capital habeas litigants seeking to inject delay into their executions down the road deliberately to include unexhausted claims in their federal habeas pleadings, in the hope that, at an appropriate future time, they will be able to challenge the procedural ruling in a Rule 60(b) motion. Because this court disposed of Ruiz's claims on the merits, however, Ruiz's Rule 60(b) motion was construed as a successive petition and quickly transferred to the Fifth Circuit in accordance with Section 2244. Williams' unexplained injection of so many wholly unexhausted new ineffective assistances claims in his amended petition and his inclusion of so many new factual theories underlying his otherwise exhausted sixth and seventh claims herein strongly suggest he may be engaged in similar mischief.

Moreover, this court has previously explained that several members of the Supreme Court have urged district courts to avoid delving into complex procedural default issues, particularly those which compel deep dives into the minutia of state procedural default rules:

> The Supreme Court has made clear that federal habeas courts may deny writs of habeas corpus by engaging in de novo review when it is unclear whether AEDPA deference applies because a federal habeas petitioner will not be entitled to a writ of habeas corpus if his claim is rejected on de novo review. *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010). The Supreme Court has declined to address an issue of procedural default and chosen, instead, to resolve a claim on the merits, holding that an application for habeas corpus may be denied on the merits notwithstanding a petitioner's failure to exhaust in state court. *See Bell v. Cone*, 543 U. S. 447, 451 n.3 (2005) (citing section 2254(b)(2)). "An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." *Rhines v. Weber*, 544 U. S. 269, 277 (2005) (quoting 28 U.S.C. § 2254(b)(2)). Writing for four Justices of the United States Supreme Court, Justice Alito explained the rationale underlying a federal habeas court's decision to eschew analysis of a factually and legally convoluted procedural default question in favor of simply addressing the lack of merit in a particular claim as follows:
>
>> In the absence of any legal obligation to consider a preliminary nonmerits issue, a court may choose in some circumstances to bypass the preliminary issue and rest its decision on the merits. *See*, *e.g.*, 28 U.S.C. § 2254(b)(2) (federal habeas court may reject claim on merits without reaching question of exhaustion). Among other things, the court may believe that the merits question is easier, and the court may think that the parties and the public are more likely to be satisfied that justice

under *de novo* review, this ineffective assistance claim lacks any arguable merit.

The State presented the state habeas trial court with a series of memoranda to file written or dictated by attorney Seymour, which were admitted into evidence and contain summaries of attorney-client communications between Williams and his defense team leading up to trial and which include two memoranda which discuss the filing of Williams' first motion for change of venue and the negotiations between the defense and prosecution.[115] Thus, these memos are now properly before this court as state court records which this court may consider in addressing the merits of Williams' unexhausted ineffective assistance claim on *de novo* review.

The memos discussing the circumstances under which attorney Seymour and Williams' defense team agreed to a change of venue to Rockwall County establish that (1)

---

> > has been done if the decision is based on the merits instead of what may be viewed as a legal technicality.
>
> *Smith v. Texas*, 550 U. S. 297, 324 (2007) (Justice Alito, with Chief Justice Roberts and Justices Scalia and Thomas, dissenting). A Supreme Court majority employed this very approach in *Lambrix v. Singletary*, 520 U. S. 518, 520 (1997), where the Supreme Court held "[w]e do not mean to suggest that the procedural-bar issue must be resolved first; only that it ordinarily should be. Judicial economy might counsel giving the *Teague* question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."

*Broadnax v. Davis*, 2019 WL 3302840, *29 n.41 (N.D. Tex. July 23, 2019).

[115] The memoranda discussing the motion for change of venue and the negotiations which followed its filing are dated December 31, 2013 and January 16, 2014. These memos were marked as State Exhibits 6 and 7 and admitted into evidence as State's Exhibits during the evidentiary hearing held in Williams' state habeas proceeding. They appear among the state court records herein at 88 SHRR [ECF no. 112, at pp. 82-86 & 87-89 of 296].

following the filing of Williams' first motion for change of venue, Williams' lead defense counsel, attorney Seymour, negotiated with lead prosecutor Wirskye and the prosecution's second chair, attorney Shook, for a change of venue from Kaufman County to Rockwall County; (2) these negotiations began after (a) the prosecution initially opposed Williams' first motion for change of venue and (b) the defense had difficulty getting cooperation from the affiants who originally supported the defense's change of venue motion; (3) Seymour and another member of the defense team met with Williams on December 16, 2013 and explained the developing situation on the change of venue motion; (4) during that meeting Williams, a former attorney, raised the possibility of an agreed change of venue; (5) when Seymour explained to Williams that an agreed change of venue could waive the venue issue on appeal, Williams stated that he was willing to take that chance because he wanted his case moved out of Kaufman County; (6) during Seymour's negotiations, Wirskye explained that, as prosecutor pro tem, he was limited in his ability to agree to a change of venue to only Rockwall or Collin Counties because (a) Kaufman County officials did not want Williams' case moving to Dallas County because they were upset with the Dallas County District Attorney and (b) there were travel cost considerations which prevented him from agreeing to move the trial out of the DFW area; (7) Seymour communicated this information to Williams and obtained Williams' assent to the change of venue to Rockwall County; (8) the trial judge informed Seymour and Wirskye that he would not agree to a change of venue to Collin County because he did not believe Williams could get a fair trial there but he would agree to a transfer to Rockwall County; (9) both Williams and Seymour were concerned about transferring Williams out of Kaufman County because the defense

team wanted to retain access to Williams prior to trial and Williams had health issues; (10) when Seymour urged the motion for change of venue, the prosecution altered its initial position and did not oppose same and the state trial judge signed an order granting the change of venue to Rockwall County; (11) Seymour filed a second motion for change of venue about a year later during voir dire, cited media coverage and the results of voir dire to date, and presented two witnesses to support the motion; and (12) the trial court denied the new motion without prejudice.[116]

While Williams supported each of his motions for change of venue with information addressing media accounts of his crime, Williams did not allege specific facts showing that the denial of his second motion for change of venue violated his substantive constitutional rights. It is well-settled in the federal system that a criminal defendant is entitled to a transfer of his trial to a different district "if extraordinary local prejudice will prevent a fair trial—a 'basic requirement of due process.'" *Skilling v. United States*, 561 U.S. 358, 378 (2010) (quoting *In re Murchison,* 349 U.S. 133, 136 (1955)). The Supreme Court's opinion in *Skilling*, 561 U.S. at 377-99, emphasized that, to obtain a reversal of a criminal conviction based on denial of a motion for a change of venue, a defendant ordinarily must do more than merely point to news coverage of his trial and the events leading up to same. Absent extreme circumstances establishing a "trial atmosphere that [was] utterly corrupted by press coverage," juror exposure to news accounts alone does not permit a presumption that the defendant was denied due process. *Skilling*, 561 U.S. at 380 (quoting *Murphy v.*

---

[116] *Id.*

*Florida*, 421 U.S. 794, 198-99 (1975)).

This is because juror exposure to news accounts of the crime alone does not presumptively deprive the defendant of due process:

> Prominence does not necessarily produce prejudice, and juror *impartiality,* we have reiterated, does not require *ignorance*. *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) (Jurors are not required to be "totally ignorant of the facts and issues involved"; "scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case."); *Reynolds v. United States,* 98 U.S. 145, 155–156, 25 L.Ed. 244 (1879) ("[E]very case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits."). A presumption of prejudice, our decisions indicate, attends only the extreme case.

*Skilling*, 561 U.S. at 381 (quoting *Murphy v. Florida,* 421 U.S. 794, 798–799 (1975)). "Pretrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial." *Skilling*, 561 U.S. at 384 (quoting *Nebraska Press Assn. v. Stuart,* 427 U.S. 539, 554 (1976)).

The three extreme cases discussed by the Supreme Court in *Skilling* illustrate how extensive and pernicious press coverage of a crime must be before a presumption of prejudice arises. For example, in *Rideau v. Louisiana,* 373 U.S. 723 (1963), an indigent criminal defendant, flanked by law enforcement personnel, was video-recorded confessing in detail to a series of violent felonies, including a murder, during an uncounseled custodial interrogation by law enforcement conducted prior to the Supreme Court's issuance of its landmark decision in *Miranda v. Arizona*, 384 U.S. 436 (1966). In the weeks immediately leading up to Rideau's trial on those same criminal charges, a local television station in the

relatively small Louisiana parish in which Rideau was tried broadcast the entire "interview" three times. The Supreme Court held "due process of law in this case required a trial before a jury drawn from a community of people who had not seen and heard Rideau's televised 'interview.'" *Rideau*, 373 U.S. at 727.

In *Estes v. Texas,* 381 U.S. 532, 538 (1965), extensive publicity before trial swelled into excessive exposure during preliminary court proceedings, reporters and television crews overran the courtroom and bombarded the community with the sights and sounds of the pretrial hearing. Video and sound recordings of pretrial proceedings were broadcast on local televisions stations. The courtroom was "a mass of wires, television cameras, microphones and photographers." *Estes*, 381 U.S. at 550. The Supreme Court held the media's overzealous reporting efforts, "led to considerable disruption" and denied the "judicial serenity and calm to which [Billie Sol Estes] was entitled." *Estes*, 381 U.S. at 536.

Finally, in *Sheppard v. Maxwell,* 384 U.S. 333 (1966), news reporters extensively covered the story of Sam Sheppard, who was accused of bludgeoning his pregnant wife to death. "[B]edlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom," thrusting jurors "into the role of celebrities." *Sheppard,* 384 U.S. at 353. Pretrial media coverage, which the Supreme Court characterized as "months [of] virulent publicity about Sheppard and the murder," did not alone deny due process. *Id.,* at 354. Sheppard's case involved more than heated reporting pretrial; the Supreme Court upset the resulting murder conviction because a "carnival atmosphere" pervaded the trial. *Id.,* at 358.

The Supreme Court in *Skilling* identified several factors which it felt compelled the affirmation of the trial court's rejection of Skilling's motion for change of venue: (1) the metropolitan size of the Houston area from which the jury was selected (4.5 million potential jurors); (2) the news stories about the fall of Enron which ran prior to Skilling's trial did not include any accounts of a confession or other blatantly prejudicial information; (3) the time lapse of almost four years between the events charged in the indictment and the date of trial; (4) the fact the jury acquitted Skilling of nine counts of insider trading; and (5) the fact the trial court asked jurors during voir dire about their exposure and reaction to pretrial publicity. *Skilling*, 561 U.S. at 382-85.

Williams has failed to allege any facts showing that there is a reasonable probability that, but for the agreement by his counsel to a change of venue to Rockwall County, the outcome of either phase of his trial would have been any different. Moreover, Williams' trial counsel did move a second time for a change of venue but were unable to muster any evidence showing that the trial court's denial of that motion violated Williams' federal constitutional rights. Nor does Williams allege any specific facts showing that the level of pretrial publicity in Rockwall County prior to his trial approached the level in any of the three Supreme Court cases discussed in *Skilling*. Under such circumstances, Williams is obligated to do more than make conclusory assertions that his right to a fair trial was violated by his trial in Rockwall County. He must allege specific facts demonstrating prejudice under *Strickland*. This he has failed to do.

After *de novo* review of the state court record currently before this court, it is apparent that the decision by Williams' trial counsel to agree to a change of venue to

Rockwall County was under the then-existing circumstances objectively reasonable. Furthermore, this court finds Williams has failed to allege any specific facts showing a reasonable probability exists that, but for the decision by Williams' trial counsel to agree to the change of venue to Rockwall County, the outcome of either phase of Williams' capital murder trial would have been any different. Thus, Williams' unexhausted ineffective assistance claim fails to satisfy either prong of *Strickland* and is denied.

**2.Failure to Challenge Toolmark Evidence (AEDPA & *De Novo* Review)**

Williams argues his trial counsel failed to adequately challenge the prosecution's toolmark evidence linking spent shell casings found at the McLelland crime scene with spent shell casings found at a site near an overpass close to the Williams home and an unfired round found inside Unit 18 (ECF no. 76, 73-76). Williams also argues his trial counsel should not have hired a member of the Association of Firearms & Toolmark Examiners to challenge the prosecution's toolmark testimony. Williams did include a claim in his state habeas application which argued his trial counsel inadequately challenged the prosecution's firearms testimony.[117] The state habeas trial court heard testimony from Williams' lead defense counsel, admitted other evidence, and issued findings and conclusions recommending denial of this claim.[118] The state habeas trial court concluded

[117] Stater Habeas Application st 276-88, 1 Supp. SHCR [ECF no. 98] 335-46.

[118] FFCL 178-84, 1 Supp. SHCR [ECF no. 99] 181-67, ¶¶ 904-345. In pertinent part, the state habeas trial court found that (1) the prosecution's firearms and toolmark expert was properly qualified as an expert and furnished credible and reliable testimony; (2) before trial, in response to a motion filed by defense counsel, the court held a *Daubert/Kelly* hearing during which Williams' counsel challenged the validity of the science underlying this expert's opinion testimony; (3) Williams' lead trial counsel,

Williams' trial counsel rendered effective assistance with regard to the ballistics/firearms evidence presented by the prosecution. The TCCA adopted these findings and conclusions when it denied state habeas relief on the merits. *Ex parte Williams*, WR-85,942-01, 2020 WL 5540714, *1-*2. Those findings and conclusions were fully supported by the evidence before the state habeas trial court, including the testimony of lead defense counsel, attorney Seymour.

Williams' defense counsel retained the services of an independent expert who evaluated the same evidence as the prosecution's expert and reached basically the same conclusions. Williams has alleged no specific facts showing that it was objectively unreasonable for his defense team to rely upon the opinions of its own expert. Counsel are not required to scour the globe for a more favorable expert. *Dowthitt v. Johnson*, 230 F.3d 733, 748 (5th Cir. 2000). Moreover, the selection of an expert is one of the many aspects

---

attorney Seymour, spent a significant amount of time, energy, and resources preparing to challenge the admissibility of the toolmark expert's testimony; (4) Seymour prepared for the hearing by (a) extensively researching the issue by reading scholarly journal articles, contacting some of the authors, utilizing a trial resource guide for forensic ballistics and (b) retained an expert who evaluated the ballistics evidence and came to largely the same conclusions as the prosecution's firearms expert; (5) Seymour thoroughly cross-examined the prosecution's firearms expert both during the pretrial hearing and at trial; (6) a challenge to the reliability of the prosecution firearm expert's testimony based on the absence of a known murder weapon would have failed; (7) there are dozens of published studies pertaining to identifications without a known tool; (8) the science does not require a known firearm for identification; (9) the techniques or method the prosecution's firearms expert employed were valid and properly applied; (10) counsel could reasonably conclude that attacking the prosecution's testimony based on the contents of the American Firearms and Toolmark Examiner's Code of Conduct was likely to produce little benefit. *Id.* The state habeas trial court concluded that Williams' trial counsel rendered effective assistance in connection with the firearms evidence, *Id.*

of legal representation which is subject to the presumption of reasonableness under *Strickland*. *Hinton v. Alabama*, 571 U.S. 263, 275 (2014) ("The selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after thorough investigation of [the] law and facts,' is 'virtually unchallengeable.'").

When a petitioner complains in an ineffective assistance claim about the failure of his trial counsel to call a witness, the Fifth Circuit requires the petitioner to demonstrate prejudice by naming the witness, demonstrating that the witness was available to testify and would have done so, setting out the content of the witness's proposed testimony, and showing that the testimony would have been favorable to a particular defense. *Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010) (quoting *Day v. Quarterman,* 566 F.3d 527, 538 (5th Cir.2009)). This requirement applies to both uncalled lay and expert witnesses. *Id.*

This court concludes the TCCA's rejection on the merits of this aspect of Williams' second claim for state habeas relief was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Williams' trial and state habeas corpus proceeding. Williams is not entitled to relief under AEDPA.

Likewise, insofar as this aspect of Williams' sixth claim for federal habeas relief can be construed as unexhausted, this court concludes Williams is not entitled to relief under *de novo* review. The state habeas court found Williams' trial counsel made substantial effort to challenge the prosecution's ballistics evidence, but the defense's own expert reached the same basic conclusions as the prosecution's expert. Nonetheless,

Williams' trial counsel filed a pretrial motion to exclude the prosecution's ballistics evidence which the state trial court denied after an evidentiary hearing. Williams alleges no specific facts showing it was objectively unreasonable for defense counsel to rely upon the opinions of the defense's ballistics expert. Williams has not identified specific facts which show that a challenge to the scientific bases for toolmark and firearms comparison had a reasonable probability of success in Williams' case. Nor has Williams alleged any specific facts showing how his trial counsel could have prepared the defense's own expert differently and obtained a different trial court ruling on the pretrial motion to exclude the prosecution's firearms testimony. The state habeas court found the prosecution's expert was qualified and credible. Under such circumstances, none of the arguments contained in this portion of Williams' sixth claim for relief satisfy either prong of *Strickland*.

**3. Failure to Investigate Cell Tower Evidence (*De Novo* Review)**

Williams complains that his trial counsel failed to adequately investigate cell tower data (ECF no. 76, at 76-79). But, as Respondent correctly points out, Williams wholly fails to allege any specific facts showing what beneficial information could have been obtained had his trial counsel undertaken a more thorough investigation of the cell tower data in question. Moreover, at trial, Kim Williams testified without contradiction that she left her own cell phone at home when she drove to the McLelland residence the day of the murder. And Kim also testified without contradiction that Williams had a lot of cell phones. This latter point was corroborated when investigators recovered boxes and boxes of cell phones from Williams' residence.

Because Williams failed to fairly present this specific ineffective assistance claim

to the state habeas court, this court's review of same is *de novo*. This court concludes this aspect of Williams' sixth claim for federal habeas relief fails to satisfy the prejudice prong of *Strickland*. There are no specific facts before this court showing a reasonable probability that, but for a more thorough investigation into cell tower data by his trial counsel, the outcome of either phase of Williams' capital murder trial would have been any different. Williams is not entitled to federal habeas relief based on this unexhausted claim

**4. Failure to Challenge Fingerprint Evidence (AEDPA & *DE Novo* Review)**

Williams also argues his trial counsel failed to adequately investigate, and challenge fingerprint evidence presented by the prosecution (ECF no. 76, at pp. 79-82). Williams included a slightly different version of this complaint as a subpart in his second claim for state habeas relief, *i.e.*, Williams argued his trial counsel should have demanded a *Daubert/Kelly* hearing and challenged the admissibility of the prosecution's fingerprint testimony.[119] The state habeas trial court made findings and conclusions regarding this claim, specifically concluding Williams' complaints failed to satisfy either prong of *Strickland* analysis.[120] The TCCA adopted those findings and conclusions when it denied

[119] State Habeas Application 288-322, 1 Supp. SHCR [ECF no. 98] 346-80.

[120] FFCL 185-90, 1 Supp. SHCR [ECF no. 99] 188-93, ¶¶ 935-65. In pertinent part, the state habeas trial court found that (1) none of the three reports identified by Williams in his state habeas application established that fingerprint analysis employing the ACE-V method was so unreliable as to render it inadmissible; (2) the ACE-V method is foundationally valid; (3) Williams presented no evidence showing that either of the prosecution's two fingerprint experts who testified at trial were unqualified or improperly trained; (4) both prosecution experts were qualified and properly trained; (5) Williams' trial counsel confronted one of the prosecution experts on cross-examination with a report indicating the expert had made a mistake during fingerprint analysis of other latent prints in Williams' case; (6) Williams failed to present any evidence showing the prosecution's

Williams' second state habeas claim on the merits. *Ex parte Williams*, 2020 WL 5540714, *1-*2. The state habeas court's findings and conclusions were fully supported by the evidence before the state habeas court.

Now before this court Williams raises a host of new complaints about the way his trial counsel approached the fingerprint evidence, including assertions that his trial counsel should have employed a different approach during cross-examination of the examiners, probed unspecified known reliability issues" with fingerprint examination, and more aggressively attacked the science underlying fingerprint examination. But, as the Respondent accurately point out, Williams fails to allege any specific facts showing a reasonable probability of a different outcome at either phase of Williams' capital murder trial if his trial counsel had undertaken these rather ill-defined steps to challenge the

---

fingerprint examiners failed to follow proper procedure or were exposed to contextual bias; (7) the experts identified points of comparison on both the unknown and known prints, compared them side by side, and determined whether they originated from the same source; (8) in making an identification, the experts determined the unknown and known prints originated from the same source; the experts made an identification only if they determined there were sufficient points of comparison or common characteristics; (9) the prosecution's examiners were trained experts who properly employed the ACE-V method; (10) Williams' counsel likely knew any challenge to the fingerprint identification evidence would fail and, thus, opted not to use it; (11) Williams' counsel did impeach the experts on cross-examination; (12) Williams' counsel relied on the fingerprint evidence of unidentified prints on the Crown Victoria and attacking the science of fingerprint analysis would have been inconsistent with that strategy; and (13) even if the fingerprint evidence had been excluded, it would not have affected the outcome of Williams' trial because the state linked Williams to the murders through a substantial amount of circumstantial evidence, including the video and unit records showing the Crown Victoria coming and going from the unit at times consistent with the McLelland murders, an incriminating Crime Stoppers tip sent from Williams' IP address, the recovery of the Hasse murder weapon and the bag and cell phone from Lake Tawakoni, and the bullet from Williams' storage unit which had been cycled through the McLelland murder weapon. *Id.*

prosecution's fingerprint analysis.

The state habeas court reasonably found as a matter of fact that the examiners were qualified, properly trained, and employed proper techniques and methods in their analysis of the relevant fingerprints in Williams' case. The state habeas court reasonably found that Williams failed to overcome the presumption under *Strickland* that Williams' trial counsel acted reasonably when they chose not to challenge the prosecution's fingerprint testimony as categorically inadmissible but, rather, chose to cross-examine the prosecution's examiners on their work in Williams' case.

The state habeas court also determined there was no reasonable probability that, but for the failure of Williams' trial counsel to undertake a challenge to the categorical admissibility of all fingerprint examination using the ACE-V method, the outcome of either phase of Williams' trial would have been any different. This court agrees. As Respondent accurately points out, Williams does not identify a single instance in which any American court has determined that fingerprint comparison employing the ACE-V method is so unreliable as to be in admissible.

The state habeas court's rejection on the merits of this subpart of Williams' second claim for state habeas relief was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Williams' trial and state habeas corpus proceeding. Williams is not entitled to relief under AEDPA.

Insofar as Williams' complaints in his sixth claim herein about his trial counsels'

approach to the prosecution's fingerprint evidence can be construed as unexhausted, this court concludes after *de novo* review that Williams fails to satisfy the prejudiced prong of *Strickland.* There is no factual allegation currently before this court, much less any evidence, establishing a reasonable probability that, but for the failure of Williams' trial counsel to undertake any of the new cross-examination tactics suggested in Williams' sixth claim herein, the outcome of either phase of Willams; capital murder trial would have been any different. As was explained in detail in Section I.C. above, while the prosecution's evidence presented during the guilt-innocence phase of trial was circumstantial, it was compelling. Moreover, for the reasons discussed in Section IX.D. above, the evidence against Williams on both special issues at the punishment phase of trial was truly overwhelming.

**5. Failure to Object to Judicial Bias (AEDPA & *De Novo* Review)**

Williams next complains that his trial counsel failed to object at trial to alleged judicial bias shown by the trial judge (ECF no 76, at p. 81). Williams raised a similar claim as part of his second claim for state habeas relief.[121] The state habeas trial court heard testimony from three of Williams' defense counsel and made findings of fact and conclusions of law.[122] The TCCA adopted those findings and conclusions when it denied

---

[121] State Habeas Application 275-76, 1 Supp. SHCR [ECF no. 98] 333-34.

[122] FFCL 177-78, 1 Supp. SHCR [ECF no. 99] 180-81, ¶¶ 894-903. The state habeas trial court concluded that Williams' complaint about his trial counsels' failure to timely object to judicial bias or file a recusal motion failed to satisfy either prong of *Strickland*. It also found that (a) Judge Snipes was not biased against Williams and (b) any attempt to remove Judge Snipes would have failed. *Id.*

Williams' second claim for state habeas relief on the merits. *Ex parte Williams*, WR-85,942-01, 2020 WL 5540714, *2.

For the reasons discussed at length in Section IV above, the TCCA's rejection on the merits of this aspect of Williams' second claim for state habeas relief was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Williams' trial and state habeas corpus proceeding. Williams failed to establish that his trial counsels' decision *not* to object to any ruling based on judicial bias or to move for the recusal of (or otherwise to replace) Judge Snipes as presiding judicial officer fell outside the broad range of objectively reasonable strategic decision-making. Williams is not entitled to relief under AEDPA.

Furthermore, also for the reasons discussed in Section IX.D. above, this aspect of Williams' sixth claim herein is likewise without arguable merit under *de novo* review. Based on the state habeas trial court's findings, there is no reasonable probability that, but for the failure of Williams' trial counsel to either object on the basis of judicial bias or move for Judge Snipes' recusal or disqualification, the outcome of either phase of Williams' capital murder trial would have been any different.

**6. Failure to Withdraw (*De Novo* Review)**

Williams also complains that his trial counsel, who announced "not ready" on the first day of trial after unsuccessfully renewing their motion for a continuance numerous times throughout voir dire and other pretrial proceedings, rendered ineffective assistance

when they failed to withdraw and proceeded to trial despite not being fully ready to do so (ECF no. 76, at pp. 83-84). This ineffective assistance complaint was not presented to the state habeas court and is unexhausted. It is unnecessary to determine whether it is procedurally defaulted because, for the reasons discussed at length above in Sections VII and VIII above, under *de novo* review it lacks even arguable merit.

Williams fails to allege any specific facts showing the decision by his trial counsel to proceed to trial and not move to withdraw was objectively unreasonable. Williams' trial counsel could reasonably have concluded that filing a motion for leave to withdraw made at that juncture would antagonize the trial court and ultimately result in the withdrawal motion being denied. Likewise, Williams alleges no specific facts suggesting that a motion to withdraw would have been permitted by the trial judge at that point in the proceedings. Finally, Williams wholly fails to allege any specific facts showing a reasonable probability that the outcome of either phase of his trial would have been changed if his trial counsel had made such a motion to withdraw at that juncture.

Thus, under *de novo* review, this ineffective assistance complaint fails to satisfy either prong of *Strickland*.

**7. Cumulative Prejudice**

Finally, Williams argues that, collectively and cumulatively, the foregoing complaints of ineffective assistance in connection with the guilt-innocence phase of his trial combined to prejudice him with the meaning of *Strickland* (ECF no. 76, at p,84). The first problem with this argument is that, under long-standing Fifth Circuit precedent, this court cannot cumulate ineffective assistance claims which lack a finding of either prejudice

or deficient performance. *Pondexter v. Quarterman*, 537 F.3d 511, 525 (5th Cir. 2008) (meritless ineffective assistance claims or claims that are not prejudicial cannot be cumulated, regardless of the total number raised). This leads to the second problem with this aspect of Williams' sixth claim herein – this court has determined after *de novo* review of almost all of Williams' complaints about the performance of his trial counsel in question that Williams has not been prejudiced by any of the alleged acts or omissions attributed to his trial counsel. This raises the question of exactly what it is that Williams is asking this court to cumulate. All of the ineffective assistance complaints contained in Williams' multifarious sixth claim herein fail to satisfy the prejudice prong of *Strickland*. Logically, therefore, there is nothing before this court to cumulate.

**8. Conclusions**

Because none of Williams' complaints of ineffective assistance in his multifarious sixth claim herein satisfies the prejudice prong of *Strickland* (much less both prongs), whether viewed individually or cumulatively, the ineffective assistance claims in Williams' sixth claim herein are all individually and collectively denied. Even when viewed collectively, Williams' complaints in his sixth claim herein about the performance of his trial counsel vis-à-vis the guilt-innocence phase of his trial do not establish a reasonable probability that, but for those acts and omissions collectively, the outcome of Williams' guilt-innocence phase would have been any different. As explained in Section I.C. above, there was substantial and compelling circumstantial evidence of Williams' role in the murder of Cynthia McLelland presented during the guilt-innocence phase of trial. Even if Williams' defense team had corrected all the alleged deficient performance

identified in Williams' sixth claim herein, there is simply no reasonable probability of a different verdict at the conclusion of the guilt-innocence phase of Williams' trial. Williams' sixth claim is denied.

**C. Ineffective Assistance at the Punishment Phase of Trial**

Williams alleges that his defense team rendered ineffective assistance vis-à-vis the punishment phase of his trial by (1) virtue of the inexperience of his defense team, including its mitigation specialist and investigators; (2) the failure of his defense team to adequately investigate the details of Williams' life and present Williams' mitigation evidence in an organized manner which highlighted difficulties in Williams' life; (3) the failure of his defense team to adequately investigate many aspects of Williams' life history despite having notice of the potential for mitigating evidence relating to those matters (including family history, brain damage and mental illness, and the details of the burglary offense for which Williams was convicted); (4) the failure of his defense team to present evidence showing Williams came from a troubled family, struggled for years with physical and mental illness, suffered from significant brain damage, and at the time of his capital offense had entered a downward spiral of isolation and paranoia); (5) the failure of his defense team to (a) investigate and present available evidence challenge the prosecution's evidence showing Williams had engaged in incidents of violence or threats of violence, (b) adequately cross-examine Kim Williams, (c) object to the prosecution's victim impact evidence, (d) challenge the prosecution's evidence showing Williams' vast collection of firearms, (e) investigate and challenge the prosecution's DNA evidence, and (f) adequately challenge the prosecution's fingerprint evidence; (6) the failure of his defense team

preserve constitutional claims arising from the trial court's exclusion of proffered mitigating evidence by objecting to the exclusions in question; and (7) the failure of his defense team to object to judicial bias. (ECF no. 76, at pp. 85-155). As respondent correctly points out, while most of Williams' ineffective assistance claims in his seventh claim herein do have analogues in Williams' state habeas application, Williams asserts a host of new facts in this court in support of many of his federal habeas claims. This court will once more be required to employ *de novo* review in such cases.

**1. Review of *Strickland* Prejudice in the Capital Sentencing Context**

In making the prejudice determination under *Strickland* in the context of a capital sentencing proceeding, the Supreme Court has instructed federal habeas courts to examine all of the mitigating evidence introduced at trial and all new mitigating evidence presented in the habeas proceeding and re-weigh same against the evidence in aggravation. *Andrus*, 590 U.S. 806, 821-22 (2020); *Sears v. Upton*, 561 U.S. 945, 956 (2010); *Williams*, 529 U.S. at 397-98. Thus, a federal habeas court must re-weigh all the evidence in aggravation against the totality of available mitigating evidence (had the petitioner's trial counsel chosen a different course). *See Wong*, 558 U.S. at 20; *Wiggins*, 539 U.S. at 534 *Strickland* does not require the State to "rule out" or negate a sentence of life in prison to prevail; rather, it places the burden on the defendant to show a "reasonable probability" that the result of the punishment phase of a trial would have been different. *Wong*, 558 U.S. at 27. Within the context of *Strickland* analysis, "prejudice" means a reasonable probability the result of the proceeding would have been different. *See Hinton v. Alabama,* 571 U.S. 263, 275 (2014). To satisfy the prejudice prong, "[t]he likelihood of a different result must be

substantial, not just conceivable." *Harrington*, 562 U.S. at 112 (quoting *Strickland*, 466 U.S. at 693).

"When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer — including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Sandoval Mendoza v. Lumpkin*, 81 F.4th 461, 481 (5th Cir. 2023) (quoting *Strickland*, 466 U.S. at 695). Because a Texas death sentence required a unanimous jury recommendation, prejudice here requires only 'a reasonable probability that at least one juror would have struck a different balance' regarding [his] 'moral culpability.'" *Sandoval Mendoza*, 81 F.4th at 481 (quoting *Andrus*, 590 U.S. at 822) (in turn quoting *Wiggins*, 539 U.S. at 537–38). "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Sandoval Mendoza*, 81 F.4th at 481 (quoting *Strickland*, 466 U.S. at 695). "Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 696.

The Supreme Court recently emphasized that a federal habeas court reviewing a *Wiggins* claim is required to conduct a comparative analysis of the competing expert opinions before it when balancing the weight of the new mitigating evidence against the totality of the aggravating evidence before it. *Thornell v. Jones*, 602 U.S. 154, 163-64 (2024) (where a prosecution expert has furnished an opinion contrary to those of the

defense's experts, it is hard to see how the state court could decide how much weight to give the defense expert's opinions without making a comparative analysis). Likewise, in *Jones* the Supreme Court repeatedly noted the significance of the absence of evidence showing a causal link between his proffered new mitigating evidence and his capital offense. *Id.*, at 164-71 (recognizing that the absence of any causal link between Jones's new mitigating evidence (of mental illness, cognitive impairments caused by childhood trauma, childhood sexual abuse, and substance abuse) and Jones's capital offense meant his new mitigating evidence had little value). Williams' state habeas court cannot reasonably be faulted for failing to engage in the same analytical errors the Supreme Court condemned in *Jones.*

Contrary to some of the arguments implicit in Williams' complaints about the performance of his trial counsel vis-à-vis the punishment phase of his trial, the state habeas court was not free to completely disregard the opposing mental health expert opinions presented by the State during Williams' state habeas proceeding, i.e., the opinions of Dr. J. Randall Price. *See Jones*, 602 U.S. at 163 ("When an ineffective-assistance-of-counsel claim is based on counsel's performance at the sentencing phase of a capital case, a defendant is prejudiced only if 'there is a reasonable probability that, absent [counsel's] errors, the sentencer . . . would have concluded the balance of aggravating and mitigating circumstances did not warrant death.'" (quoting *Strickland*, 466 U.S. at 695)). "Determining whether a defense expert's report or testimony would have created a reasonable probability of a different result if it had been offered at trial necessarily requires an evaluation of the strength of that report or testimony. And where a prosecution expert

has expressed a contrary opinion, it is hard to see how a court could decide how much weight to give the defense expert without making a comparative analysis." *Jones*, 602 U.S. at 164.

Likewise, contrary to the arguments implicit in Williams' amended federal habeas petition, the Supreme Court has also held that it is *not* error for a court reviewing an ineffective assistance claim arising in the context of a capital sentencing proceeding to attach diminished persuasive value to mental health conditions when it finds no causal link between those conditions and the defendant's conduct when he committed his capital offense. *Id.*

**2. Mitigation Investigation (AEDPA & *De Novo* Review)**

The first four complaints of ineffective assistance vis-à-vis the punishment phase of Williams' capital murder trial contained in his seventh claim herein (*i.e.*, claims 7a, 7b, 7c, and 7d) all challenge the scope of his defense team's investigation for mitigating evidence and the decisions his defense made with regard to which potential mitigation witnesses to call to testify. Accordingly, they will be examined collectively.

In his state habeas application, Williams alleged his defense team inadequately investigated his background and failed to present a coherent case in mitigation. The state habeas trial court heard testimony from multiple witnesses and issued extensive and compelling findings and conclusions that this claim satisfied neither prong of *Strickland*.[123]

[123] FFCL 119-44, 1 Supp. SHCR [ECF no. 99] 122-47, ¶¶ 526-675. The state habeas court found in pertinent part that (1) Williams' trial counsel conducted n timely and thorough investigation into Williams' physical and mental health, including obtaining a neuropsychological evaluation of Williams; (2) during counsel's initial visit with Williams

on April 22, 2013, counsel collected a client history, list of Williams' medications, history of Williams' hospitalizations, emergency room visits, alcohol usage, health concerns, and mental health history; (3) counsel also obtained the name of Williams' primary care physician; (4) on February 14, 2014, counsel requested funding to retain Dr. Steven Young to evaluate Williams; (5) the defense also retained the services of Dr. James Merifangas, a psychiatrist and neuropsychologist to consult on mental health issues but not evaluate Williams; (6) in May 2014 counsel provided Williams' medical records from Williams' primary physician to Dr. Yount; (7) in June 2014 Dr. Yount evaluated Williams; (8) in July 2014, the trial court authorized funding for Dr. Joan Mayfield, a neuropsychologist who (a) conducted neuropsychological testing on Williams in August 2014 and (b) in September 2014 advised defense counsel and Dr. Yount that (i) Williams' scores were within the normal or average range and (ii) Williams' test scores did not show significant deficits, which meant that any anomalies in Williams' brain structure were not affecting his cognitive functioning; (9) Dr. Mayfield did not perform any emotional testing, such as the MMPI or the PAI; (10) in September 2014 Dr. Yount arranged for further testing of Williams' blood glucose levels, liver enzymes, and thyroid hormones; (11) Dr. Yount reported the results of these teats to defense counsel in September 2014 and inquired about brain scans, (12) In October 2014 the defense obtained the assistance of Dr. John Fabian, a neuropsychologist regarding which type of brain scans the defense should obtain and related matters; (14) after interviewing Willliams and reviewing Dr. Mayfield's test results, Dr. Fabian advised that he believed Williams was exhibiting symptoms of a serious mental illness; (15) on December 1, 2014, counsel filed a supplement to the defense's motion for continuance pointing to the need to complete brain scans; (16) on December 8, 2013 the trial court granted that motion; (17) Williams' brain was imaged on January 9, 2015 and the results were reviewed by defense expert Dr. William Orrison and Dr. Tomas Uribe Acosta; (18) at the hearing on Williams' motion for new trial, Dr. Yount testified the defense chose not to bring up the brain damage issue at trial because of Dr. Mayfield's test results; (19) Dr. Uribe testified at the hearing on the motion for new trial that Williams' brain scan was normal; (20) evidence Williams' brain abnormalities would render him susceptible to violent outbursts and irrational thinking have been inconsistent with the defense's argument that Williams would not; (21) presenting evidence that Williams' brain abnormalities impacted his behavior would have required a psychological evaluation which, in turn, would have necessitated emotional testing, such as the MMPI and PAI; (22) the results of such emotional testing would likely have yielded evidence of antisocial personality disorder or psychopathic characteristics which would have been highly aggravating facts; (23) the reliable evidence shows Williams does not suffer from brain damage; (24) Dr. Orrison's opinions are not reliable; (25) quantitative analysis such as that relied upon by Dr. Orrison are not relied upon for diagnosis in a clinical setting; (26) the presence of structural abnormalities in Williams' brain does not mean he suffers from impairments; (27) a person can have a structural abnormality without a functional deficit; (28) even if Williams has a structural abnormality in his brain he suffered no functional deficits; (29) the opinions of defense experts Dr. Woods and Dr, Jacobs are unreliable; (30)

no evidence shows Williams is unable to function independently in everyday living; (31) Williams' crime was sophisticated and involved complex planning; (32) Dr. Jacobs' correlation between Williams' diabetes and aberrant behavior is weak and does not demonstrate Williams' diabetes caused his behavior; (33) even assuming Williams suffers from an emotional impairment, the evidence does not show it was caused by a structural abnormality (structure does not equal function); (34) the brain damage evidence Williams presented did not show that he committed the murders because of an impairment caused by a structural brain abnormality; (35) brain damages evidence is a double-edged sword, in that attorney Seymour testified evidence showing Williams suffered from a permanent brain injury would undermine the defense team's efforts to show Williams would not pose a future danger; (36) Seymour also testified Williams' brain damage evidence is inconsistent with the defense's evidence showing Williams achievements and a jury would likely have a hard time reconciling brain damage evidence with Williams' long record of academic and professional successes; (37) Williams' trial counsel undertook a mitigation investigation which yielded an inordinate amount of mitigation evidence which fostered the development at trial of a sound mitigation theory; (38) the jury was not deprived of any compelling mitigation evidence; (39) in April and May 2013, the defense team met with Williams to get information about his family, friends, and colleagues which could be used in mitigation; (40) the defense team began interviewing Williams' neighbors in May of 2013; (41) the team's mitigation investigation continued for over a year; (42) the mitigation investigation had to deal with Williams' reluctance to discuss his personal life and seemed more interested in the guilt-innocence phase of his trial; Williams' parents, sister, and brother-in-law would not show up for meetings with the team or would arrive late; (43) the defense team also had problems reaching people in Azle and Kaufman; (44) the assertions of members of the defense who came on board late in the pretrial phase of the case about confusion in the mitigation investigation are not credible; (45) the affidavits of new mitigation witnesses Williams furnished to the state habeas court show how little mitigating information was not discovered by the team and presented; (46) Williams' defense team decided on pursuing an "arc of life" mitigation theory designed to present a full picture of Williams' life history and help show what he could offer others, i.e., that his life would still have value to society even if he were in prison; (48) while members of the defense team agreed on the mitigation theory, they disagreed on how to achieve it; (49) attorney Peck wanted to present as many witnesses as possible in chronological order while Seymour preferred to put on the most impressive witnesses first and then back fill with others; (50) the defense team presented a large number of witnesses who covered Williams' life history (51) valid reasons existed for the defense team's decisions not to call Williams' elderly father or difficult-to-work-with brother-in-law to testify; (52) some of the information contained in the affidavits of uncalled witnesses was hearsay; (53) much of the information contained in the uncalled witnesses' affidavits was redundant or cumulative of evidence actually presented at trial, especially the deposition testimony of Williams' mother presented at trial; (54) counsel could reasonably have believed that evidence showing a family tendency toward addiction and mental illness would be counter-

The TCCA adopted all of these findings and conclusions when it denied Williams' second claim for state habeas relief. *Ex parte Williams*, 2020 WL 5540714, *2.

The state habeas court's conclusions that Williams' complaints about the performance of his defense team in investigating and developing mitigating evidence failed to satisfy either prong of *Strickland* were fully supported by the testimony and other evidence before that court and foreclose this aspect of Williams' seventh claim herein. In sum, the TCCA's rejection on the merits of Williams' ineffective assistance complaints about the scope and detail of his defense team's mitigation investigation was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Williams' trial and state habeas corpus proceeding. Williams is not entitled to relief

---

productive with regard to future dangerousness; (55) the defense's mitigation investigation was not deficient and did not prejudice Williams; (56) the evidence showed Williams was raised by two parents who provided for him, were proud of him, attended scouting and school activities with him, and documented and celebrated his accomplishments; (57) even if Williams' parents were reserved in expressing affection they clearly loved Williams and showed it; (58) there was no evidence beyond Williams' own statements to the defense team suggesting Williams was ever abused by his parents; (59) evidence showing Williams' brother and sister abused drugs and suffered from mental illness was purely anecdotal and unsupported by any mental health diagnosis; (60) evidence of a family history of addiction and mental illness would be more aggravating than mitigating with regard to future dangerousness; (61) the failure of William' defense team to present evidence showing Williams' father was an alcoholic did not prejudice Williams; (62) at trial there was no dispute as to Williams' own drinking habits; (63) no significant mitigating evidence available at the time of trial went undiscovered; and (64) through the trial testimony of Williams' mother and other defense witnesses, especially the female witnesses, Williams' trial counsel presented a case in mitigation which covered Williams' entire life story. *Id.*

under AEDPA on these ineffective assistance claims.

For the reasons discussed in Section IX.D. above, the evidence presented by the prosecution during the punishment phase of Williams' trial was so overwhelming that, even under *de novo* review, Williams' complaints about the scope of his defense team's mitigation investigation do not satisfy the prejudice prong of *Strickland*.

**3. Failure to Investigate Prosecution's Evidence & Object (AEDPA & De Novo Review)**

In his fifth complaint of ineffective assistance in his seventh claim herein, Williams complains that his defense team failed to adequately investigate many of the incidents from Williams' past presented by prosecution as part of its case-in-chief and rebuttal during the punishment phase of trial (ECF no. 76, at pp. 136-51). Williams also complains about his trial counsel's failure to challenge the admission of forensic evidence, including fingerprint and DNA evidence, as well as his trial counsel's failure to more aggressively challenge the trial court's admission of all the weapons seized in Unit 18. *Id.*

Williams presented a variation on this same ineffective assistance claim as part of his second claim for state habeas relief.[124] The state habeas trial court heard testimony, received other evidence, issued detailed findings of fact and conclusions of law, and recommended denial of this claim on the merits.[125] The state habeas court concluded that

---

[124] State Habeas Application 194-234, 1 Supp. SHCR [ECF no. 98] 252-92.

[125] FFCL 144-60, 1 Supp. SHCR [ECF no. 99] 147-63, ¶¶ 676-778. The state habeas court held, in pertinent part, that (1) that Williams' complaints about his trial counsel's failure to more thoroughly cross-examine Kim did not satisfy either prong of *Strickland* because (a) lead defense counsel Seymour testified during the state habeas hearing that,

after he confronted her with several instances in which her trial testimony on direct conflicted with prior statements she had made to law enforcement officers, he noticed the jury seemed to be losing interest in the repetitious exchanges, (b) Kim's demeanor during those exchanges was forthright and open in that she candidly admitted she had previously attempted to downplay her role in the murders but was now telling the truth and admitting her full culpability, (c) he therefore chose to pivot the focus of his cross-examination to elicit testimony from Kim about Williams helping her parents; (d) defense counsel made a strategic decision to impeach Kim with only some of the many conflicts the defense's expert had identified in her interviews, (e) in impeaching Kim on some of her inconsistent statements, defense counsel alerted the jury to the fact Kim had been less than honest during her interviews, (f) Kim did not fight counsel when he confronted her with her inconsistent statements, (g) the additional impeachment value of confronting Kim with more of her inconsistent statements was minimal since the additional inconsistent statements were no more significant than the inconsistent statements which she admitted she had made, (h) much of Kim's trial testimony was corroborated by other evidence, including her testimony about the underpass where Williams test-fired his weapons, the recovery of the mask and Hasse murder weapons in Lake Tawakoni, and the items found inside a green backpack in Unit 18, (i) the prosecution had considerably more aggravating evidence than Kim's punishment phase testimony, (j) except for Williams' statement about shooting a cat in the eye years before, all of the testimony given by Kim which Williams argued was protected by the spousal privilege was actually admissible under state law and not privileged because it was made in the course of the commission of a crime or because it related to Williams' conduct which Kim had observed and not to any statements made by Williams, (k) Williams' threat to kill Kim was not privileged, (l) Williams' state habeas counsel did not question Williams's trial counsel during the state habeas hearing about why trial counsel chose not to raise spousal privilege objections to Kim's testimony, (m) before she testified to Williams' admission that he once shot a cat, Kim described a much more graphic incident in which she saw Williams engage in an act of animal cruelty, (n) Kim candidly admitted to her personal animosity toward their victims and her testimony about Williams' animosity was not privileged because she was stating what she had observed, not heard, and (o) considerable evidence beyond Kim's testimony established that Williams had engaged in extraneous violent acts; (2) Williams' trial counsel could have reasonably chosen not to call a former female colleague of Williams to testify in contradiction of Kim's testimony that Williams once had an affair during their marriage because (a) the evidence in the record suggested the female colleague in question was emotionally stressed, (b) defense could have concluded she would not be a good witness, and (c) impeaching this aspect of Kim's testimony would have accomplished little to dent the prosecution's case in aggravation; (3) when given the opportunity during the state habeas hearing, Williams' state habeas counsel did not question Williams' trial counsel on why he failed to call this witness to impeach Kim's testimony about the affair; (4) Williams' trial counsel retained the services of a DNA expert who assisted both parties in obtaining reliable DNA test results while maintaining source material and assisted the defense in crafting aa stimulation

much of the evidence to which Williams argues his trial counsel should have objected was actually admissible under state law, those rulings bind this court in this federal habeas proceeding. The TCCA adopted the state habeas trial court's findings and conclusions, including those addressing the admissibility of the prosecution's evidence. The state habeas court's conclusions on matters of state evidentiary law are binding on this federal habeas court. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *Garza v. Stephens*, 738 F.3d 669, 677 (5th Cir. 2013) (holding a Texas habeas court's interpretation of evidentiary rules was binding in a federal habeas case); *Paredes v. Quarterman*, 574 F.3d 281, 291 (5th Cir. 2009) (a state court's interpretation of state law binds a federal court sitting in habeas corpus). This court must respect the state habeas court's conclusions that much of the testimony of Kim Williams and other prosecution witnesses to which Williams argues his trial counsel should have objected was, in fact, admissible under state

---

which helped get DNA evidence admitted; (5) Williams' trial counsel chose not to challenge the admission of the DNA evidence in question because that evidence eliminated Willams as a source for a considerable amount of the DNA collected by law enforcement and Seymour used the DNA evidence during his closing argument to point out that all of the DNA evidence linking Williams to materials was touch DNA; (6) both of the DNA experts who testified for the prosecution were qualified, experienced DNA analysts;(7) both of the DNA analysts gave testimony that was reliable and credible; (8) the testimony which Williams alleges was improper and inadmissible victim impact testimony was not, in fact, victim impact testimony but, rather admissible testimony; (9) testimony about Hasse's abilities as a prosecutor was admissible because it related to the motive for his murder, *i.e.*, his prosecution of Williams and because it was not inflammatory but relevant and admissible. *Id.*;

evidentiary rules and statutes.

Williams' ineffective assistance claims fail in this regard because it is well settled that counsel's failure to make meritless objections satisfies neither prong of *Strickland*. The failure of Williams' trial counsel to make what would have been meritless or even frivolous objections did not result in deficient performance; nor was Williams prejudiced thereby within the meaning of *Strickland*. *See Clark v. Thaler*, 673 F.3d 410, 429 (5th Cir. 2012) (the failure to make a meritless objection cannot be grounds for a finding of deficient performance (citing *Buxton v. Collins*, 925 F.2d 816, 825 (5th Cir. 1991))); *Paredes v. Quarterman*, 574 F.3d 281, 291 (5th Cir. 2009) (failure to make a meritless objection did not prejudice the defendant (citing *United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999))).

For the reasons set forth in detail in the state habeas court's findings and conclusions, Williams failed to show that the failure of his trial counsel to make any of the objections Williams now urges was objectively unreasonable. The state habeas court correctly noted that Williams failed to question his trial counsel during the state habeas hearing regarding why said counsel chose not to make the objections Williams now urges. Under such circumstances' Williams failed to show that his trial counsel's decisions made during the cross-examination of Kim Williams fell outside the broad range of professionally reasonable decision-making permitted under *Strickland*. The same is true for Williams' complaints about the scope of his counsel's cross-examination of other prosecution witnesses.

The TCCA's rejections on the merits of Williams' ineffective assistance complaints

about (1) the scope of his trial counsel's cross-examination of Kim Williams and (2) his trial counsel's failure to make certain objections to the testimony of prosecution witnesses was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Williams' trial and state habeas corpus proceeding. Williams is not entitled to relief under AEDPA on these ineffective assistance claims.

For the reasons discussed in Section IX.D. above, the evidence presented by the prosecution during the punishment phase of Williams' trial was so overwhelming that, even under *de novo* review, Williams' complaints about these matters do not satisfy the prejudice prong of *Strickland*.

**4. Failure to Object to Challenge Fingerprint Evidence (*De Novo* Review)**

Williams also argues in conclusory fashion in his seventh claim herein that his trial counsel rendered ineffective assistance at the punishment phase of trial by failing to object to, or otherwise challenge, the admission of fingerprint evidence (ECF no. 76, at p. 151). For the reasons set forth at length in Section X.B.4. above, after *de novo* review, this court concludes this ineffective assistance claim fails to satisfy either prong of *Strickland*.

**5. Failure to Contextualize the Firearms (*De Novo* Review)**

Williams argues that his trial counsel failed to investigate and present punishment phase evidence showing there were neutral reasons for Williams' possession of a large cache of firearms in April 2013 (ECF no. 76, at pp. 144-45).

After *de novo* review, this court concludes this claim fails to satisfy either prong of

*Strickland*. At the time law enforcement agents seized the small arsenal of firearms Williams had stored in Unit 18, Williams was a convicted felon. His possession of those weapons was, therefore, illegal. Furthermore, multiple witnesses for both sides testified at trial that Williams was a gun enthusiast. Thus, the failure of Williams' trial counsel to either present additional witnesses or explain to the jury that Williams was a gun enthusiast and collector did not cause the performance of his trial counsel to drop below an objective level of reasonableness and did not prejudice Williams within the meaning of *Strickland*.

**6. Failure to Preserve Objections to Exclusion of Mitigating Evidence (*De Novo* Review)**

Williams argues his trial counsel rendered ineffective assistance by failing to properly preserve objections to the trial court's exclusion of testimony and other evidence the defense proffered during the punishment phase of trial (ECF no. 76, at pp. 151-52).

The state habeas trial court made factual findings and conclusions regarding this ineffective assistance claim, concluding this claim failed to satisfy either prong of *Strickland*, in part, because the evidence Williams was attempting to present was a collateral attack upon the validity of his burglary and theft convictions, which is not permissible under Texas law.[126] More specifically, the state habeas court determined that (1) Williams had the opportunity to question his trial, counsel during the state habeas hearing about this claim but chose not to do so; (2) Williams' trial counsel made offers of proof regarding the excluded evidence and additional objections or amendments would

[126] FFCL 160-63, 1 Supp. SHCR [ECF no. 99] 163-66, ¶¶ 779-95.

have been futile; (3) to a large extent the evidence Williams was attempting to present constituted an effort to retry his burglary and theft convictions, in that Wiliams proffered testimony by local Kaufman County residents concerning their opinions on whether Williams' original prosecution was political in nature, *i.e.*, a form of retaliation for Williams' public support of a candidate who twice ran against McLelland for District Attorney; (4) in essence Williams was attempting to retry his burglary and theft chargers and to convince the jury that he was actually innocent of same; (5) the trial court properly excluded such evidence and no further objections or offers of proof would have rendered it admissible; (6) none of the witnesses whose testimony was excluded gave post-conviction affidavits explaining what their excluded testimony would have been; (7) the excluded testimony emphasized Williams' motive for killing Hasse and the McLelland's and its exclusion, even if later ruled erroneous on appeal, would have been harmless; and (8) the failure of Williams' trial counsel to object on other grounds or include additional information in the offer of proof did not prejudice Williams defense or render the performance of his trial counsel ineffective.[127]

As explained above, the state hakeas court's ruling on the admissibility of the proffered evidence in question is binding on this court. *Bradshaw*, 546 U.S. at 76. The failure of counsel to make a meritless objection or proffer does not satisfy either of the prongs of *Strickland*. *Clark*, 673 F.3d at 429. After *de novo* review, this court concludes this ineffective assistance claim fails to satisfy either prong of *Strickland*.

[127] *Id.*

**7. Failure to Object to Judicial Bias (*De Novo* Review)**

Williams argues that his trial counsel should have raised a timely objection to what Williams perceives as judicial bias or moved to recuse Judge Snipes. (ECF 76, at pp. 151-53). For the reasons set forth at length in Section IV above, this court concludes after *de novo* review that this ineffective assistance claim fails to satisfy either prong of *Strickland*.

**8. Failure to Investigate and Challenge Evidence of Extraneous Bad Acts (*De Novo* Review)**

In a related pair of ineffective assistance claims, Williams argues that his trial counsel rendered ineffective assistance by failing to investigate and preset unidentified mitigating evidence relating to the incidents described during the punishment phase of trial in which (1) Williams threatened a female court administrator with a weapon and (2) made a verbal threat to kill a fellow attorney and the attorney's entire family (ECF no. 76, at pp. 136-38).

With regard to the incident in which Williams threatened a fellow court coordinator while attending a conference in Huntsville, Williams alleges no specific facts showing that exactly what information could have been gleaned from the police reports he alleged his trial counsel should have reviewed in a search for mitigating evidence. Williams does not allege any specific facts showing the trial testimony of his victim was in any manner factually inaccurate. Williams states that examination of the unidentified police reports would have furnished his trial counsel with unspecified information which could have contextualized the incident in question. But he alleges no specific facts showing a

reasonable probability that, but for this allegedly deficient aspect of his trial counsel's performance, the outcome of the punishment phase of his capital murder trial would have been any different. *Woodfox*, 609 F.3d at 808.

Williams murdered three people with ruthless efficiency after planning and preparing thoroughly for each offense. Williams carried out the execution of Hasse so efficiently he and his wife avoided arrest for that offense for over two months. Williams then executed the McLellands in their own home using a high velocity rifle. They likely would have avoided arrest for that crime as well had Williams not chosen to dispose of the Hasse murder weapons the same night as the McLelland murders, which is what likely led to a positive test for gunshot reside later that night. The ruthlessness and premeditated nature of his capital offense, not the threat he made to a former girlfriend in Huntsville years before, is what landed Williams on death row. Absent specific allegations of who could have been called to "contextualize" the incident in Huntsville at Williams' capital murder trial, Williams bald assertion that his trial counsel should have dug deeper into that incident in a search for unspecified mitigating evidence fails to satisfy the prejudice prong of *Strickland.*

Williams alleges that if his trial counsel had done a deeper dive into the incident in which Williams threatened to kill a fellow attorney and the attorney's family over a scheduling dispute in a mediation, Williams alleges that further investigation by his trial counsel would have revealed that Williams was prescribed a mind-altering medication in the days before that outburst. The problem with this assertion is that Williams alleges no facts showing there was anyone available at the time of his trial who could testify from

personal knowledge that Williams either filled that prescription or took the medication in question prior to having his raucous outburst. Williams does not allege that he would have been able to do so. Likewise, he does not allege that Kim could have done so.

Finally, for the reasons discussed in Section IX.D. above, the evidence supporting the jury's pro-prosecution answers to the Texas capital sentencing special issues at Williams' trial was overwhelming. There is no reasonable probability that "contextualizing" the two incidents in question would have resulted in different answers to the special issues. After *de novo* review this court concludes these two ineffective assistance claims fail to satisfy the prejudice prong of *Strickland*.

**9. Cumulation of Prejudice & Conclusions**

As was true with his multifarious sixth claim herein, Williams' multifarious seventh claim concludes with a request that this court's ineffective assistance review include cumulative analysis of all his claims asserted under the umbrella of his seventh claim. Out of an abundance of caution, this court will oblige Williams.

None of Williams' complaints of ineffective assistance in his multifarious seventh claim herein satisfy the prejudice prong of *Strickland* (much less both prongs). Whether viewed individually or cumulatively, the ineffective assistance claims in Williams' seventh claim herein are all individually and collectively denied. Even when viewed collectively, Williams' complaints in his seventh claim herein about the performance of his trial counsel vis-à-vis the punishment phase of his trial do not establish a reasonable probability that, but for those acts and omissions collectively, the outcome of Williams' punishment phase would have been any different. As explained in Sections I.D. and IX.D. above, there was

overwhelming evidence presented supporting the jury's affirmative answer to the future dangerousness special issue, as well as overwhelming evidence supporting the jury's negative answer to the mitigation special issue. Williams' conclusory complaints about his trial counsel's failure to dig up ill-defined evidence that might contextualize the two incidents in question would not have altered that fact. Williams' seventh claim herein and all its subparts are denied.

### D. Ineffective Assistance on Appeal

In his eighth claims in his amended petition, Williams argues that his state appellate counsel renmde3red ineffective assistance by failing to (1) adequately challenge on appeal the trial court's repeated denials of Williams' motions for continuance; (2) challenge the trial court erroneous denial of Williams' second motion for change of venue; and (3) adequately brief the judicial bias claim (ECF no. 76, at pp. 155-61). Williams also asserts the cumulative impact of these acts of deficient performance by his state appellate counsel prejudiced Williams.

#### 1. Constitutional Standard

The same two-pronged standard for evaluating ineffective assistance claims against trial counsel announced in *Strickland* applies to complaints about the performance of counsel on appeal. *See Smith v. Robbins*, 528 U. S. 259, 285 (2000) (holding a petitioner arguing ineffective assistance by his appellate counsel must establish both his appellate counsel's performance was objectively unreasonable and there is a reasonable probability that, but for appellate counsel's objectively unreasonable conduct, the petitioner would have prevailed on appeal). Thus, the standard for evaluating the performance of counsel on

appeal requires inquiry into whether appellate counsel's performance was deficient, i.e., whether appellate counsel's conduct was objectively unreasonable under then-current legal standards, and whether appellate counsel's allegedly deficient performance "prejudiced" the petitioner, i.e., whether there is a reasonable probability that, but for appellate counsel's deficient performance, the outcome of the petitioner's appeal would have been different. *Smith*, 528 U. S. at 285. Appellate counsel who files a merits brief need not and should not raise every nonfrivolous claim but, rather, may select from among them in order to maximize the likelihood of success on appeal. *Smith*, 528 U. S. at 2886 *Jones v. Barnes*, 463 U. S. 745, 751 (1983). The process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail is the hallmark of effective appellate advocacy. *Smith v. Murray*, 477 U. S. 527, 536 (1986); *Jones v. Barnes*, 463 U. S. at 751-52.

Where, as in Williams' case, state appellate counsel presented, briefed, and argued, albeit unsuccessfully, one or more nonfrivolous grounds for relief on appeal and did not seek to withdraw from representation without filing an adequate *Anders* brief, the defendant must satisfy *both* prongs of the *Strickland* test in connection with his claims of ineffective assistance by his appellate counsel. *See Roe v. Flores-Ortega*, 528 U. S. 470, 477, 482 (2000) (holding the dual prongs of *Strickland* apply to complaints of ineffective appellate counsel and recognizing, in cases involving "attorney error," the defendant must show prejudice); *Smith*, 528 U.S. at 287-89 (holding petitioner who argued his appellate counsel rendered ineffective assistance by failing to file a merits brief must satisfy both prongs of *Strickland*).

To prevail on a claim of ineffective assistance by appellate counsel based on an

unasserted point of error or claim, a petitioner must establish that the unasserted claim was plainly stronger than those actually presented in the appellate brief. *See Davila*, 582 U.S. at 531-33 (declining to raise a claim on appeal is not deficient performance unless that claim was plainly stronger than those actually presented to the appellate court); *Smith*, 528 U.S. at 288 (to prove ineffective assistance on appeal for failure to raise a claim in a merits brief, a petitioner must show that a particular omitted nonfrivolous issue was clearly stronger than issues that appellate counsel did present).

**2. Denial of Motions for Continuance**

The state habeas court issued findings and conclusions regarding this aspect of Williams' appellate ineffective assistance claim and recommended denial of relief after determining in part that (1) the affidavit furnished by lead appellate counsel John Tatum was credible, as was the hearing testimony of appellate co-counsel Brady Wyatt; (2) under Texas law, to prevail on appeal on a complaint about the denial of a continuance motion, the appellant must show how he was harmed by the absence if more time to prepare for trial; (3) this typically done by a showing of what more information, evidence, or witnesses the defense would have been able to muster had the motion been granted; (4) Williams was not harmed by virtue of the denial of his discovery-related motions for continuance; (5) Williams cites no authority supporting his argument that this was a viable claim; and (6) this claim fails to satisfy either prong of *Strickland*.[128] The TCCA adopted the foregoing findings and conclusions when it denied Williams' sixth claim in his state habeas

[128] FFCL 220-22, 1 Supp. SHCR [ECF no.99] 223-25, ¶¶ 1146-75.

application on the merits. The foregoing findings and conclusions were fully supported by the evidence before the state habeas court, including the testimony of attorney Wyatt and the affidavit of attorney Tatum.

For the reasons detailed in Sections VII and VIII above, the TCCA's denial on the merits of this aspect of Williams' sixth claim in his state habeas application was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Williams' trial and state habeas corpus proceeding. Williams is not entitled to relief under AEDPA.

Moreover, after *de novo* review, for the reasons discussed in Sections VII and VIII above, this court concludes this appellate ineffective assistance claim fails to satisfy the prejudice prong of *Strickland*.

**3. Denial of Motion for Change of Venue**

The state habeas trial court also made findings and conclusions regarding Williams' second motion for change of venue, declaring that (1) Williams brought no meaningful evidence of prejudicial news coverage after his first change of venue, no meaningful evidence of the prospective jurors' exposure to media coverage, and little-to-no evidence of the effect of media coverage on the jurors; (2) Williams could not show the trial court abused its discretion in denying the change of venue; and (3) Williams' appellate counsel were not ineffective for failing to assert a point of error addressing the denial of the

defense's second motion for change of venue.[129] The TCCA adopted the foregoing findings and conclusions when it reject on the merits this aspect of Williams' sixth claim in his state habeas application. The foregoing findings and conclusions were fully supported by the evidence before the state habeas court, including the testimony of attorney Wyatt and the affidavit of attorney Tatum.

For the reasons discussed at length in Section X.B.1. above, the TCCA's denial on the merits of this aspect of Williams' sixth claim in his state habeas application was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Williams' trial and state habeas corpus proceeding. Williams is not entitled to relief under AEDPA.

For the reasons discussed in Section X.B.1. above, after *de novo* review this court concludes this appellate ineffective assistance claim fails to satisfy the prejudice prong of *Strickland.*

**4. Inadequate Briefing on Judicial Bias**

The state habeas trial court made the following findings and conclusions regarding Williams' conclusory complaints of inadequately briefed points of error: (1) Williams has not briefed the claim he presented in his state habeas application, instead he merely identified a list of points of error he believed were inadequately briefed on direct appeal;

[129] FFCL 222-24, 1 Supp. SHCR [ECF no. 99] 225-27, ¶¶ 1176-94.

(2) several of the points of error that were allegedly inadequately briefed were disposed of on the merits; (3) Williams adduced no evidence showing that any of the allegedly inadequately briefed claims have any merit; and (4) Williams' appellate counsel did not render ineffective assistance in the writing of the appellant's brief.[130] The TCCA adopted all of the foregoing findings and conclusions when it rejected this aspect of Williams' sixth claim for state habeas relief on the merits. The foregoing findings and conclusions were fully supported by the record before the state hakeas court.

For the reasons discussed at length in Section IV above, the TCCA's denial on the merits of this aspect of Williams' sixth claim in his state habeas application was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Williams' trial and state habeas corpus proceeding. Williams is not entitled to relief under AEDPA.

For the reasons discussed in Section IV above, after *de novo* review this court concludes this appellate ineffective assistance claim fails to satisfy the prejudice prong of *Strickland.*

**5. Cumulation & Conclusions**

Williams requests cumulation of all of his complaints about the performance of his state appellate counsel. This court concludes after *de novo* review that all of Williams'

[130] FFCL 230-31, 1 Supp, SHCR [ECF no. 99] 233-34, ¶¶ 1256-63.

claims of ineffective assistance by his state appellate counsel fail to satisfy the prejudice prong of *Strickland*, regardless of whether they are viewed individually or collectively. There is simply nothing to cumulate.

The state habeas court rejected on the merits Williams' complaint that he was entitled to state habeas relief based on the cumulative effect of his complaints about the performance of his state appellate counsel.[131] That conclusion was eminently reasonable in light of the record before the state habeas court. The TCCA adopted those findings and conclusions when it rejected this aspect of Williams' sixth claim for state habeas relief.

## XI. CUMLATIVE PREJUDICE

In his thirteenth claim in his amended federal habeas petition, Williams argues that the cumulative prejudicial effect arising from all of the ineffective assistance of his state counsel at both phases of trial and on appeal collectively warrants federal habeas relief (ECF no. 76, at p. 17

The United States Supreme Court has never expressly recognized a "cumulative error" doctrine sufficient to independently grant federal habeas relief absent a conclusion that some identifiable federal constitutional right has been violated. *See Derden v. McNeel*, 978 F.2d 1453, 1456 (5th Cir. 1992) ("That the constitutionality of a state criminal trial can be compromised by a series of events none of which individually violated a defendant's constitutional rights seems a difficult theoretical proposition and is one to which the Supreme Court has not directly spoken.").

[131] FFCL 231, 1 Supp. SHCR [ECF no. 99] 234, ¶¶ 1264-67.

But the Fifth Circuit has recognized a type of cumulative error analysis. It is well-settled in the Fifth Circuit that the cumulative error doctrine requires a showing that constitutional error occurred during the defendant's state court trial. *See Young v. Stephens*, 795 F.3d 484, 494 (5th Cir. 2015) (noting petitioner's failure to demonstrate any constitutional error committed during his trial, as is required to satisfy the cumulative error doctrine (citing *Turner v. Quarterman*, 481 F.3d 292, 301 (5th Cir. 2007))); *Coble v. Quarterman*, 496 F.3d 430, 440 (5th Cir. 2007) (federal habeas relief is only available for cumulative errors that are of a constitutional dimension); *Miller v. Johnson*, 200 F.3d 274, 286 n.6 (5th Cir. 2000) (absent constitutional error, there is nothing to cumulate); *Jackson v. Johnson*, 194 F.3d 641, 659 n.59 (5th Cir. 1999) (cumulative error doctrine provides relief only when the constitutional errors committed in the state court trial so fatally infected the trial that they violated the trial's fundamental fairness) (citing *Spence v. Johnson*, 80 F.3d 989, 1000 (5th Cir. 1996)); *Derden*, 978 F.2d at 1454 (federal habeas corpus relief may only be granted for cumulative errors in the conduct of a state trial where (1) the individual errors involved matters of constitutional dimension other than violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors "so infected the entire trial that the resulting conviction violates due process") (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

For the reasons discussed above in Section X above, all of Williams' complaints about the performance of his trial counsel or his state appellate counsel in his amended petition fail to satisfy the prejudice prong of *Strickland.* For the reasons discussed at length above in Sections III through IX above, all of Williams' other substantive constitutional

claims lack arguable merit. So, under the cumulative error doctrine recognized in this circuit, there is nothing for this Court to cumulate. Williams' conclusory cumulative error claim is without arguable merit and is denied.

## XII. CERTIFICATE OF APPEALABILITY

Under AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under § 2254, the petitioner must obtain a Certificate of Appealability ("CoA"). *Miller-El v. Johnson*, 537 U.S. 322, 335-36 (2003); 28 U.S.C. § 2253(c)(2). Likewise, under AEDPA, appellate review of a habeas petition is limited to the issues on which a CoA is granted. *See Crutcher v. Cockrell*, 301 F.3d 656, 658 n.10 (5th Cir. 2002) (holding a CoA is granted on an issue-by-issue basis, thereby limiting appellate review to those issues); *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997) (holding the scope of appellate review of denial of a habeas petition limited to the issues on which CoA has been granted). In other words, a CoA is granted or denied on an issue-by-issue basis, thereby limiting appellate review to those issues on which CoA is granted. *Crutcher*, 301 F.3d at 658 n.10; 28 U.S.C. § 2253(c)(3).

A CoA will not be granted unless a petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke*, 542 U.S. 274, 282 (2004); *Miller-El v. Johnson*, 537 U.S. at 336; *Slack v. McDaniel*, 529 U.S. 473, 483 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983). To make such a showing, the petitioner need *not* show he will prevail on the merits but, rather, must demonstrate that reasonable jurists could debate whether (or, for that matter, agree) the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed

further. *Tennard*, 542 U.S. at 282; *Miller-El*, 537 U.S. at 336. This Court is required to issue or deny a CoA when it enters a final Order such as this one adverse to a federal habeas petitioner. *Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts*.

The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the District Court has disposed of a claim. "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El*, 537 U.S. at 338 (quoting *Slack*, 529 U.S. at 484). In a case in which the petitioner wishes to challenge on appeal this Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the petitioner must show jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* whether this Court was correct in its procedural ruling. *See Slack*, 529 U.S. at 484 (holding when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the petitioner shows that reasonable jurists would find it debatable whether (1) the claim is a valid assertion of the denial of a constitutional right and (2) the district court's procedural ruling was correct). This court did not dispose of any of William s' federal habeas corpus claims on procedural grounds. This court addressed the merits of all of Williams' federal constitutional claims, including those which were unexhausted, which was most of them.

Reasonable minds could not disagree with the conclusions that (1) all of Williams' ineffective assistance claims fail to satisfy the prejudice prong of *Strickland*; (2) all of Williams' substantive claims are without arguable merit; (3) Williams' cumulative error and cumulative prejudice claims lack any arguable merit because there is no constitutional error in this case to cumulate; and (4) all of Williams' unexhausted claims are without arguable merit when reviewed under *de novo* standard. Williams is not entitled to a CoA from this court.

## XIII. MOTION FOR STAY AND ABEYANCE

The matters before the court are (1) Williams' motion for stay and abeyance, filed December 18, 2025 (ECF no. 205); (2) Respondent's response, filed February 9, 2026 (ECF no. 208); and (3) Williams' reply brief, filed March 9, 2026 (ECF no. 211).

In his motion, Williams seeks a stay of this habeas action and an abeyance so he can return to state court and exhaust state habeas remedies on various unexhausted aspects of his first five claims in his amended petition. A stay and abeyance to permit exhaustion of state court remedies on unexhausted claims for relief is appropriate in the context of a pending federal habeas corpus proceeding only when a district court determines that (1) there is good cause for a petitioner's failure to exhaust his claims in state court; (2) the unexhausted claims are not plainly meritless; and (3) the petitioner has not engaged in abusive litigation tactics or intentional delay. *Rhines v. Weber*, 544 U.S. 269, 277–78 (2005); *Haynes v. Quarterman*, 526 F.3d 189, 196 (5th Cir. 2008).

For the reasons set forth in detail in Respondent's response to this motion (ECF no. 208), Williams' motion for stay and abeyance is dilatory in nature and identifies as

unexhausted a group of claims which are most likely procedurally defaulted under state writ abuse principles, barred by AEDPA's one-year statute of limitations, or both. Finally, as explained above, all of Williams' unexhausted claims or the unexhausted portions of such claims are so lacking in arguable merit as to be unworthy of a CoA.

It is hereby ORDERED that (1) all relief requested in Williams' amended petition (ECF no. 76) or his reply brief (ECF no. 125) is DENIED; (2) Williams' is DENIED a Certificate of Appealability on all claims in this cause; (3) Williams' motion for stay and abeyance (ECF no. 205) is DENIED; and (4) all other pending motions are DENIED.

**IT IS SO ORDERED.**

**SIGNED September 22, 2026.**

**DAVID C. GODBEY**
**SENIOR UNITED STATES DISTRICT JUDGE**